# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RYAN MERHOLZ, and MELVYN KLEIN, Derivatively On Behalf Of WORLD WRESTLING ENTERTAINMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> VINCENT K. MCMAHON, STEPHANIE MCMAHON, PAUL LEVESQUE, FRANK A. RIDDICK, III, STUART U. GOLDFARB, LAUREEN ONG, ROBYN W. PETERSON, MAN JIT SINGH, JEFFREY R. SPEED, ALAN M. WEXLER, AND GEORGE A. BARRIOS, <br><br> Defendants, <br><br> WORLD WRESTLING ENTERTAINMENT, INC., <br><br> Nominal Defendant. | Case No.:   20-557 <br><br> **VERIFIED STOCKHOLDER** <br> **DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs  Ryan Merholz and Melvyn Klein ("Plaintiffs"), derivatively and on behalf of World Wrestling Entertainment, Inc. ("WWE" or the "Company"), by Plaintiffs' undersigned attorneys, for Plaintiffs complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United  States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WWE, Company press releases and conference call transcripts, and media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

I.     **NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought in the right, and for the benefit, of WWE against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") that occurred between February 7, 2019 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.     The Company was founded in 1980 and is headquartered in Stamford, Connecticut. The Company engages in the sports entertainment business in many venues around the globe, including in North America, Latin America, Europe, the Middle East, Africa, and Asia.

3.     In recent years, the Company entered into important strategic relationships with the Kingdom of Saudi Arabia, which the Company viewed as a critical emerging market and key to its growth plans and financial success in the face of decreasing domestic fan interest. These relationships included a multi-year television distribution rights agreement with the Orbit Showcase Network ("OSN"), a Saudi-controlled direct broadcast satellite provider serving the Middle East and North Africa ("MENA") region, and a 10-year partnership with the Saudi General Sports Authority to host live events in Saudi Arabia.

4.     The Company and its management faced blowback from fans and the media for their willingness to work with the Saudis, given the human rights abuses, denial of equal rights to women and minorities, and autocratic policies imposed during the reign of King Salman bin Abdulaziz Al Saud and his son, Crown Prince Mohammad bin Salman bin Abdulaziz Al Saud ("MBS"). These critical voices reached a crescendo following the October 2, 2018 murder of

journalist Jamal Khashoggi, widely believed to have been commissioned by the Saudi government.

5.      Soon after the murder of Khashoggi, the Company decided to proceed with a scheduled live event in Saudi Arabia, Crown Jewel, on November 2, 2018.  Several prominent wrestlers refused to participate, including John Cena and Daniel Bryan.  Although the Company decided to go forward with the event, citing contractual commitments, its representatives openly criticized the Saudi government.  For example, the Company's Chief Brand Officer (Defendant Stephanie McMahon) stated it was an "incredibly tough decision, given that heinous act."

6.      Unbeknownst to investors and the market, the events in late 2018 fomented simmering tensions between WWE and the Saudi government.  In particular, conservative elements of the Saudi government disliked the Company's portrayal of women and what they viewed as the questionable morality reflected in its programming and live shows.  At the same time, the Company was under immense pressure to justify its decision to continue working with the Saudi government and claimed that it was trying to push for change from within the country.

7.      By at least early 2019, tensions in the relationship between the Company and the Saudi government had reached a breaking point. The Saudi government had refused to make millions of dollars in payments owed to the Company.  Further, OSN was contemplating the early termination of its obligations under its broadcasting agreement and had rebuffed the Company's efforts to renew the agreement.  These developments threatened the Company's ability to reach a renewed media agreement in 2019, which the Company told investors was critical to its expansion plans and its growth prospects in the MENA region. Moreover, the Company was facing declining consumer interest in its traditional markets, which high-lighted the need for the Company to reach an agreement with the Saudis on favorable terms.  The broadcasting agreement with the Saudis, however, was eventually terminated in March of 2019.

8.     During the time period at issue, rather than disclose these adverse developments, Defendants represented that the Company had continued to bolster its relationship with Saudi Arabia and was making significant progress on the renewal of the critical broadcasting agreement and its business initiatives in the country.  For example, Defendants stated that WWE's "important partnership with the [Saudi] General Sports Authority" was "expected to continue to constitute a significant percentage of [WWE's] revenues" and that the Company had reached an "agreement in principle" on a renewed media rights deal for the MENA region. In reality, however, the prospects for a deal continued to worsen during this time period, as the Saudi government failed to make millions of dollars in additional payments owed to the Company following a June 2019 live event held in the country and the negotiations with OSN floundered.

9.     The Individual Defendants (defined below) are liable for causing harm to the Company by causing it to: (i) make false statements; and (ii) by failing to disclose adverse facts known to them about WWE, including (a) misleading the investing public regarding WWE's business and prospects; (b) artificially inflating the price of WWE securities; (c) permitting certain senior executives of WWE to sell more than $282 million worth of their personally held shares of Company stock at inflated prices; and (d) causing damages to the Company as a result, including the initiation of a proposed class action for securities fraud against the Company.

10.    On April 25, 2019, the Company disclosed disappointing financial results and fiscal guidance, which several analysts connected to the Company's dealings with the Saudis.  While Defendants insisted that negotiations were proceeding smoothly and nearing completion, this claim was shown to be false on October 31, 2019 when the Defendants caused the release of the Company's third quarter 2019 financial results.  Therein, the Company revealed significant underperformance across key metrics and surprised investors by disclosing that the MENA region

broadcasting deal had been indefinitely delayed.  In addition, it was reported that the Saudi government had withheld tens of millions of dollars in payments owed to WWE. The dispute culminated in a decision by WWE to cut a broadcasting feed of a live event held in Saudi Arabia. In retaliation, the Saudi government temporarily refused to allow several WWE wrestlers to leave the country in a "hostage situation" under the guise of mechanical airplane issues.

11.     Then, on January 30, 2020, the Company revealed that two of its longest serving senior executives – Defendants Barrios and Wilson – had been discharged from the Company. Shortly thereafter, on February 6, 2020, the Company again disclosed disappointing financial performance due to its failure to secure a favorable broadcasting deal with the Saudis and revealed that the Company's financial forecasting no longer included the Saudi broadcasting deal.

12.     As a result of these disclosures, the price of WWE stock dropped from a high of more than $100 per share to as low as $40.24 per share on February 6, 2020, representing a 60% share price decline.  However, the Company's most senior executives and directors took advantage of WWE's inflated stock price to sell millions of dollars' worth of their own WWE shares during this time period. In a single stock sale on March 27, 2019, WWE's Chief Executive Officer ("CEO") and Chairman of the Board, Defendant V. McMahon, sold more than 3.2 million WWE shares for over $261 million in proceeds.  This sale occurred when there were only a few days left in the Company's 2019 first quarter which insiders knew was experiencing poor financial performance and despite growing behind-the-scenes problems with the Saudis.

## II.   JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Sections 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §

1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, a substantial portion of the transactions and wrongs, complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

### III.    PARTIES

#### A.    Plaintiffs

15.     Plaintiff Ryan Merholz is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

16.     Plaintiff Melvyn Klein is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

#### B.    Nominal Defendant

17.     Defendant World Wrestling Entertainment, Inc. is headquartered in Stamford, Connecticut.  WWE Class A common stock is listed and trades on the NYSE under the ticker symbol "WWE."  The holders of WWE Class A common stock generally have the same rights as holders of WWE Class B common stock, except that holders of Class A common stock are entitled to one vote per share, whereas holders of Class B common stock are entitled to ten votes per share. Defendants admit that because "[a] substantial majority of the issued and outstanding shares of Class B common stock is owned beneficially by [defendant] McMahon," "he controls a majority of the voting power of [WWE] common stock and can effectively exercise control over [WWE's] affairs."

#### C.    Directors

18.     **Defendant Vincent K. McMahon** ("V. McMahon") has been the Chairman of the Board of Directors ("Board") and Chief Executive Officer ("CEO") of the Company since 1980.

19.     **Defendant Stephanie McMahon** ("S. McMahon") is a director and Chief Brand Officer of the Company since 2015.

20.     **Defendant Paul Levesque** ("Levesque") is a director and the EVP of Global Talent Strategy & Development since 2015.

21.     **Defendant Frank A. Riddick, III** ("Riddick") is a director and Interim Chief Financial Officer of the Company since 2008.

22.     **Defendant Stuart U. Goldfarb** ("Goldfarb") is a director of the Company since 2011.  Defendant Goldfard is also a member of the Audit Committee and the Governance and Nominating Committee.

23.     **Defendant Laureen Ong** ("Ong") is a director of the Company.  Defendant Ong is also the Chair of the Compensation Committee and the Governance and Nominating Committee.

24.     **Defendant Robyn W. Peterson** ("Peterson") is a director of the Company. Defendant Peterson is also a member of the Governance and Nominating Committee.

25.     **Defendant Man Jit Singh** ("Singh") is a director of the Company.  Defendant Singh is also a member of the Audit Committee.

26.     **Defendant Jeffrey R. Speed** ("Speed") is a director of the Company.  Defendant Speed is Chair of the Audit Committee and a member of the Compensation Committee.

27.     **Defendant Alan M. Wexler** ("Wexler") is a director of the Company.  Defendant Wexler is a member of the Compensation Committee.

28.     Defendants McMahon, S. McMahon, Levesque, Riddick, Goldfarb, Ong, Peterson, Singh, Speed, and Wexler are collectively hereinafter referred to as the "Director Defendants."

29.    The Directors Defendants breached their duties to the Company by making or causing the Company to make false statements that artificially inflated the price of WWE securities during the Relevant Period.   The Director Defendants, because of their positions with the Company, possessed the power and authority to control the contents of WWE's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

**Officer Defendants**

30.    ***Defendants George A. Barrios*** ("Barrios") was a Co-President of WWE, its principle financial officer and a member of the Company's Board.  On January 30, 2020, WWE announced that Barrios had abruptly left the Company "effective immediately."

31.    ***Defendant Michelle D. Wilson*** ("Wilson") was a Co-President of WWE and a member of the Company's Board. On January 30, 2020, WWE announced that Wilson had abruptly left the Company "effective immediately."

32.    The Director Defendants and Defendants Barrios and Wilson are herein referred to as the "Individual Defendants."

## THE AUDIT COMMITTEE CHARTER

33.    The Audit Committee Charter states in relevant part:

The Audit Committee shall provide assistance to the Directors in fulfilling their responsibility to the stockholders, potential stockholders, and investment community relating to corporate accounting, reporting practices of the Company and the quality and integrity of financial reports of the Company.  In so doing, the Audit Committee shall assist the Board in overseeing:

•    the accounting and financial reporting practices of the Company;

•    the audits of the Company's financial statements including without limitation the performance of the Company's internal controls and internal audit function and the independent auditor's qualifications, independence and performance;

- the integrity of the Company's financial statements;
- the Company's compliance with legal and regulatory requirements; and

- the Company's system of disclosure controls and system of internal controls regarding finance, accounting, legal compliance and ethics that management and the Board have established.

While certain duties and responsibilities of the Audit Committee are more specifically set forth below, the general function of the Audit Committee is oversight.

Management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements. In addition, management is responsible for maintaining appropriate accounting and financial reporting principles and policies and internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations.

Each member of the Audit Committee may rely on (i) the integrity of those persons and organizations within and outside the Company from which it receives information; and (ii) the accuracy of the financial and other information provided to the Audit Committee by such persons or organizations absent actual knowledge to the contrary (which shall promptly be reported to the Board).

As more fully described in "Responsibilities" below, the outside auditors for the Company are accountable to the Audit Committee. The outside auditors shall submit to the Audit Committee and the Company annually a formal written statement delineating all relationships between the outside auditors and the Company ("Statement as to Independence"), addressing at least the matters set forth in Independence Standard No. 1 adopted by the Independence Standards Board.

\*     \*     \*

RESPONSIBILITIES

The Audit Committee will primarily fulfill its responsibilities by carrying out the activities enumerated in this Section below. The Audit Committee will report regularly to the Board regarding the execution of these duties and responsibilities, including, without limitation, its (i) evaluation of the independent auditors; (ii) the quality and integrity of the Company's financial statements; (iii) the Company's compliance with legal  and regulatory requirements; (iv) the qualifications, performance and independence of the Company's independent auditors; and (v) the performance of the internal audit function. The Audit Committee has the authority, without seeking Board approval, to, and shall, obtain advice and assistance from outside legal, accounting and/or other advisors as deemed appropriate by the Committee to fully execute its duties and responsibilities. The Company shall

provide appropriate funding, as determined by the Audit Committee, for compensation for the independent auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attestation services and for any outside legal, accounting and other advisers that the Audit Committee may choose to engage and for ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties. None of the Committee's responsibilities may be delegated to any other committee of the Board.

The Audit Committee shall:

Documents/Reports/Accounting Information Review

1.    Review this Charter at least annually, and recommend to the Board any necessary amendments as conditions dictate.

2.    Review and discuss with management and the independent auditor the Company's audited financial statements, quarterly financial statements and all internal controls reports (or summaries thereof). Review any other relevant reports or financial information submitted by the Company to any governmental body, or the public, including management certifications as required by the SarbanesOxley Act of 2002 (Sections 302 and 906) and relevant reports rendered by the independent auditors (or summaries thereof).

3.    Review with financial management and the independent auditor each Quarterly Report on Form 10-Q and each Annual Report on Form 10-K (including, without limitation, the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") prior to its filing.

4.    Review and discuss earnings press releases with management, including the type and presentation of information, paying particular attention to any use of "proforma", "adjusted" or other information which is not required by generally accepted accounting principles ("GAAP").

5.    Review and discuss with management financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be on general terms (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not be in advance of each earnings release or earnings guidance.

6.    Review the regular internal reports (or summaries thereof) to management prepared by the internal auditing department and management's response.

7.    Recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

8.    Obtain from the outside auditor assurance that the audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934, as amended, which sets forth certain procedures to be followed in any audit of financial statements required under the Securities Exchange Act of 1934.

Independent Auditors

9.    Have sole authority to appoint (subject to stockholder ratification), compensate, retain and oversee the work performed by the independent auditor engaged for the purpose of preparing and issuing an audit report or performing other audit, review or attest services for the Company. The Audit Committee shall have the ultimate authority to approve all audit engagement fees and terms. The Audit Committee shall have sole authority to review the performance of the independent auditor and remove the independent auditor if circumstances warrant. The independent auditor shall report directly to the Audit Committee and the Audit Committee shall oversee the resolution of any disagreement between management and the independent auditor in the event that any may arise.

10.    Review with the independent auditor (without representatives of management when deemed necessary) reports or communications (and management's and/or the internal audit department's response thereto) submitted to the Audit Committee by the outside auditors required by or referred to in PCAOB AU 380 and SEC Rule 2-07 of Regulation S-X; review any problems or difficulties with an audit and management's response, including any restrictions on the scope of the independent auditor's activities or access to requested information, and any significant disagreements with management; and review and hold timely discussions with the independent auditor regarding the following:

- all critical accounting policies and practices and other major issues Regarding accounting principles and financial statement presentations, including significant changes in accounting principles;

- all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

- other material written communications between the independent auditor and management including, but not limited to, any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor and schedule of unadjusted

differences;

- the scope of the annual audit;

- the audited financial statements and disclosures made in Management's Discussion and Analysis;

- significant risks and exposures, if any, and the steps taken to monitor and minimize such risks;

- any other significant matters arising from any audit or report or communication referred to in items 2 or 3 above, whether raised by management, the internal audit department or the outside auditor, relating to the Company's financial statements;

- review the form of opinion the outside auditor proposes to render to the Board and stockholders;

- any accounting adjustments that were noted or proposed by the independent auditor but were "passed" (as immaterial or otherwise); and

- any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement.

11. At least annually, obtain and review a report by the independent auditor to allow the Committee to evaluate the independent auditor's qualifications, performance and independence. The independent auditor's report shall describe:

- the firm's internal quality control procedures, the budget, staffing and responsibilities of the internal audit department and any recommended changes in the planned scope of the internal audit;

- any material issues raised by the most recent internal quality-control review or peer review of the independent auditor, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues;

- (to assess the auditor's independence) all relationships between the independent auditor and the Company;

This Committee's evaluation of the independent auditor shall include the review

and evaluation of the lead partner and shall take into account the opinions of management and the Company's internal auditor (or other personnel responsible for the internal audit functions). The Audit Committee shall present its conclusions with respect to the independent auditor to the full Board.

12. Review audit services and approve in advance non audit services to be provided by the independent auditor, taking into consideration SEC rules regarding permissible and impermissible services by such independent auditor. This duty may be delegated to one or more designated members of the Audit Committee with any such preapproval reported to the Audit Committee at its next regularly scheduled meeting. Approval of non audit services shall be disclosed to investors in periodic reports to the extent required by Section 13(a) of the Securities Exchange Act of 1934.

13. Set clear hiring policies, compliant with governing laws or regulations, for employees or former employees of the independent auditor.

14. Review and evaluate the lead audit partner of the independent auditor.

15. Assure the regular rotation of the lead audit partner as required by law, and further consider whether regular rotation of the independent auditor itself is advisable to assure continuing auditor independence.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background

34.     The Company engages in the sports entertainment business in North America, Europe, the Middle East, Africa, the Asia Pacific, and Latin America.  As in other professional wrestling promotions, the Company's shows are not legitimate contests, but are entertainment based and feature storyline-driven, scripted, and choreographed matches, though matches often include moves that can put performers at risk of injury, even death, if not performed correctly. Since the 1980s, WWE has publicly branded its product as sports entertainment, acknowledging the product's roots in competitive sport and dramatic theater.

35.     WWE personnel consist of professional wrestlers, managers, play-by-play and color commentators, ring announcers, interviewers, referees, trainers, producers, script writers, and various other positions. As of February 2019, WWE had 915 employees, excluding its

hundreds of "Superstars" and "NXT" talent, which it considers independent contractors. Main roster personnel are assigned to one of three primary brands - Raw, SmackDown, and NXT - and primarily appear on Monday Night Raw, Friday Night SmackDown, or NXT, while cruiserweight wrestlers appear on 205 Live and wrestlers from NXT UK appear on their own weekly show.

36.    Personnel can also appear on WWE's other weekly television programming, as well on pay-per-view and untelevised live events.

37.    WWE reports revenues in three segments: Live Events, Media, and Consumer Goods (merchandise).  Live Events provides ongoing content for WWE's media platforms and Live Event segment revenues consist primarily of ticket sales, including primary and secondary distribution, revenues from events for which WWE receives a fixed fee, as well as the sale of travel packages associated with the Company's global live events.  The Media segment reflects the production and monetization of long-form and short-form media content across various platforms, including WWE Network, pay television, digital and social media, as well as filmed entertainment. Across these platforms, revenues principally consist of content rights fees, subscriptions to WWE Network, and advertising and sponsorships. Media net revenues were $683.4 million, $535.6 million, and $476.9 million, representing 73%, 67%, and 65% of WWE's total net revenues in fiscal years 2018, 2017, and 2016, respectively.

38.    The Kingdom of Saudi Arabia is an absolute monarchy ruled by the Al Saud royal family.  Beginning in 2014, the Saudi government began hosting several WWE live events in Saudi Arabia. The events were very lucrative for WWE, and later expanded as part of Saudi Arabia's social and economic reform program, Saudi Vision 2030.

39.    OSN is a direct-broadcast satellite provider serving the MENA region. OSN has traditionally offered popular entertainment content such as movies, sporting events, and various

TV shows from major U.S. and international networks and studios, in addition to local versions specifically for the MENA region. The OSN network is owned and operated by Panther Media Group Limited, a joint venture between a Kuwait-based company and Mawarid Holding, a private Saudi investment company controlled by the Al Saud royal Saudi family.

40.     On July 21, 2014, WWE and OSN announced a five-year exclusive media agreement, stating that "WWE's flagship television program Monday Night Raw [would] air live on OSN, WWE's exclusive pay TV partner in the Middle East and North Africa through 2019." According to a press release, WWE and OSN put out that day, "[u]nder this new agreement, fans [could] now enjoy all of WWE's programming, including Raw, SmackDown®, NXT™ and Main Event™, as well as WWE pay-per-view events including WrestleMania® and SummerSlam®, in one place on OSN Sports 2 HD."  The release further stated in pertinent part as follows:

> "OSN and WWE have a long standing relationship and we are very excited to be taking that to the next level," said Andy Warkman, OSN's VP of Sport & Production. "For the first time in the region, all core WWE programming will be available in one place, making OSN the home of WWE, reaching an audience across more than 20 countries.  This deal furthers our commitment to bringing our customers the best content."

41.     "WWE is very excited to be extending and expanding its deal with OSN in the Middle East," said Carlo Nohra, General Manager of WWE Middle East. "OSN hosts some of the very best international entertainment and sports programming and is the perfect home for WWE programming.  Together with OSN, we will continue to grow our TV, pay-per-view, live event and consumer products businesses across the Middle East."

42.     On February 15, 2015, WWE and OSN jointly issued a release stating they were adding WWE Network to the five-year agreement as part of an expanded partnership.

43.     In the years that followed, expansion into the MENA region became an increasingly important part of WWE's business plans and growth initiatives, as the Middle East grew to become

the Company's second largest market by monetization.  Key to this expansion was the Company's

desire to deepen its relationship with the Saudi government, which it planned to leverage into

increased penetration and monetization of the entire MENA region.

44.     Towards this end, in March 2018, the Saudi Press Agency announced that WWE

and the Saudi General Sports Authority had signed a 10-year multi-platform partnership with

WWE to hold wrestling events in the country.  Analysts estimated the partnership was worth about

$500 million to WWE.  A press release issued by WWE and the Saudi General Sports Authority

described the deal as follows:

> The Saudi General Sports Authority in partnership with WWE will present the
> Greatest Royal Rumble event at the King Abdullah Sports City in Jeddah, Saudi
> Arabia on Friday, April 27. For the first time ever, the Royal Rumble match will
> feature 50 WWE Superstars. As part of this historic event, fans will see WWE
> Superstars John Cena™, Triple H™, Roman Reigns™, AJ Styles™, Braun
> Strowman™, The New Day™, Randy Orton™, Bray Wyatt™ and Shinsuke
> Nakamura™, among others.
>
> *       *       *
>
> Ticket and broadcast information will be available in the coming weeks. This event
> is part of a 10-year strategic multiplatform partnership in support of Vision 2030,
> Saudi Arabia's social and economic reform program.

45.     "The Greatest Royal Rumble will be a spectacle of historic proportions," said Vince

McMahon, WWE Chairman & CEO. "Our partnership with the Saudi General Sports Authority

reflects a long-term commitment to present WWE's world-class entertainment to a global audience

on a grander scale than ever before."

46.     The first event held under the Saudi partnership was the Greatest Royal Rumble,

which took place on April 27, 2018 at the King Abdullah International Stadium in Jeddah, Saudi

Arabia. WWE hailed the event as the largest "outside the U.S. in the past 16 years" and a major

contributor to the Company's "record" second quarter 2018 results. Speaking during an earnings

call with investors, Defendant Wilson stated that, "[a]s added proof of the compelling nature of our content, last Friday, we held one of our largest events ever outside the United States, with a sold-out crowd at the Greatest Royal Rumble event in Jeddah, Saudi Arabia." She continued, stating that "[t]he April 27th event marked the successful beginning of a 10-year partnership with the Kingdom of Saudi Arabia."

47.     Although WWE was criticized for holding the event without female wrestlers in accord with Saudi government policies, female fans were allowed to attend if accompanied by a male guardian. During the show, a WWE commercial was aired that included female wrestlers in their ordinary regalia, inciting the Saudi General Sports Commission to issue an apology to Saudi citizens for the "indecent material." WWE also sought to tamp down allegations that the partnership gave legitimacy and cover to an oppressive regime. For example, Defendant Levesque (known by his stage name, "Triple H"), WWE's Executive Vice President of Talent, Live Events and Creative, responded to the criticism: "'I understand that people are questioning it, but you have to understand that every culture is different and just because you don't agree with a certain aspect of it, it doesn't mean it's not a relevant culture. You can't dictate to a country or a religion about how they handle things but, having said that, WWE is at the forefront of a women's evolution in the world and what you can't do is effect change anywhere by staying away from it.'" He continued: "'While, right now, women are not competing in the event, we have had discussions about that and we believe and hope that, in the next few years they will be.'"

48.     Despite the criticism, WWE continued to view business dealings with the Saudi government as a lucrative entrance point into the MENA region and a key pillar of its business plans. For example, in discussing the Company's "record" second quarter 2018 results, Defendant V. McMahon stated: "'We're pleased with our continued success in increasing the monetization

of WWE content globally." He claimed this "'success is evidenced by the development of a 10-year strategic partnership with the Saudi General Sports Authority,'" which he listed as among the Company's most important international initiatives.

49.     On October 2, 2018, the world was shocked to learn of the murder of journalist Jamal Khashoggi, in which the Saudi government was implicated. It was rumored that the next anticipated WWE live event scheduled to take place in Saudi Arabia, Crown Jewel, might be cancelled. But the event went forward, with WWE stating on October 25, 2018, in connection with its third quarter 2018 results, that, "[s]imilar to other U.S.-based companies who plan to continue operations in Saudi Arabia, the Company has decided to uphold its contractual obligations to the General Sports Authority." However, the incident placed added strain on the relationship between WWE and the Saudi government, which had begun to break down by at least the start of 2019. The Saudis withheld millions of dollars in money owed to WWE under the parties' agreements and decided to prematurely pull WWE programming on OSN as the parties entered a critical bargaining period, with the MENA media rights agreement coming up for renewal during the year.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE RELEVANT PERIOD

50.     On February 7, 2019, Defendants caused WWE to issue a press release announcing its fourth quarter and fiscal 2018 ("4Q18" and "FY18") financial results for the period ended December 31, 2018 and providing fiscal year 2019 ("FY19") financial guidance. The press release stated that during FY18, WWE had successfully "[p]roduced new, large-scale international events (Greatest Royal Rumble, Crown Jewel and Super Show-Down) and compelling content across platforms." Discussing the Company's then-present business metrics and financial prospects, the release highlighted the Company's monetization of international markets, including Saudi Arabia. It stated in pertinent part as follows:

"In 2018, WWE generated the highest level of revenue and earnings in the Company's history by leveraging our brand strength to increase the monetization of our content worldwide," stated Vince McMahon, Chairman and Chief Executive Officer. "Our long-term growth strategy will continue to focus on content creation, digitization and international development."

George Barrios, WWE Co-President, added "We increased revenue by nearly $130 million, and achieved a record level of Adjusted OIBDA and network subscribers. We expect to balance 2019 revenue growth with investment in strategic areas that extend the moat around our business, enabling us to continue our business transformation and maximize shareholder value."

51.     The press release also stated that WWE expected to achieve "Adjusted OIBDA of at least $200 million" for the year, stating in pertinent part:

**Financial Outlook 2019**

In 2019, WWE management expects the Company to achieve another year of record revenue of approximately $1.0 billion and, as previously communicated, is targeting Adjusted OIBDA of at least $200 million, which would also be an all-time record (up at least 12% from Adjusted OIBDA of $178.9 million in 2018).

Management believes that increasing fan engagement over the next few years can enhance WWE's brand value and strengthen the Company's ability to optimize the value of its content over the long-term.  Given the potential magnitude of this opportunity and its importance to long-term growth, the Company plans to continue to invest in content, digitization and international development.

*       *       *

Achieving the targeted range of full year results assumes substantial revenue, which supports Adjusted OIBDA of at least $100 million in the fourth quarter.  (Footnote omitted.)

52.     During the earnings call to discuss WWE's 4Q18 results, Defendant V. McMahon stated: "Our international revenue surpassed $300 million for the first time in history . . . [as] we performed large-scale record-breaking events, [including] Greatest Royal Rumble.  Similarly, Defendant Barrios stated: "[I]n 2018, we effectively executed our strategy, leveraged our brand to increase the monetization of our content worldwide and across multiple platforms . . . with international markets surpassing $300 million for the first time in our history." He also tied the

$200 million adjusted OIBDA projection to the Company's continued success and efforts in the Middle East region.  He further stated in pertinent part:

> So if we're moving revenue at a faster clip than we anticipate, we may put some additional investments in the fourth quarter but all geared towards hitting that $200 million in OIBDA for the year. And as we talked about in the prepared remarks, it really is on those areas of continuing to drive content, especially the localization of our current content and potentially local content in some of our key international markets. We just think that's a big addition to the flywheel that we've built. We'll continue to invest in digital products and digitization kind of writ large, the network being kind of one of the largest manifestations of that. And we'll continue to put more people, more kind of functional roles in our key markets, in India, in the Middle East, in China, in Latin America. So that's what we're going to do. As we said again in the prepared remarks, we think there's a long tail for us in the monetization of content, both in the U.S. and outside the U .S. and we think the opportunity is one we want to make sure we take advantage of. In terms of the rights renewal process outside the U.S., obviously, there's a lot of key markets that we're still working on, U.K., India, China, Latin America, the Middle East. We'll announce those as the deals get done or shortly thereafter.

53.    On February 7, 2019, Defendants caused the Company to file its FY18 Annual Report on Form 10-K with the SEC ("FY18 10-K").  The FY18 10-K emphasized the continuing importance of the Company's Saudi business dealings, stating in pertinent part as follows:

**Customers**

> Our customers include content distributors of our media content through their networks and platforms, fans who purchase tickets to our live events, purchase our merchandise at venues or online through our eCommerce platforms and subscribers to WWE Network, advertisers and sponsors, consumer product licensees, and film distributors/buyers. As noted elsewhere, we have several important partners, including NBCU who carries the domestic television distribution of Raw and, until October 2019, SmackDown Live, the Fox Network which beginning October 2019 will begin distributing SmackDown Live, and the General Sports Authority of the Kingdom of Saudi Arabia who, among other things, hosts our live events in the Middle East.

54.    In addition, the FY18 10-K emphasized the importance of the Saudi relationship, stating that, "[i]n 2018, WWE embarked on an important long-term partnership with the General Sports Authority of the Kingdom of Saudi Arabia for, among other things, a series of live events in that region."  It also stated that WWE had "an important partnership with the General Sports

Authority of the Kingdom of Saudi Arabia" that was then "expected to continue to constitute a significant percentage of [WWE's] revenues."

55.    On February 7, 2019, Defendants caused the Company to issue a press release "announc[ing] that the Company's Board of Directors ha[d] authorized a stock repurchase program of up to $500 million of the Company's common stock." The release quoted Defendant Barrios (who would ultimately sell over $3.3 million worth of his WWE stock that same month) as stating in pertinent part as follows:

> "The authorization of a stock repurchase program underscores our commitment to the Company's shareholders. The decision is supported by WWE's strong financial performance and demonstrates our confidence in the Company's future. We believe we can continue to invest for future growth, maintain financial flexibility and return excess capital to shareholders, all of which should keep us on the path toward building long-term value."

56.    On February 26, 2019, Defendant Barrios presented to investors at the Morgan Stanley Technology, Media & Telecom Conference. He stated that the negotiations on the MENA distribution rights deal were "ongoing," with a target to "get that locked down by the middle of the year." He further stated that the "Middle East is now #2 in 2018 after the U.S." in terms of gross monetization and "important for us strategically because our distribution partners for the core content is a key part of the value creation for the business, important for us financially."

57.    The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) WWE was experiencing rising tension with the Saudi government and a breakdown in negotiations over a renewed broadcasting distribution deal; (ii) the Saudi government and its affiliates had failed to make millions of dollars in payments owed to WWE pursuant to existing contractual commitments between the parties; (iii) OSN had

terminated the broadcast of WWE programming in the first quarter of 2019 despite a contractual obligation to continue such broadcasts, which cancellation was symptomatic of a deterioration in the business relationship between the parties; (iv) OSN had rebuffed efforts to renew a distribution rights agreement on terms acceptable to WWE, and such renewal was unlikely to occur in 2019, if ever; (v) WWE did not have the ability to expand its operations in the Middle East or within Saudi Arabia as had been represented to investors; and (vi) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

58.     On April 25, 2019, WWE reported disappointing first quarter 2019 ("1Q19") financial results, revealing that revenues had fallen year over year on notable declines in the live events and consumer products segments. In addition, WWE announced lower than expected guidance for its second quarter of 2019 ("2Q19") but maintained full-year guidance of "at least $200 million" in adjusted OIBDA.  The Company also revealed a $24 million uptick in accounts receivables but claimed that this reflected the ordinary timing of different events.  WWE blamed the absence of certain "Super Stars" for the poor performance, but several analysts tied the disappointing results and guidance to potential delays in scheduling a live Saudi event.

59.     On this news, WWE's stock price fell $13.12 per share, or 13.12%, to close at $85.38 per share on April 25, 2019, on unusually high volume of more than 10 million shares traded. However, by continuing to conceal the true status of the deterioration in WWE's relationship with the Saudis and reaffirming the Company's fiscal 2019 ("FY19") financial guidance, Defendants maintained the artificial inflation in the price of WWE securities.

60.     In addition, Defendants continued to provide false and misleading statements to the market.  For example, although the 1Q19 press release stated that 2Q19 OIBDA would be reduced

due to "the timing of strategic investments," it failed to disclose the breakdown of the critical Saudi relationship that had occurred behind the scenes and that threatened the Company's business and prospects. The press release stated in pertinent part as follows:

**Second Quarter 2019 Business Outlook**

For the second quarter 2019, the Company estimates Adjusted OIBDA of $19 million to $24 million. This range of results represents a year-over-year decline in Adjusted OIBDA driven by increases in fixed costs, including the timing of strategic investments.

**Financial Outlook 2019**

In 2019, WWE management is targeting another year of record revenue of approximately $1.0 billion and, as previously communicated, Adjusted OIBDA of at least $200 million, which would also be an all-time record (up at least 12% from Adjusted OIBDA of $178.9 million in 2018).

Achieving the targeted range of full year results assumes substantial revenue, which supports Adjusted OIBDA of at least $100 million in the fourth quarter.  (Footnote omitted.)

61.     On July 25, 2019, WWE reported its financial results for 2Q19, ended June 30, 2019.  The release stated that, "[d]uring the quarter, WWE continued to demonstrate success in staging large-scale, action packed events for its fans, including . . . Super ShowDown in Jeddah, Saudi Arabia."  The Super ShowDown event had occurred on June 7, 2019, and the release touted the event as a major driver of WWE's results and portrayed the Company's successful operations in Saudi Arabia as a pillar of its FY19 financial guidance.  The press release stated in pertinent part as follows:

George Barrios, Co-President, added "In the quarter, our earnings exceeded guidance, however we anticipate a portion of this to reverse and we continue to target full-year Adjusted OIBDA of at least $200 million. The guidance presupposes the staging of a second large scale international event and the completion of a media rights deal in the MENA region. As we optimize near-term results, we will continue to focus on content creation, localization and digitization, including the evolution of our direct-to-consumer network, to drive long-term growth."

Second-Quarter Consolidated Results

\*       \*       \*

Adjusted OIBDA (which excludes stock compensation) was $34.6 million as compared to $43.5 million and the Company's Adjusted OIBDA margin was 13% as compared to 15% in the prior year quarter, respectively. The current period results exceeded guidance primarily due to enhanced revenue recognized in conjunction with the Company's recent event in Saudi Arabia, which is expected to reverse in connection with an anticipated fourth quarter event in that country.

\*       \*       \*

Cash flows used in operating activities were $7.6 million as compared to $74.2 million of cash generated in the prior year quarter driven by unfavorable changes in working capital, which was primarily related to the timing of the Saudi event in June as the prior year event was held in April, as well as lower operating performance.

62.     The release also stated that WWE had reached non-binding "agreements in principle with the Saudi General Sports Authority on the broad terms" for a second large scale live event and a media rights deal for the MENA region.  It stated in pertinent part:

**Financial Outlook 2019**

The Company reiterated its full year guidance, which targets revenue of approximately $1 billion and Adjusted OIBDA of at least $200 million. This guidance assumes continued improvement in WWE's engagement metrics, a second large scale event in the MENA region, and the completion of a media rights deal in the MENA region. The Company believes it has agreements in principle with the Saudi General Sports Authority on the broad terms for the latter two items; however, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or that engagement does not improve as assumed. The Company has evaluated these potential outcomes and currently believes that the most likely downside to its Adjusted OIBDA would be approximately $10 million to $20 million below its current outlook.

The Company's full year guidance reflects strong fourth quarter results with substantial revenue growth from both the Company's new content distribution agreements in the U.S., which become effective in that period, and the aforementioned media rights deal in the MENA region.  (Footnote omitted.)

63.     That same day, Defendants held an earnings call to discuss WWE's 2Q19 results

in which Defendants V. McMahon, Wilson, and Barrios participated.  During his prepared remarks, Defendant V. McMahon stated: "Obviously, there's India and MENA to do, and we are going to be close to announcing those deals very soon."

64.     Similarly, Defendant Barrios stated that, "[d]uring the quarter, we achieved adjusted OIBDA of $34.6 million, which exceeded our guidance, primarily due to enhanced revenue recognized in conjunction with our recent event in Saudi Arabia. That enhanced revenue is expected to reverse in connection with an anticipated fourth quarter event in that country."

65.     During her prepared remarks, Defendant Wilson stated: "During the quarter, we continue[d] to successfully stage large-scale events for our fans, including . . . Super ShowDown in Jeddah, Saudi Arabia."

66.     Later in the call, Defendant Barrios provided more color on the Company's guidance and the positive impact of the Saudi relationship, stating in pertinent part as follows:

> For the full year, we continue to target record revenue of approximately $1 billion and adjusted OIBDA of at least $200 million.  This guidance assumes continued improvement in our engagement metrics, a second large-scale event in the MENA region and the completion of a media rights deal in the MENA region. We believe we have agreements in principles with the Saudi – in principle with the Saudi General Sports Authority on the broad terms for the latter 2 items.  However, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or the engagement does not improve as assumed. We valued these potential outcomes and currently believe that [the] most likely downside to our adjusted OIBDA would be approximately $10 million to $20 million below our current outlook. Our full year guidance reflects strong fourth quarter results, substantial revenue growth from both our new content distribution agreements in the U.S. which become effective in that period, and the aforementioned media rights deal in the MENA region.

67.     The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) WWE's relationship with the Saudi

25

government had continued to deteriorate; (ii) the Saudi government and its affiliates had failed to make millions of dollars in payments owed to WWE pursuant to existing contractual commitments between the parties, including at least $60 million owed in connection with the June 2019 Super ShowDown event; (iii) OSN had refused to restart the broadcast of WWE programming despite a contractual obligation to continue such broadcasts, which refusal was symptomatic of a deterioration in the business relationship between the parties; (iv) OSN had rebuffed efforts to renew a distribution rights agreement on terms acceptable to WWE and such renewal was unlikely to occur in 2019, if ever; (v) WWE did not have the ability to expand its operations in the Middle East or within Saudi Arabia as had been represented to investors; and (vi) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

68.     On October 31, 2019, WWE issued a press release providing the Company's third quarter 2019 ("3Q19") financial results. The press release stated that the Company's revenues and operating income had continued to decline year over year to $186.3 million and $6.4 million, respectively. The Company also announced that it was lowering its FY19 adjusted OIBDA guidance to a range of $180 million to $190 million due in large part to WWE's failure to complete a MENA distribution agreement with the Saudis. On a conference call to discuss the results, Defendant Barrios stated that "no assurances" could be given that the deal would ever be completed.

69.     That same day, WWE held the Crown Jewel live event in Riyadh, Saudi Arabia. After the event ended, shocking news reports surfaced claiming that the Saudi government was effectively holding a number of WWE wrestlers "hostage" in retaliation for Defendant V. McMahon's decision to delay a live broadcast of Crown Jewel until the Saudis made tens of

millions of dollars in past due payments. Estimates for the amount outstanding ranged from $60 million to as much as $500 million. Several wrestlers detailed their experience during the ordeal on social media platforms.

70.    Reports based on discussions with Company insiders claimed that this blowup was just the latest iteration of a long-standing Saudi pattern and practice of failing to make necessary payments.  For example, professional wrestling journalist Brad Shepard stated that he had spoken to a source within WWE who had stated "that every show [the Saudis] come up short on money owed by about a couple of million, and they provide the excuse of it being a 'departmental issue' and they promise to send the money within a short time frame later – but never do."  He continued: "So, there's a belief within WWE that they are either getting screwed on the deal with Saudi Arabia or something else is going on – which I won't speculate. I once again asked if women's wrestling had anything to do with this and was once again told yes, partly."

71.    As reported by *The Wall Street Journal* that evening, Benchmark analyst Mike Hickey stated that "by lowering its outlook now rather than missing fourth-quarter expectations, the company is signaling that it doesn't have a lot of confidence a deal will get done."

72.    On this news, WWE's stock price fell $10.40 per share, or 15.65%, to close at $56.04 per share on October 31, 2019, on unusually high volume of more than 7.5 million shares traded.

73.    On January 30, 2020, WWE announced that two of its most senior and longest serving executives, Defendants Barrios and Wilson, had abruptly left the Company.  Analysts and market commentators reacted with shock at the sudden loss of two key figures who had long been part of the public face of the Company. For example, *Forbes* described the departures as a "bloodbath" that had caused "[p]anic and uncertainty" throughout WWE's corporate offices.

74.     On this news, WWE's stock price fell $13.42 per share, or 21.54%, to close at $48.88 per share on January 31, 2020, on unusually high volume of more than 19.4 million shares traded.

75.     Then, just a few days later, on February 6, 2020, WWE again announced disappointing financial results and guidance.  The earnings release issued by the Company revealed that consumer engagement metrics had continued to deteriorate in the fourth quarter, and that the Company had achieved just $180 million in adjusted OBIDA for the year due to the failure to complete the MENA distribution agreement with the Saudis. On an earnings call to discuss the results, WWE's CFO, Frank Riddick, confirmed that the Company's 2020 financial guidance did not include any revenues related to a prospective MENA deal.

76.     On this news, WWE's stock price fell another $4.50 per share, or 9.18%, to close at $44.50 per share on February 6, 2020, on unusually high volume of more than 15.5 million shares traded.

## DUTIES OF THE DIRECTOR DEFENDANTS

77.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

78.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or

directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

79.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state

securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

80.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

81.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

83.     Plaintiffs will adequately and fairly represent the interests of the Company in

enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

84.     Plaintiffs are current owners of the Company stock and have continuously been an owners of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

85.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

86.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

87.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

88.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

89.     Each of the Director Defendants authorized and/or permitted the false statements

to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

90.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant V. McMahon**

91.     The principal professional occupation of Defendant V. McMahon is his employment with the Company as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   Additionally, Defendant V. McMahon is a named defendant in the securities class action entitled *Paul Szaniawski v. World Wrestling Entertainment, Inc., et al.*, Case 1:20-cv-02223 (S.D.N.Y) (the "Securities Class Action").

92.     Defendant V. McMahon owns a majority of Alpha Entertainment, LLC ("Alpha"), which owns and operates the professional football league XFL.  Under arrangements made at the time of its organization, WWE received, among other things, an equity interest in Alpha without payment by, or other financial obligation on the part of, WWE; WWE sold certain intellectual property rights relating to XFL to Alpha for a payment in the amount of $1 million; and WWE entered into a support services agreement under which WWE provides Alpha certain administrative support services on a cost-plus margin basis.  During the year ended December 31, 2019, Alpha was billed approximately $3.25 million for services under the administrative support services agreement, of which $236,000 was due at year end and subsequently paid.

**Defendant S. McMahon**

93.     The principal professional occupation of Defendant S. McMahon is her employment with the Company as its Chief Brand Officer, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits.   Defendant S. McMahon is also the daughter of Defendant V. McMahon.

**Defendant Levesque**

94.     The principal professional occupation of Defendant Levesque is his employment with the Company as its EVP of Global Talent Strategy & Development, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Defendant Levesque is the husband of Defendant S. McMahon.

**Defendant Riddick**

95.     The principal professional occupation of Defendant Riddick is his employment with the Company as its Interim Chief Financial Officer, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.

**Defendants Goldfarb, Singh and Speed**

96.     Demand is excused because Defendants Goldfarb, Singh and Speed face a substantial likelihood of liability for their misconduct.

97.     During the Relevant Period, Defendants Goldfarb, Singh and Speed served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure

controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

98.     Defendants Goldfarb, Singh and Speed breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Goldfarb, Singh and Speed face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

<u>**COUNT I**</u>

**(Against the Director Defendants for Breach of Fiduciary Duty)**

99.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

100.    The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

101.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

102.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the

Company's corporate interests.

103.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

104.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

105.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

106.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

107.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

108.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

109.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT III

### (Against Defendant V. McMahon For Unjust Enrichment)

110.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

111.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendant V. McMahon were unjustly enriched at the expense of, and to the detriment of, the Company.

112.    During the Relevant Period, Defendant Vincent K. McMahon, sold more than 3.2 million WWE shares *for over $261 million in gross insider trading proceeds*.  This sale occurred on March 27, 2019, with only a few days left in the Company's disappointing 2019 first quarter and despite growing behind-the-scenes problems with the Saudis.

113.    Plaintiffs, as shareholders and representatives of the Company, seek restitution from Defendant V. McMahon and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by Defendant V. McMahon due to his wrongful conduct and breach of their fiduciary duties.

## COUNT IV

### (Against the Director Defendants for Violations of
### Section 10(b) of the Exchange Act and SEC Rule 10b-5)

114.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

115.    During the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose that (i) WWE's relationship with the Saudi government

had continued to deteriorate; (ii) the Saudi government and its affiliates had failed to make millions of dollars in payments owed to WWE pursuant to existing contractual commitments between the parties, including at least $60 million owed in connection with the June 2019 Super ShowDown event; (iii) OSN had refused to restart the broadcast of WWE programming despite a contractual obligation to continue such broadcasts, which refusal was symptomatic of a deterioration in the business relationship between the parties; (iv) OSN had rebuffed efforts to renew a distribution rights agreement on terms acceptable to WWE and such renewal was unlikely to occur in 2019, if ever; (v) WWE did not have the ability to expand its operations in the Middle East or within Saudi Arabia as had been represented to investors; and (vi) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants. Despite this artificial inflation in the price of the Company's shares, the Director Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

116.    As alleged herein, the Director Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Director Defendants, by virtue of their receipt of information reflecting the true facts regarding WWE, their control over, and/or receipt and/or modification of WWE's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information

concerning WWE, participated in the fraudulent scheme alleged herein.

117.    Director Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Director Defendants.

118.    The Director Defendants were each members of WWE's Board of Directors during the aforesaid time period.  Based on their roles at WWE, each of the Director Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

119.    At a minimum, the Director Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at WWE, the Director Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

120.    Likewise, the Director Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Director Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

121.    The allegations above also establish a strong inference that WWE, as an entity, acted with corporate scienter throughout the Relevant Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing WWE's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, WWE maintained and/or increased its artificially inflated common stock price throughout the Relevant Period.

122.    As such Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud; and

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123.    As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT V

### (Derivative Claim for Violations of Section 20(a) of the Exchange Act Against Defendant V. McMahon)

124.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

125.    This Count is asserted on behalf of the Company against Defendant V. McMahon for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

126.    During his tenure as an executive officer and/or Chairman of the Board, Defendant V. McMahon was a controlling person of all officers of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of his control, Defendant V. McMahon had the power and authority to direct the management and activities of the other Company officers, to hire and fire the other Company officers at whim, and to cause the other Company officers to engage in the wrongful conduct complained of herein.  Defendant V. McMahon was able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the Relevant Period, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

127.    In his capacity as the senior executive, and Chairman of the Board of WWE, Defendant V. McMahon had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendant V. McMahon agreed with his course of conduct.

128.    As a result of the foregoing, Defendant V. McMahon, individually, was a controlling person of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

129.    As a direct and proximate result of Defendant V. McMahon's conduct, the Company suffered damages in connection with its purchase of WWE common stock at materially inflated prices.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing WWE to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to WWE restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 24, 2020

**GAINEY McKENNA & EGLESTON**

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston (CT19709)
Thomas J. McKenna
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiffs*

## **VERIFICATION**

I, RYAN MERHOLZ, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of World Wrestling Entertainment, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this ____16th__ day of _____April_____ 2020.


__*Ryan B. Merholz*_____
RYAN B. MERHOLZ

## **VERIFICATION**

I, MELVYN KLEIN, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of World Wrestling Entertainment, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___30___ day of _MARCH_ 2020.

_____
MELVYN KLEIN