## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RYAN MERHOLZ, and MELVYN KLEIN, Derivatively On Behalf Of WORLD WRESTLING ENTERTAINMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> VINCENT K. MCMAHON, STEPHANIE MCMAHON, PAUL LEVESQUE, FRANK A. RIDDICK, III, STUART U. GOLDFARB, LAUREEN ONG, ROBYN W. PETERSON, MAN JIT SINGH, JEFFREY R. SPEED, ALAN M. WEXLER, GEORGE A. BARRIOS, and MICHELLE D. WILSON, <br><br> Defendants, <br><br> WORLD WRESTLING ENTERTAINMENT, INC., <br><br> Nominal Defendant. | Case No.: 3:20-cv-00557-VAB <br><br> **VERIFIED SECOND AMENDED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Ryan Merholz and Melvyn Klein ("Plaintiffs"), derivatively and on behalf of World Wrestling Entertainment, Inc. ("WWE" or the "Company"), by Plaintiffs' undersigned attorneys, for Plaintiffs' verified second amended complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WWE, Company press releases and conference call transcripts, litigation concerning the Company and media and

social media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of WWE against certain of its officers and directors seeking to remedy Defendants' (defined below) breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: Violations of Sections 10(b) and 20(a) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is headquartered in this District, a substantial portion of the transactions and wrongs, complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiffs**

4.     ***Plaintiff Ryan Merholz*** ("Plaintiff Merholz") is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

5.     ***Plaintiff Melvyn Klein*** (Plaintiff Klein") is a current stockholder of the Company

and intends to retain ownership of said shares through the prosecution of the instant matter.

**Nominal Defendant**

6.      Nominal Defendant WWE is headquartered in Stamford, Connecticut.  WWE Class A common stock is listed and trades on the NYSE under the ticker symbol "WWE."  The holders of WWE Class A common stock generally have the same rights as holders of WWE Class B common stock, except that holders of Class A common stock are entitled to one vote per share, whereas holders of Class B common stock are entitled to ten votes per share.

7.      Defendants (defined below) admit that because "[a] substantial majority of the issued and outstanding shares of Class B common stock is owned beneficially by [Defendant V.] McMahon," "he controls a majority of the voting power of [WWE] common stock and can effectively exercise control over [WWE's] affairs."

**Directors**

8.      ***Defendant Vincent K. McMahon*** ("V. McMahon") has been the Chairman of the Board of Directors ("Board") and Chief Executive Officer ("CEO") of the Company since 1980.

9.      ***Defendant Stephanie McMahon*** ("S. McMahon") is a director and Chief Brand Officer of the Company since 2015.  Defendant S. McMahon is the daughter of Defendant V. McMahon.

10.      ***Defendant Paul Levesque*** ("Levesque") is a director and the EVP of Global Talent Strategy & Development since 2015.  Defendant Levesque is the husband of Defendant S. McMahon.  He is also the son-in-law of Defendant V. McMahon.

11.      ***Defendant Frank A. Riddick, III*** ("Riddick") is a director and Interim Chief Financial Officer ("CFO") of the Company since 2008.

12.      ***Defendant Stuart U. Goldfarb*** ("Goldfarb") is a director of the Company since

2011.  Defendant Goldfard is also a member of the Audit Committee and the Governance and Nominating Committee.

13.     **Defendant Laureen Ong** ("Ong") is a director of the Company.  Defendant Ong is also the Chair of the Compensation Committee and the Governance and Nominating Committee.

14.     **Defendant Robyn W. Peterson** ("Peterson") is a director of the Company. Defendant Peterson is also a member of the Governance and Nominating Committee.

15.     **Defendant Man Jit Singh** ("Singh") is a director of the Company.  Defendant Singh is also a member of the Audit Committee.

16.     **Defendant Jeffrey R. Speed** ("Speed") is a director of the Company.  Defendant Speed is Chair of the Audit Committee and a member of the Compensation Committee.

17.     **Defendant Alan M. Wexler** ("Wexler") is a director of the Company.  Defendant Wexler is a member of the Compensation Committee.

18.     Defendants V. McMahon, S. McMahon, Levesque, Riddick, Goldfarb, Ong, Peterson, Singh, Speed, and Wexler are collectively hereinafter referred to as the "Director Defendants."

**Officer Defendants**

19.     **Defendants George A. Barrios** ("Barrios") was a Co-President of the Company, its principle financial officer and a member of the Company's Board.  On January 30, 2020, the Company announced that Defendant Barrios had abruptly left the Company "effective immediately."

20.     **Defendant Michelle D. Wilson** ("Wilson") was a Co-President of the Company and a member of the Company's Board.  On January 30, 2020, the Company announced that Defendant Wilson had abruptly left the Company "effective immediately."

21.     The Director Defendants and Defendants Barrios and Wilson are herein referred to as "Defendants."

## THE AUDIT COMMITTEE CHARTER

22.     The Audit Committee Charter states in relevant part:

The Audit Committee shall provide assistance to the Directors in fulfilling their responsibility to the stockholders, potential stockholders, and investment community relating to corporate accounting, reporting practices of the Company and the quality and integrity of financial reports of the Company.  In so doing, the Audit Committee shall assist the Board in overseeing:

•       ***the accounting and financial reporting practices*** of the Company;

•       the audits of the Company's financial statements including without limitation the performance of the ***Company's internal controls and internal audit function*** and the independent auditor's qualifications, independence and performance;

•       ***the integrity of the Company's financial statements***;

•       the Company's compliance with legal and regulatory requirements; and

•       the Company's system of disclosure controls and system of internal controls regarding finance, accounting, legal compliance and ethics that management and the Board have established.

While certain duties and responsibilities of the Audit Committee are more specifically set forth below, the general function of the Audit Committee is oversight.

Management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements. In addition, management is responsible for maintaining appropriate accounting and financial reporting principles and policies and internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations.

Each member of the Audit Committee may rely on (i) the integrity of those persons and organizations within and outside the Company from which it receives information; and (ii) the accuracy of the financial and other information provided to the Audit Committee by such persons or organizations absent actual knowledge to the contrary (which shall promptly be reported to the Board).

As more fully described in "Responsibilities" below, the outside auditors for the

Company are accountable to the Audit Committee. The outside auditors shall submit to the Audit Committee and the Company annually a formal written statement delineating all relationships between the outside auditors and the Company ("Statement as to Independence"), addressing at least the matters set forth in Independence Standard No. 1 adopted by the Independence Standards Board.

\*   \*   \*

RESPONSIBILITIES

The Audit Committee will primarily fulfill its responsibilities by carrying out the activities enumerated in this Section below. The Audit Committee will report regularly to the Board regarding the execution of these duties and responsibilities, including, without limitation, its (i) evaluation of the independent auditors; (ii) the quality and integrity of the Company's financial statements; (iii) the Company's compliance with legal  and regulatory requirements; (iv) the qualifications, performance and independence of the Company's independent auditors; and (v) the performance of the internal audit function. The Audit Committee has the authority, without seeking Board approval, to, and shall, obtain advice and assistance from outside legal, accounting and/or other advisors as deemed appropriate by the Committee to fully execute its duties and responsibilities. The Company shall provide appropriate funding, as determined by the Audit Committee, for compensation for the independent auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attestation services and for any outside legal, accounting and other advisers that the Audit Committee may choose to engage and for ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties. None of the Committee's responsibilities may be delegated to any other committee of the Board.

The Audit Committee shall:

Documents/Reports/Accounting Information Review

1.      Review this Charter at least annually, and recommend to the Board any necessary amendments as conditions dictate.

2.      Review and discuss with management and the independent auditor the Company's audited financial statements, quarterly financial statements and all internal controls reports (or summaries thereof). Review any other relevant reports or financial information submitted by the Company to any governmental body, or the public, including management certifications as required by the SarbanesOxley Act of 2002 (Sections 302 and 906) and relevant reports rendered by the independent auditors (or summaries thereof).

3.      Review with financial management and the independent auditor each

Quarterly Report on Form 10-Q and each Annual Report on Form 10-K (including, without limitation, the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") prior to its filing.

4.     Review and discuss earnings press releases with management, including the type and presentation of information, paying particular attention to any use of "proforma", "adjusted" or other information which is not required by generally accepted accounting principles ("GAAP").

5.     Review and discuss with management financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be on general terms (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not be in advance of each earnings release or earnings guidance.

6.     Review the regular internal reports (or summaries thereof) to management prepared by the internal auditing department and management's response.

7.     Recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

8.     Obtain from the outside auditor assurance that the audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934, as amended, which sets forth certain procedures to be followed in any audit of financial statements required under the Securities Exchange Act of 1934.

Independent Auditors

9.     Have sole authority to appoint (subject to stockholder ratification), compensate, retain and oversee the work performed by the independent auditor engaged for the purpose of preparing and issuing an audit report or performing other audit, review or attest services for the Company. The Audit Committee shall have the ultimate authority to approve all audit engagement fees and terms. The Audit Committee shall have sole authority to review the performance of the independent auditor and remove the independent auditor if circumstances warrant. The independent auditor shall report directly to the Audit Committee and the Audit Committee shall oversee the resolution of any disagreement between management and the independent auditor in the event that any may arise.

10.    Review with the independent auditor (without representatives of management when deemed necessary) reports or communications (and management's and/or the internal audit department's response thereto) submitted to the Audit Committee by the outside auditors required by or

referred to in PCAOB AU 380 and SEC Rule 2-07 of Regulation S-X; review any problems or difficulties with an audit and management's response, including any restrictions on the scope of the independent auditor's activities or access to requested information, and any significant disagreements with management; and review and hold timely discussions with the independent auditor regarding the following:

- all critical accounting policies and practices and other major issues Regarding accounting principles and financial statement presentations, including significant changes in accounting principles;

- all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

- other material written communications between the independent auditor and management including, but not limited to, any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor and schedule of unadjusted differences;

- the scope of the annual audit;

- the audited financial statements and disclosures made in Management's Discussion and Analysis;

- significant risks and exposures, if any, and the steps taken to monitor and minimize such risks;

- any other significant matters arising from any audit or report or communication referred to in items 2 or 3 above, whether raised by management, the internal audit department or the outside auditor, relating to the Company's financial statements;

- review the form of opinion the outside auditor proposes to render to the Board and stockholders;

- any accounting adjustments that were noted or proposed by the independent auditor but were "passed" (as immaterial or otherwise); and

- any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement.

11.     At least annually, obtain and review a report by the independent auditor to allow the Committee to evaluate the independent auditor's qualifications, performance and independence. The independent auditor's report shall describe:

- the firm's internal quality control procedures, the budget, staffing and responsibilities of the internal audit department and any recommended changes in the planned scope of the internal audit;

- any material issues raised by the most recent internal quality-control review or peer review of the independent auditor, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues;

- (to assess the auditor's independence) all relationships between the independent auditor and the Company;

This Committee's evaluation of the independent auditor shall include the review and evaluation of the lead partner and shall take into account the opinions of management and the Company's internal auditor (or other personnel responsible for the internal audit functions). The Audit Committee shall present its conclusions with respect to the independent auditor to the full Board.

12.     Review audit services and approve in advance non audit services to be provided by the independent auditor, taking into consideration SEC rules regarding permissible and impermissible services by such independent auditor. This duty may be delegated to one or more designated members of the Audit Committee with any such preapproval reported to the Audit Committee at its next regularly scheduled meeting. Approval of non audit services shall be disclosed to investors in periodic reports to the extent required by Section 13(a) of the Securities Exchange Act of 1934.

13.     Set clear hiring policies, compliant with governing laws or regulations, for employees or former employees of the independent auditor.

14.     Review and evaluate the lead audit partner of the independent auditor.

15.     Assure the regular rotation of the lead audit partner as required by law, and further consider whether regular rotation of the independent auditor itself is advisable to assure continuing auditor independence.

## FACTS

### Background

23.     The Company engages in the sports entertainment business in North America, Europe, the Middle East, Africa, the Asia Pacific, and Latin America.  As in other professional wrestling promotions, the Company's shows are not legitimate contests, but are entertainment based and feature storyline-driven, scripted, and choreographed matches.

24.     Company personnel consist of professional wrestlers, managers, play-by-play and color commentators, ring announcers, interviewers, referees, trainers, producers, script writers, and various other positions.

25.     Personnel can also appear on the Company's other weekly television programming, as well on pay-per-view and untelevised live events.

26.     The Company reports revenues in three segments: (1) Live Events; (2) Media; and (3) Consumer Products.

27.     Live Events provides ongoing content for the Company's media platforms and Live Event segment revenues consist primarily of ticket sales, including primary and secondary distribution, revenues from events for which the Company receives a fixed fee, as well as the sale of travel packages associated with the Company's global live events.

28.     The Media segment reflects the production and monetization of long-form and short-form media content across various platforms, including WWE Network, pay television, digital and social media, as well as filmed entertainment.  Across these platforms, revenues principally consist of content rights fees, subscriptions to WWE Network, and advertising and sponsorships. Media net revenues were $683.4 million, $535.6 million, and $476.9 million, representing 73%, 67%, and 65% of the Company's total net revenues in fiscal years 2018, 2017,

and 2016, respectively.

29.     By the early 2000s, the Company was intent on international expansion.  Although the brand continued to have success in the domestic market, it experienced bouts of ratings dips and lowered attendance at its live events, and so the Company recognized the need to expand its global presence and further diversify its fan base.

30.     The Company's brand of professional wrestling made for an ideal export.  The Company's Executive VP of Marketing, Kurt Schneider, provided a number of reasons why in an October 2005 interview, explaining that, unlike major sports leagues, there are no game "rules" to understand—it's simply a straightforward depiction of good (the "faces") versus evil (the "heels"); fans do not need to understand any one language to consume it; most countries have had wrestling in some form as part of their culture; and WWE wrestling is seen as a uniquely American export.

31.     Although the Company already had an international presence by the early 2000s, it was mostly via television deals in international markets.  Television deals in international markets were one of the Company's many wrestling-related revenue streams.

32.     Another business model of the Company is to sponsor live events internationally.  The Company leverages these live events to more effectively grow and monetize its content.

33.     As Defendant V. McMahon explained in 2004:

> From an international standpoint, I don't think we've done a very good job, quite frankly, of exploiting the international market like we really should.  We're on television in many, many markets and do extremely well television ratings-wise, but that's only one aspect of what we do.  We do licensing; we do merchandising, and live events, and publications, and DVD's and everything else imaginable.  And we haven't integrated all of that in our international platforms, and [doing that] is one of our goals.[1]

---

[1]     Joshua A. Shuart, Ph.D. & Peter A. Maresco, *World Wrestling Entertainment: Achieving Continued Growth and Market Penetration through International Expansion*, THE SPORT JOURNAL, dated Sept. 6, 2006 at https://thesportjournal.org/article/world-wrestling-entertainment-achieving-continued-growth-and-market-penetration-through-international-expansion/ (last visited June 17, 2020).

34.     This strategy was formally outlined in the Company's 2005 Form 10-K, dated July

13, 2005:

> *Continue to expand internationally*.     International expansion represents an
> important part of our business strategy. The broad appeal of our content has yielded
> high international demand for our television programs and live events. To further
> nurture this demand, we plan to continue to expand our international television
> distribution. Increasing our television penetration around the world will likely
> increase the demand for live events abroad, which, in turn, should increase sales of
> our branded merchandise.  Our dual brands enable us to execute this strategy by
> freeing up schedules for talent to perform at more events in more countries. Fiscal
> 2005 included 49 international events, including six productions of our flagship
> television shows from the international stage, which is up from 32 international
> events, with no televised events, in fiscal 2004.

35.     The Company started to increase the number of tours and live events it held

internationally, growing its presence in Europe and Asia, and expanding into other regions,

including the Middle East, Latin America, Australia, and New Zealand.

36.     The Company also continued to expand its television distribution internationally,

which it used to support its live events and merchandise sales, and to more generally grow the

popularity of the sport in new markets.  Further, selling the rights to air WWE content in

international markets proved to be a significant revenue generator of its own.

37.     An important part of the Company's international expansion involved extending

the Company's reach into countries within the Middle East and North Africa ("MENA") region.

38.     An entity known as Orbit Showcase Network ("OSN") is a direct-broadcast satellite

provider serving the MENA region.  OSN has traditionally offered popular entertainment content

such as movies, sporting events, and various TV shows from major U.S. and international networks

and studios, in addition to local versions specifically for the MENA region.

39.     On July 21, 2014, the Company and OSN announced a five-year exclusive media

agreement, reporting that "WWE's flagship television program Monday Night Raw [would] air live on OSN, WWE's exclusive pay TV partner in the Middle East and North Africa through 2019." According to a press release, "[u]nder this new agreement, fans [could] now enjoy all of WWE's programming, including Raw, SmackDown®, NXT™ and Main Event™, as well as WWE pay-per-view events including WrestleMania® and SummerSlam®, in one place on OSN Sports 2 HD." The press release further stated:

> "OSN and WWE have a long-standing relationship and we are very excited to be taking that to the next level," said Andy Warkman, OSN's VP of Sport & Production. "For the first time in the region, all core WWE programming will be available in one place, making OSN the home of WWE, reaching an audience across more than 20 countries. This deal furthers our commitment to bringing our customers the best content."

> "WWE is very excited to be extending and expanding its deal with OSN in the Middle East," said Carlo Nohra, General Manager of WWE Middle East. "OSN hosts some of the very best international entertainment and sports programming and is the perfect home for WWE programming. Together with OSN, we will continue to grow our TV, pay-per-view, live event and consumer products businesses across the Middle East."

40.     On February 15, 2015, the Company and OSN jointly issued a press release reporting that they were adding WWE Network to the five-year agreement as part of an expanded partnership.

41.     The international expansion proved successful. The Company's international revenues increased from $87.6 million in 2005 to $135.3 million in 2010. After a decline over the next few years, the Company's international revenues increased to $169.8 million in 2015, $189 million in 2016, and $201 million in 2017—the increase during these more recent years driven, in part, by the 2014 launch of the WWE Network—a subscription streaming network available in more than 170 countries.

42.     The Company's growing international revenue began to represent an increasingly

large percentage of its total revenue.  For instance, in 2017, the Company's international segment represented 25%, with North America representing 75% of revenues.  In 2018, the international segment increased to *34%* of total revenues (with North America revenues falling to 66%).  While the international segment slightly decreased to *32%* of total revenues in 2019 (with North America revenues at 68%), the Company stated "***WWE is well positioned to take advantage of significant growth opportunities, including the rising value of live sports content, the growth of media and entertainment in international markets, and the evolution of other businesses, specifically WWE Network***."[2]

43.     Defendant V. McMahon told shareholders that the Company's goal was to increase its presence in large international markets.  For instance, in May 2017, Defendant V. McMahon told investors: "The recent production of WrestleMania set records for network viewership as well as digital and social engagement.  As we leverage continuing innovation to extend our reach in India, China and around the world, we are confident that the enduring and increasing global power of our brands will provide a solid foundation for long-term growth."[3]

44.     Expansion into the MENA region became an increasingly important part of the Company's business plans and growth initiatives, as the Middle East grew to become the Company's second largest market by monetization.

45.     The Company is popular in the Middle East, and it has had a presence in the region for many years, initially via distribution of its programming to regional television networks.  The Company also has been holding live events in the Middle East for nearly a decade, starting in 2011.

---

[2]     Emphasis added throughout unless noted otherwise.

[3]     Darren Heitner, *The WWE Is Exploring Overseas Opportunitis For Further Revenue Growth,* FORBES, dated July 17, 2017 at https://www.forbes.com/sites/darrenheitner/2017/07/17/the-wwe-is-exploring-overseas-opportunities-for-further-revenue-growth/#145d47b522bd (last visited June 17, 2020).

46.     In March 2018, the Saudi Press Agency announced that WWE and the Saudi General Sports Authority had signed a 10-year multi-platform partnership with WWE to hold wrestling events in the country.  The market believes this partnership was worth approximately $500 million to WWE.  A press release issued by the Company and the Saudi General Sports Authority described the deal as follows:

> The Saudi General Sports Authority in partnership with WWE will present the Greatest Royal Rumble event at the King Abdullah Sports City in Jeddah, Saudi Arabia on Friday, April 27.  For the first time ever, the Royal Rumble match will feature 50 WWE Superstars.  As part of this historic event, fans will see WWE Superstars John Cena™, Triple H™, Roman Reigns™, AJ Styles™, Braun Strowman™, The New Day™, Randy Orton™, Bray Wyatt™ and Shinsuke Nakamura™, among others.
>
> *        *        *
>
> Ticket and broadcast information will be available in the coming weeks.  This event is part of a 10-year strategic multiplatform partnership in support of Vision 2030, Saudi Arabia's social and economic reform program.[4]

47.     "The Greatest Royal Rumble will be a spectacle of historic proportions," said Defendant V. McMahon.  "Our partnership with the Saudi General Sports Authority reflects a long-term commitment to present WWE's world-class entertainment to a global audience on a grander scale than ever before."[5]

48.     The first event held under the Saudi partnership was the Greatest Royal Rumble, which took place on April 27, 2018 at the King Abdullah International Stadium in Jeddah, Saudi Arabia.  The Company hailed the event as the largest "outside the U.S. in the past 16 years" and a major contributor to the Company's "record" second quarter 2018 results.  Speaking during an earnings call with investors, Defendant Wilson stated that, "[a]s added proof of the compelling

---

[4]     *Saudi Arabia to Host the Greatest Royal Rumble, Business Wire News*, dated March 5, 2018 at https://www.businesswire.com/news/home/20180305005764/en/Saudi-Arabia-Host-the%C2%A0Greatest-Royal-Rumble%C2%AE (last visited June 17, 2020).

[5]     *Id.*

nature of our content, last Friday, we held one of our largest events ever outside the United States, with a sold-out crowd at the Greatest Royal Rumble event in Jeddah, Saudi Arabia."  Defendant Wilson continued, stating that "[t]he April 27th event marked the successful beginning of a 10-year partnership with the Kingdom of Saudi Arabia."

49.     The Company's expansion into Saudi Arabia must be understood in the context of Vision 2030—a strategic initiative launched in 2016 by the current Crown Prince of Saudi Arabia (at the time, the Deputy Crown Prince), Mohammed bin Salman, to institute social reforms in Saudi Arabia and diversify its economy.

50.     Vision 2030 is principally an economic initiative aimed at reducing the country's dependence on oil, but it also includes a progressive reform program that seeks to modernize certain elements of the country's religious society.  Part of this initiative has included significant investment in Saudi Arabia's entertainment sector, including bringing international sporting events to the country.

51.     Sports have become a central feature of the Vision 2030 program, so much so that the Saudis retained an American lobbying firm (Churchill Ripley) to arrange meetings with representatives from the National Basketball Association, Major League Soccer, World Surf League and Formula One auto racing to discuss bringing international sports to the kingdom.  The chairman of the Saudi General Sports Authority ("SGSA"), Prince Abdulaziz bin Turki Al-Faisal, has explained that making Saudi Arabia a hub of global sports could boost the country's economic growth and create thousands of jobs: "A big part of the change within the kingdom is the sector of sport and growing the sector of sport."[6]  While the sports expansion is central to the Crown Prince's

---

[6]     Alan Rappeport, *Saudi Arabia Embraces Western Sports to Rehabilitate Global Image,* N.Y. TIMES, dated Dec. 2, 2019 at https://www.nytimes.com/2019/12/02/business/economy/saudi-arabia-image-sports.html (last visited June 17, 2020).

effort to attract foreign investment and convince the world that the country is making important changes to its society, it has been viewed by critics as an attempt to distract attention from the country's continued human rights abuses—called "sportswashing" by some.[7]

52.     The financial support behind the efforts to bring Western sports to Saudi Arabia is the country's Sports Development Fund, which provides capital to build new sports facilities and attract and promote international sports events. Events have included Saudi Arabia's first international motorsport event, the two-day Race of Champions, conducted in Riyadh in February 2018, as well as an international boxing event conducted in Jeddah in May later that year.

53.     The 10-year partnership agreement between the Company and the SGSA was part of this same effort, as it was designed to bring large-scale international sporting events to Saudi Arabia, in this case, professional wrestling.

54.     Not only did the partnership serve the Saudi government's needs, but it also benefited the Company.  The Company's brand of professional wrestling is extremely popular in Saudi Arabia.

55.     On April 2018, Defendant Barrios was asked about the partnership on a "WWE Post-WrestleMania Call."  Defendant Barrios explained that the Company's content is popular in Saudi Arabia on its social media channels (for instance, YouTube), which popularity the Company believed it could more effectively monetize by signing the 10-year partnership.

56.     The partnership agreement also was announced at a time when the Company was working to increase its profile in the Middle East by signing and promoting talent from within the region.  These signings included the Company's first Kuwaiti and Egyptian wrestlers, signed in December 2017 and January 2018, respectively, as well as the Company's first female wrestler

---

[7]     *Id.*

from the Arab world—the Jordanian Shadia Bseiso—signed in October 2017.

57.     The Company also hosted recruitment events throughout the MENA region, including Saudi Arabia, in an effort to not only grow and diversify the talent pool, but also to localize the content around the world.

58.     These efforts to build its brand in the MENA region was successful, considering that by February 2019, the Middle East grew to become the Company's second largest market by monetization.

59.     The Company's full-year 2018 results also benefited significantly from the two events held pursuant to the Saudi partnership.  Market participants estimated that the *Greatest Royal Rumble* (held in April 2018) and the *Crown Jewel* (held in November 2018) together generated revenues for the Company in the range of $70 to $80 million.[8]  These results are significant considering that the Company announced that its revenues for 2018 were "***the highest in the Company's history***," increasing 16% from the prior year to $930.2 million.  The Company also announced that "international revenue increased 58% to $317.8 million from $201.3 million in the prior year, the highest in the Company's history and the first-time international revenue has exceeded $300 million."[9]

60.     More specifically, the February 7, 2019 press release revealed that revenues in the Media segment for 2018 "increased by $147.8 million, or 28%, to $683.4 million in 2018 over the prior year, ***primarily driven by the $95.8 million increase of Other media revenues, due to the***

---

[8]      Ray Giri, *How Much WWE May Have Made With Saudi Arabia Deal In 2018,* WRESTLINGINC.COM, dated Feb. 7, 2019 at https://www.wrestlinginc.com/news/2019/02/how-much-wwe-may-have-made-with-saudi-arabia-deal-in-2019-650684/ (last visited June 17, 2020).

[9]      *WWE® Reports Record Results For Fourth Quarter and Full Year 2018*, dated Feb. 7, 2019 at https://www.businesswire.com/news/home/20190207005303/en/WWE%C2%AE-Reports-Record-Results-Fourth-Quarter-Full (last visited June 17, 2020).

***addition of certain live, in-ring programming content in international markets***."[10]  The Company

therefore generated an additional $95.8 million in the Media segment (as compared to the prior

year) from "certain live, in-ring programming content in international markets," the vast majority

of which was estimated to be from the two events in Saudi Arabia.[11]

61.     The Company's Media segment, which is the Company's largest segment in terms

of revenue, includes a number of different revenue streams, including revenue from content rights

fees, subscriptions to WWE Network, and advertising and sponsorships.

62.     With respect to content rights fees, the Company generates revenues from fees

earned on the Company's "core content," which refers to the Company's two long-running weekly

live television programs, called *Raw* (a three-hour weekly show) and *SmackDown Live* (a two-

hour weekly show).  Both are live wrestling shows that feature WWE talent and portray the brand's

wrestling-related storylines.

63.     The Company generates revenue on this content by selling the exclusive right to air

*Raw* and *SmackDown Live* (as well as other WWE content) in the applicable region.  In the United

States, *Raw* airs on the *USA Network*, which is owned by NBC Universal.  *SmackDown Live* had

for years aired domestically also on the *USA Network*, but began airing on the *Fox Network* in

October 2019.

---

[10]     *Id.*  The press release included the following note describing what "Other" revenues for the Media
segment is defined to mean: "Other forms of media monetization reflect revenues earned from the
distribution of other content, including, but not limited to, certain live in-ring programming content in
international markets, scripted, reality and other programming, theatrical and direct-to-home video
releases."

[11]     Ray Giri, *How Much WWE May Have Made With Saudi Arabia Deal In 2018,*
WRESTLINGINC.COM (Feb. 7, 2019) at https://www.wrestlinginc.com/news/2019/02/how-much-wwe-
may-have-made-with-saudi-arabia-deal-in-2019-
650684/#:~:text=WWE%20held%20the%20Greatest%20Royal,Saudis%20for%20that%20event%20itsel
f. (last visited June 17, 2020).

64.     The Company enters into separate international distribution agreements with television providers throughout the world.

65.     In the Middle East, the Company's exclusive provider of its content had for years been OSN.

66.     On July 21, 2014, the Company and OSN entered into a five-year exclusive media rights agreement which provided OSN with exclusive access to WWE programming (*i.e.*, *Raw* and *SmackDown Live*) and pay-per-view events, including WrestleMania and SummerSlam, through 2019. From the Company's perspective, the deal meant that the Company would have even greater access to the MENA region, which it viewed as crucial to its efforts to continue its international expansion.

67.     On February 12, 2015, the Company and OSN jointly issued a release stating they were adding WWE Network, the Company's subscription streaming app service (like Netflix), to the five-year agreement as part of an expanded partnership. In the announcement, Andy Warkman, OSN's Vice President, Sport and Production, stated that:

> We will be co-branding the linear channel OSN WWE Network HD and following on from our enhanced TV deal renewal last year, this is great news for WWE fans in the Middle East & North Africa region. We are looking forward to launching the Network in the coming weeks and cementing our position as the Home of WWE in the region.[12]

68.     The WWE Network agreement with OSN meant that OSN subscribers would now have access to the WWE Network content independent of any WWE Network subscription.

69.     During a February 12, 2015 earnings call, Defendant Barrios indicated that OSN subscribers who access the WWE Network for free, via the linear premium channel, are included

---

[12]     *OSN To Launch WWE® Network in the Middle East*, dated Feb. 12, 2015 https://www.businesswire.com/news/home/20150212005115/en/OSN-Launch-WWE%C2%AE-Network-Middle-East (last visited June 17, 2020).

in the Company's reported WWE Network subscriber figures:

> ***Regarding future subscriber growth***, we continue to expect a gradual ramp-up over time as consumer awareness grows and consumers change behavior and adopt new technology. As we've said before, we're executing a 5-part strategy that includes implementing high-impact customer acquisition and marketing programs, making the network available in new geographies, creating new content, expanding distribution platforms and developing new features. As part of that strategy, we continue to broaden our global distribution of WWE Network. Beginning January 19, we made the network available in the U.K. and Ireland, which, almost overnight, became our second largest market globally. We're also expanding WWE Network distribution in Canada, the Middle East and North Africa. Rogers Communications, our exclusive network distribution partner in Canada, has reached agreements with Cogeco Cable in Canada, Eastlink, Shaw and Shaw Direct, TELUS Optik TV and TELUS Satellite and Videotron, ensuring WWE Network will be available nationally in Canada before WrestleMania on March 29.
>
> ***Additionally, we reached an agreement with OSN, the leading pay-TV network in the Middle East and North Africa, to distribute WWE Network in the region as a premium linear channel, also launching before WrestleMania.***

70.    Thus, the Company's reported WWE Network subscriber numbers were at least in part dependent on those individuals in the MENA region who had access to the WWE Network by virtue of the OSN agreement.

71.    The market believed that the OSN agreement with the Company was worth millions of dollars a year to WWE.   In addition, the deal with OSN offered the additional benefit of growing the sport in the MENA region.

72.    At the same time, the Company was telling investors that it expected to significantly grow the revenue which it earns from its media rights agreement between 2018 and 2020.  In the presentation accompanying its June 27, 2018 conference call, the Company stated that it "expects [that] revenue from existing and new 'key content agreements,' . . . will grow to approximately $311M in 2019 and $462M in 2021."[13]   The Company's "total revenue from 'key content

---

[13]      *WWE's 'key content agreements' reflect the licensing of WWE's flagship programs, Raw and SmackDown in the U.S., U.K., India, Canada, LATAM, Middle East and South Africa*, dated June 27, 2018 Conference Call Presentation at   https://corporate.wwe.com/~/media/Files/W/WWE/company-

agreements' would increase to $314M in 2019 and $542M in 2021." *Id.*

73.    The Company's effort to grow its media-rights related revenues reflects its ongoing strategy of transforming itself into a media company—something it has done with relative success in recent years.  This transformation has been widely covered by the mainstream financial press, with one media outlet characterizing the WWE in early 2018 as not "just scripted wrestling matches," but rather "a media powerhouse."[14]

74.    A January 19, 2018 *CNBC* article[15] stated:

With nearly $800 million in revenues, a $2.6 billion market cap and 850 million social media followers, World Wrestling Entertainment isn't the tiny ticketing business it was 35 years ago.

A massive overhaul of the wrestling network in 2013 and 2014 drove the "wave of growth" that made it a central player in digital media despite its seemingly niche content, CFO George Barrios told CNBC.

"Content, continued global growth and the direct-to-consumer digital has turned us into a data powerhouse," Barrios told "Mad Money" host Jim Cramer in a Friday interview. "We've seen about 70 percent growth since 2008, and we think there's a lot more runway."

75.    On February 7, 2019, the Company announced its fourth-quarter and full-year 2018 financial results.  On that same day, the Company also provided its full-year 2019 financial guidance, reporting in a press release that the Company expected to achieve revenue of approximately $1.0 billion and was targeting Adjusted OIBDA of at least $200 million.  Defendants informed investors that this financial outlook depended on the Company's ability to

---

new/2018/wwe-us-deals-and-outlook-presentation-06-27-18.pdf (last visited June 17, 2020).

[14]    Nathaniel Meyerssohn, *Why WWE is a media juggernaut,* MONEY, dated Feb. 7, 2018 at https://money.cnn.com/2018/02/07/news/companies/wwe-vince-mcmahon-wrestling/index.html    (last visited June 17, 2020).

[15]    Lizzy Gurdus, *WWE is a 'data powerhouse' thanks to content, growth and digital, CFO says* CNBC, dated Jan. 19, 2018 at https://www.cnbc.com/2018/01/19/wwe-is-a-data-powerhouse-thanks-to-content-growth-and-digital-cfo.html (last visited June 17, 2020).

renew a number of expiring media-rights agreements, including in the Middle East.[16]

76.     As a result, the Company was forced to try to find an entirely new media partner in the Middle East and would be left without revenues on a MENA-region media-rights deal effective April 1, 2019.  Despite knowing this, Defendant Barrios told the market, during a presentation to analysts at UBS on December 3, 2018, as follows:

> I mentioned the major markets for us. U.K., India, the **Middle East**, China, Latin America, Germany and a variety of other markets, those being the biggest, **will be up for renewal here over the next 12 to 18 months**. The expectation has been that we'd announce the distribution deal in the U.K. towards the end of this year; in India, in the beginning, first half of next year, we always tell people that can happen quicker than people expect, it could also take a little bit longer, but our kind of best estimate are these time lines. **And as I mentioned, Middle East, Latin America, China and several other markets, we'll announce as well over the next several months**.

77.     The Company representatives have since stated that the OSN deal was prematurely terminated in December 2018.  According to Carlo Nohra, VP and General Manager of WWE – Middle East, who was the self-described principal point of contact with OSN regarding the applicable media-rights agreements, in early 2018, OSN became delinquent in the payments of rights fees to the Company.

78.     Nohra explained that in September 2018, the Company sent OSN a "Notice of Material Breach" based on the delinquent payments.[17]

---

[16]     WWE® Reports Record Results For Fourth Quarter and Full Year 2018 at https://corporate.wwe.com/investors/news/press-releases/2019/02-07-2019-135807128 (last visited June 17, 2020)

[17]     According to a recent news article entitled *New Details on Lawsuit Against WWE Over Saudi Arabia TV Negotiations*, dated June 16, 2020 by Jeremy Thomas:

> "WWE was allegedly looking for a new broadcast partner and tries to secure a deal with Middle East Broadcasting Center (MBC).  An employee of MBC said that WWE had "wildly unreasonable expectations of the revenue it expected from a potential broadcast partner," claiming that WWE proposed an $80 million annual licensing fee. They said that WWE projected over 100 million OTT subscribers, based on the number of OSN subscribers who watched WWE.  However, MBC's projections allegedly were that WWE would get 6.5 million subscribers "at most."  WWE rejected this estimate and MBC raised

79.     OSN responded with a letter dated November 5, 2018, in which OSN's general counsel informed the Company that OSN was contemplating the future long-term funding of its business and hoped to respond to the Company about the missed payments after an upcoming Board meeting.

80.     According to Nohra, in November 2018, OSN sent the Company an unsolicited settlement proposal, in which OSN's general counsel informed the Company that it intended to exit its sport content business and conclude its sports coverage in early 2019.

81.     Negotiations followed, and, according to Nohra, the Company and OSN entered into a settlement agreement dated December 18, 2018 pursuant to which OSN and the Company agreed to the early termination of their media-rights agreements effective March 31, 2019, and OSN agreed to pay the Company all rights fees owed for 2018 and through March 31, 2019.

82.     These facts are further confirmed by Andrew Warkman—who is the Company's current VP and General Manager of WWE UK & Ireland, but who worked at OSN through March 2019.  Warkman explained that, in his role at OSN, he was responsible for managing the OSN's relationship with the Company.

83.     Warkman states that by 2018, OSN's business was struggling, and the OSN board of directors made the decision to shut down the network's sport channels.  Warkman was directed to discuss early terminations and settlements with OSN's sports rights holders, including the WWE.

---

their estimate to 10 million subscribers in order to be cooperative, then to 15 million "only to please WWE, not because MBC felt the projections were realistic."

The employee said that WWE dropped their asking price for licensing to $50 million, which was still well above the $14.5 million that MBC felt was its upper limit. Negotiations ended there. WWE has yet to announce a new TV deal in the area despite informing investors that they planned to have the deal done by the end of 2019.

84.     According to Warkman, on December 18, 2018, the Company and OSN entered into a settlement agreement pursuant to which OSN and the Company agreed to the early termination of their operative agreement effective March 31, 2019.

85.     In reality, and unbeknownst to the market, the Company tried to find a replacement partner for the OSN agreement—which had already been canceled, effective March 31, 2019. According to Nohra,  after WWE and OSN agreed to terminate the OSN Media Rights Agreements as of March 31, 2019, WWE entered into discussions with the Saudi General Sports Authority and/or Saudi General Entertainment Authority ("GEA") regarding a potential new exclusive media rights agreement in the MENA region upon the termination of the OSN Media Rights Agreements. According to Nohra, this potential new exclusive media rights agreement did not involve OSN in any respect.

86.     But Defendants knew all along, or were deliberately reckless in disregarding, that negotiating a *brand new* agreement with a *new* provider, would take time, and would not be completed by the end of 2019—as Defendants had assured the market.

87.     When discussing its full-year guidance on the July 25, 2019 call, Defendant Barrios stated "This guidance assumes continued improvement in our engagement metrics, a second large-scale event in the MENA region and the completion of a media rights deal in the MENA region. We believe we have agreements in principles with the Saudi – in principle with the Saudi General Sports Authority on the broad terms for the latter 2 items."

88.     On the same call, Defendants also announced that they had completed certain other international media rights agreements that were up for renewal, and Defendant V. McMahon assured investors that the MENA deal would get done "very soon": "We have completed our content distribution agreements in BT Sport in the U.K., Latin America Fox Sports, and in China,

PP Sports.  We're excited about that.  Excited we can influence or they can influence as well, the ability to do localized content in addition to enhance the content that they currently have in a more in-depth capacity.  And importantly, it's another way and a deeper way of reaching our audience and a new audience as well.  Obviously, there's India and MENA to do, and ***we are going to be close to announcing those deals very soon***."

89.     Although the Company disclosed on the July 25, 2019 earnings call that the Company's existing media-rights agreement in the MENA region had terminated, the Company also assured the market that a new deal would get done "very soon," which they claimed would allow the Company to meet its full-year 2019 guidance.

90.     On February 6, 2020, the Company announced its disappointing financial results and lower-than-expected full-year 2020 guidance. The earnings release issued by the Company revealed that consumer engagement metrics had continued to deteriorate in the fourth quarter, and that the Company had achieved just $180 million in adjusted OIBDA for the year due to the failure to complete the MENA distribution agreement with the Saudis.  On an earnings call to discuss its results, Defendant Riddick confirmed that the Company's 2020 financial guidance did not include any revenues related to a prospective MENA deal since the deal had not been finalized and continued delay was expected.

91.     Defendants acknowledged that the Company's full-year 2020 financial projections presumed that a media-rights agreement with the Saudi government would ***not*** be completed at all in 2020.

92.     Since February 2020 it is believed that the Saudi government has little incentive to enter into a media-rights agreement with the Company because the Saudi government is

purportedly backing a local pirate television and streaming service.[18]

93.     A report by the World Trade Organization ("WTO") has recently surfaced that "firmly establishes that the Saudi government is behind beoutQ," which is a "pirate satellite TV and streaming service that offers illegal access to sporting events."[19]  Since its inception in 2017, BeoutQ illegally transmitted at least "ten encrypted channels via the Riyadh-based satellite provider Arabsat and [sold] set-top boxes across Saudi Arabia and other Arab-speaking countries."[20]  The stolen content on these channels "included all the major international football competitions, as well as other major international sports, such as Tennis, NFL, NBA, Formula 1, Olympics, and WWE."[21]

## THE COMPANY'S PUBLIC STATEMENTS

94.     Plaintiffs allege that the statements below were materially false and misleading because they omitted to disclose material information of which Defendants were aware or were reckless in not knowing.   As alleged herein, such statements artificially inflated or artificially maintained the price of WWE securities and operated as a deceit on the Company in connection with the share repurchases that Defendants caused the Company to engage in during the time period in issue.   Because Defendants chose to speak on the issues described herein, it was important that they not mislead or withhold material information.  As described below, Defendants

---

[18]     Mark Sweney, *Saudi Arabia criticised over pirate TV service 'that airs Premier League'*, dated Jan. 27, 2020 at  https://www.theguardian.com/media/2020/jan/27/saudi-arabia-pirate-tv-premier-league-eu-beoutq (last visited June 19, 2020).

[19]     Sean Ingle, *Newcastle takeover in serious doubt as WTO rules pirate TV channel is Saudi,* THE GUARDIAN, dated May 26, 2020 at  https://www.theguardian.com/football/2020/may/26/newcastle-takeover-in-serious-doubt-as-wto-rules-pirate-tv-channel-is-saudi (last visited June 18, 2020).

[20]     Sam Carp, *Walking the plank: Why the BeIN-BeoutQ piracy saga has implications beyond Qatar,* SPORTSPROINSIDER.COM, dated Dec. 14, 2018 at  https://www.sportspromedia.com/from-the-magazine/bein-sports-beoutq-piracy-qatar-saudi-arabia-interview-feature (last visited June 18, 2020).

[21]     Paul Nichoson, *Saudis lose first round of beoutQ battle at WTO after EU and China speak against*, *Inside World Football,* dated Dec. 19, 2018 at http://www.insideworldfootball.com/2018/12/19/saudis-lose-first-round-beoutq-battle-wto-eu-china-speak/ (last visited June 18, 2020).

created an impression of a state of affairs at the Company that differed in a material way from the one that actually existed.

95.     On February 7, 2019, the Company issued a press release announcing its fourth quarter and fiscal 2018 ("4Q18" and "FY18") financial results for the period ended December 31, 2018 and providing fiscal year 2019 ("FY19") financial guidance.  The press release stated that during FY18, the Company had successfully "[p]roduced new, large-scale international events (Greatest Royal Rumble, Crown Jewel, and Super ShowDown) and compelling content across platforms."  The press release also stated that the Company expected to achieve "Adjusted OIBDA of at least $200 million" for the year, stating:

> **Financial Outlook 2019**
>
> *In 2019, WWE management expects the Company to achieve* another year of record revenue of approximately $1.0 billion and, as previously communicated, is targeting Adjusted *OIBDA of at least $200 million*, which would also be *an all-time record* (up at least 12% from Adjusted OIBDA of $178.9 million in 2018)
>
> Management believes that increasing fan engagement over the next few years can enhance WWE's brand value and strengthen the Company's ability to optimize the value of its content over the long-term.  *Given the potential magnitude of this opportunity and its importance to long-term growth, the Company plans to continue to invest in* content, digitization and *international development*.
>
> *                *                *
>
> Achieving the targeted range of full year results assumes substantial revenue, which supports Adjusted *OIBDA of at least $100 million* in the fourth quarter. (Footnote omitted.)

96.     On February 7, 2019, the Company held a conference call with analysts, media representatives and investors to discuss the Company's 4Q18 results.  During the earnings call, which Defendants V. McMahon, Wilson and Barrios participated in, Defendant V. McMahon stated: "Our international revenue surpassed $300 million for the first time in history . . . [as] we performed large-scale record-breaking events, [including] *Greatest Royal Rumble*."

97.     On the call, Defendant Barrios tied the $200 million adjusted OIBDA guidance to

the Company's continued success and efforts in the Middle East region.  Defendant Barrios stated:

> So if we're moving revenue at a faster clip than we anticipate, we may put some
> additional investments in the fourth quarter but ***all geared towards hitting that $200
> million in OIBDA for the year***.
>
> And as we talked about in the prepared remarks, ***it really is on those areas of
> continuing to drive content, especially the localization of our current content and
> potentially local content in some of our key international markets***.
>
> We just think that's a big addition to the flywheel that we've built.  We'll continue
> to invest in digital products and digitization kind of writ large, the network being
> kind of one of the largest manifestations of that.  And we'll continue to put more
> people, more kind of functional roles in our key markets, in India, in the Middle
> East, in China, in Latin America.  So that's what we're going to do.  As we said
> again in the prepared remarks, we think there's a long tail for us in the monetization
> of content, both in the U.S. and outside the US.  And we think the opportunity is
> one we want to make sure we take advantage of.
>
> ***In terms of the rights renewal process outside the U.S., obviously, there's a lot of
> key markets that we're still working on, U.K., India, China, Latin America, the
> Middle East.  We'll announce those as the deals get done or shortly thereafter***.

98.     On February 7, 2019, the Company also filed its FY18 Annual Report on Form 10-

K with the SEC ("FY18 10-K"), which was signed by Defendants V. McMahon, S. McMahon,

Levesque, Wilson, Goldfarb, Ong, Peterson, Riddick, Singh, Wexler and Barrios.  Defendants V.

McMahon and Barrios also certified the accuracy of the report pursuant to the Sarbanes Oxley Act

of 2002.  The FY18 10-K emphasized the continuing importance of the Company's Saudi business

dealings, stating as follows:

**Customers**

> Our customers include content distributors of our media content through their
> networks and platforms, fans who purchase tickets to our live events, purchase our
> merchandise at venues or online through our eCommerce platforms and subscribers
> to WWE Network, advertisers and sponsors, consumer product licensees, and film
> distributors/buyers.  ***As noted elsewhere, we have several important partners,
> including*** NBCU who carries the domestic television distribution of Raw and, until
> October 2019, SmackDown Live, the Fox Network which beginning October 2019
> will begin distributing SmackDown Live, and ***the General Sports Authority of the***

*Kingdom of Saudi Arabia who, among other things, hosts our live events in the Middle East*.

99.    In addition, the FY18 10-K highlighted the importance of the Saudi relationship, reporting that "[i]n 2018, WWE embarked on an important long-term partnership with the General Sports Authority of the Kingdom of Saudi Arabia for, among other things, a series of live events in that region." It also stated that WWE had "an important partnership with the General Sports Authority of the Kingdom of Saudi Arabia" that was then "***expected to continue to constitute a significant percentage of [WWE's] revenues***."

100.    In the FY18 10-K, the Company also identified the following relevant risk factors:

***Our failure to maintain or renew key agreements could adversely affect our ability to distribute our media content, WWE Network, our films and/or other of our goods and services, which could adversely affect our operating results***.

Our media content is distributed by cable, satellite and broadcast television networks and digital platforms around the globe. As detailed below, we depend on third parties for many aspects of the operation and distribution of WWE Network. Our films are generally also distributed by other, more established film companies. Because a large portion of our revenues are generated, directly and indirectly, from this distribution, any failure to maintain (such as due to a breach or alleged breach by either party) or renew arrangements with distributors and platforms, the failure of distributors or platforms to continue to provide services to us or the failure to enter into new distribution opportunities on terms favorable to us could adversely affect our financial outlook, liquidity, business and operating results. We regularly engage in negotiations relating to substantial agreements covering the distribution of our media content by carriers located in the United States and abroad. We have a substantial relationship with NBCU as they distribute the vast majority of our television programming domestically through their cable networks.

As previously announced, we have reached an agreement under which beginning October 2019, the domestic distribution of our program, SmackDown Live, will move to broadcast television on the Fox Network. Raw will continue to be carried by NBCU on USA Network. ***We also have an important partnership with the General Sports Authority of the Kingdom of Saudi Arabia***. These relationships are expected to continue to constitute a significant percentage of our revenues. The number of subscribers and ratings of television networks and advertising revenues in general have been reported as being impacted by viewers moving to alternative media content providers, a process known as "cord cutting" and "cord shaving". Many well-funded digital companies have been competing with the traditional

television business model and, while it has been widely reported that they are paying significant amounts for media content, it is not clear that these digital distributors will replace the importance (in terms of money paid for content, viewer penetration and other factors) of television distribution to media content owners such as WWE. ***We have significant relationships outside the United States with distributors nearing the end of their terms, including in the United Kingdom, India, Latin America and the Middle East***. Many of our other goods and services, such as our toys, video games and home video offerings are manufactured and sold by other parties under licenses of our intellectual property or distribution agreements. Our inability for any of the reasons set forth in these Risk Factors to maintain and/or renew or replace these agreements on terms favorable to us could adversely affect our financial outlook, liquidity, business and/or operating results.

101.    Defendants' above referenced statements were materially false and/or misleading when made in that they failed to disclose that:

(a)    ***OSN had informed the Company <u>in November 2018</u> that it would not renew its media rights agreement*** and the parties had entered into a settlement dated December 18, 2018 formally terminating the contract effective March 31, 2019, meaning the renewal of that particular media agreement for distribution of the Company's content in its key MENA market was impossible, and forcing the Company to seek a new media partner for distribution of its content in the Middle East, which put in serious jeopardy the ability to finalize a media-rights agreement for the MENA region by the end of 2019.

102.    Analysts at Wolfe Research stated in a February 7, 2019 report that the Company had a "Heckuva Q4 beat, but the read-thru on 2020 is what gets us excited." The Wolfe Research report also noted that "[t]he Saudi deal is proving to be an Intercontinental champ," with "Rev., OIBDA, and EPS beat across the board . . . thanks to a Saudi partnership that has more juice than we imagined." In addition, analysts at MKM Partners stated: "Outperformance came almost entirely from the Media segment and likely reflected the positive impact associated with the Crown Jewel PPV event, which was held in Saudi Arabia as well as modest upside from TV rights."

**February 26, 2019 – Company Conference Presentation**

103.    On February 26, 2019, Defendant Barrios presented to investors at the Morgan Stanley Technology, Media & Telecom Conference.   Defendant Barrios stated that the negotiations on the MENA distribution rights deal were "***ongoing***," with a target to "***get that locked down by the middle of the year***."  Defendant Barrios also stated that the "Middle East is now #2 in 2018 after the U.S." in terms of gross monetization and that (referring to media-rights agreements) "***locking those down [is] obviously, important for us strategically because our distribution partners for the core content is a key part of the value creation for the business, important for us financially.  We'll have a lot of visibility over the next several years for a pretty significant portion of our revenue, so really important***."

104.    In response to a question from an analyst from Morgan Stanley about wrapping up negotiations on outstanding media rights deals and whether those deals would contribute revenue as soon as 4Q19, Defendant Barrios confirmed they would:

**<u>Benjamin Daniel Swinburne, Morgan Stanley, Research Division</u>**

Yes, and then just to wrap up on this – on the rights front.  ***Once we get all these deals done, revenue will step up nicely in '20 and in the fourth quarter this year***.  These projects that you've got going on are stuff that you guys are making determinations that are worth spending money on.

**<u>George A. Barrios, Co-President & Director</u>**

***That's right***

*     *     *

**<u>Benjamin Daniel Swinburne, Morgan Stanley, Research Division</u>**

Okay.  We're out of time.  George, good luck with all the international renewals.  I'm sure they'll visit.

**<u>George A. Barrios, Co-President & Director</u>**

Great. Guys, thank you.

105.    Defendants' statements above contained in ¶¶ 103, 104 were materially false and/or

misleading for the same reasons set forth in ¶ 101(a).

**June 26, 2019 – Company Conference Presentation**

106.    On June 26, 2019, Senior Vice President of Investor Relations Michael Weitz

presented to investors at the 6th Annual Bernstein Future of Media Summit Conference, stating

that the media deal in the Middle East is an "important deal[]," and while not completed, he touted

that "***there are elements to those that we feel really good about***."   He stated in pertinent part:

> ***We've also been very public that there's another series of deals that are important
> to us right now.  So we – just to answer your question about kind of what's around
> the corner. The deals that we talked about U.K., India, China, Latin America and
> the Middle East.***  And so we put out some releases over the past 2 weeks that we've
> been successful in completing deals in the U.K., we've been successful in
> completing it in Latin America, and we've been successful, whom am I missing, in
> China. So those are the 3.  ***So there's still a few to go, India, in particular, and the
> Middle East, in particular.***  And by the way, next – somewhere down the path will
> be Germany. ***So those are coming and important deals for us. So we're not going
> to talk terms, but there's really interesting elements of those that become really
> important. The ability to expand reach through elements like free-to-air, the
> ability to offer – to commit our partners to localize content really important. That
> helps build the engagement. So the – so*** while I'm not talking about direct
> economic terms, there are elements to those that we feel really good about. So that's
> that. So...

107.    The statement Defendants caused WWE to make contained in ¶ 106 was materially

false and/or misleading for the same reasons set forth in ¶ 101(a).

**July 25, 2019 – 2Q19 Financial Results**

108.    On July 25, 2019, the Company reported its financial results for 2Q19, ended June

30, 2019.  The press release stated that "[d]uring the quarter, WWE continued to demonstrate

success in staging large-scale, action packed events for its fans, including . . . Super ShowDown

in Jeddah, Saudi Arabia."  The Super ShowDown event had occurred on June 7, 2019, and the

release touted the event as a major driver of the Company's results and portrayed its successful

operations in Saudi Arabia as a pillar of its FY19 financial guidance.  The press release stated:

> George Barrios, Co-President, added "In the quarter, our earnings exceeded guidance, however we anticipate a portion of this to reverse and we continue to target full-year Adjusted OIBDA of at least $200 million. The guidance presupposes the staging of a second large scale international event and the completion of a media rights deal in the MENA region.  As we optimize near-term results, we will continue to focus on content creation, localization and digitization, including the evolution of our direct-to-consumer network, to drive long-term growth."

> **Second-Quarter Consolidated Results**

> \*       \*       \*

> Adjusted OIBDA (which excludes stock compensation) was $34.6 million as compared to $43.5 million and the Company's Adjusted OIBDA margin was 13% as compared to 15% in the prior year quarter, respectively. The current period results exceeded guidance primarily due to enhanced revenue recognized in conjunction with the Company's recent event in Saudi Arabia, which is expected to reverse in connection with an anticipated fourth quarter event in that country.

> \*       \*       \*

> **Cash flows used in operating activities** were $7.6 million as compared to $74.2 million of cash generated in the prior year quarter driven by unfavorable changes in working capital, ***which was primarily related to the timing of the Saudi event in June as the prior year event was held in April***, as well as lower operating performance.

109.    The Company press release also stated that the Company had reached non-binding

"***agreements in principle*** with the Saudi General Sports Authority on the broad terms" for a second

large scale live event and a media rights deal for the MENA region.  It stated:

> <u>**Financial Outlook 2019**</u>

> ***The Company reiterated its full year guidance, which targets revenue of approximately $1 billion and Adjusted OIBDA of at least $200 million. This guidance assumes continued improvement in WWE's engagement metrics, a second large scale event in the MENA region, and the completion of a media rights deal in the MENA region. The Company believes it has agreements in principle with the Saudi General Sports Authority on the broad terms for the latter two items***; however, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or that

engagement does not improve as assumed. The Company has evaluated these potential outcomes and currently believes that the most likely downside to its Adjusted OIBDA would be approximately $10 million to $20 million below its current outlook.

**The Company's full year guidance reflects strong fourth quarter results with substantial revenue growth from** both the Company's new content distribution agreements in the U.S., which become effective in that period, **and the aforementioned media rights deal in the MENA region.**

110.    On July 25, 2019, the Company held a conference call with analysts, media representatives and investors to discuss the Company's 2Q19 results.  During the earnings call, which Defendants V. McMahon, Wilson and Barrios participated in, Defendant V. McMahon stated, with respect to the media-rights agreement in the Middle East: "Obviously, there's India and MENA to do, and **we are going to be close to announcing those deals very soon**."

111.    Also, Defendant Barrios stated that, "[d]uring the quarter, we achieved adjusted OIBDA of $34.6 million, which exceeded our guidance, **primarily due to enhanced revenue recognized in conjunction with our recent event in Saudi Arabia.  That enhanced revenue is expected to reverse in connection with an anticipated fourth quarter event in that country**."

112.    Defendant Wilson stated: "**During the quarter, we continue[d] to successfully stage large-scale events for our fans, including . . .  Super ShowDown in Jeddah, Saudi Arabia.**"

113.    Defendant Barrios also spoke further as to the Company's guidance and the positive impact of the Saudi relationship, stating:

> **For the full year, we continue to target record revenue of approximately $1 billion and adjusted OIBDA of at least $200 million. This guidance assumes** continued improvement in our engagement metrics, **a second large-scale event in the MENA region and the completion of a media rights deal in the MENA region. We believe we have agreements in principles with the Saudi – in principle with the Saudi General Sports Authority on the broad terms for the latter 2 items**.

> However, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or the engagement does not improve as assumed. We valuated these potential outcomes and currently

believe that [the] most likely downside to our adjusted OIBDA would be approximately $10 million to $20 million below our current outlook. ***Our full year guidance reflects strong fourth quarter results, substantial revenue growth*** from both our new content distribution agreements in the U.S. which become effective in that period, ***and the aforementioned media rights deal in the MENA region***.

As you know, ***we're in the process of finalizing our distribution plans for Raw and SmackDown*** in 2 international markets, India and ***the Middle East. As we stated in our last earnings call, we expect to finalize these plans later this year***.

114.     Defendant Barrios also added that "[i]n the Middle East, our pay TV agreement has been terminated, but our free-to-air agreement continues to be in place."

115.     In response to an analyst question regarding "what's going on in Saudi Arabia under the deal terms," Defendant Barrios stated:

Yeah

So we just had an event on June 7. That event was part of the 10-year agreement that we've signed.  And Laura, what we're saying is right now in our forecast, which is what suspends our guidance, our guidance is our internal forecast, we are assuming that we'll do a second event in the region and that we will also complete a media rights deal in the region.  And if those 2 comes to fruition, we believe we'll hit our $200 million. And what we're saying on the downside is, if some combination – obviously, it's not the ultimate downside case, but our best estimate of a downside case, around either those developments not coming to fruition or the engagement not improving to the level we expect it to.

We estimate the most likely downside at $10 million to $20 million. On the free cash flow side in the quarter, because of the timing of the event and the accounts receivable, our collection of that, because it happens so much later in the quarter. Last year, the MENA event happened on April 27. So we collected in the second quarter, so we didn't have an outstanding AR at the end of the quarter.

At this time, we expect to collect in the third quarter, which is why you see that so you see that reverse.

116.     As a result of Defendants' misrepresentations and omissions, the Company's stock price was artificially inflated.  Defendants' statements drove the price of the Company's shares up $1.31 per share, or about 1.75%, to close at $75.99 per share on July 26, 2019.

117.     Defendants' statements contained in ¶¶ 108-115 were materially false and/or

misleading when made in that they failed to disclose that the new media-rights agreement the Company purportedly began negotiating in 2019 with a different media company would not be completed in 2019.  *See also* 101(a).

118.    Analysts reacted positively to Defendants' statements and their guidance.  Analysts at JP Morgan stated as follows in a July 25, 2019 report: "Overall, we view today's commentary and guidance positively."  The report continued: "we're further encouraged to learn that the MENA deal is being negotiated with the Saudi General Sports Authority, whose ten year partnership with WWE clearly reflects interest in the content," and also stated that the WWE's "outlook is dependent on a second Saudi event and media rights agreement covering the MENA region (for which it has nonbinding understandings with the Saudi General Sports Authority)."

**October 31, 2019 – 3Q19 Financial Results**

119.    On October 31, 2019, the Company issued a press release providing its third quarter 2019 ("3Q19") financial results.  The press release stated that the Company's revenues and operating income had continued to decline year over year to $186.3 million and $6.4 million, respectively.  The Company also announced that it was lowering its FY19 adjusted OIBDA guidance to a range of $180 million to $190 million due in large part to the Company's failure to complete a MENA distribution agreement with the Saudis.  The press release stated:

> *The Company has modified its full year 2019 guidance to an Adjusted OIBDA range of $180 million to $190 million, which would be an all-time record.  The change is attributable to the delay in completing a previously contemplated agreement in the MENA region and the impact of accelerated investment to support content creation*. While the Company continues to work toward the completion of a MENA agreement, no assurances can be given in this regard. The Company expects to have clarity on this point in advance of providing guidance for 2020.

120.    On October 31, 2019, the Company held a conference call for analysts, media representatives and investors to discuss its 3Q19 results.  During the earnings call, which

Defendants Wilson and Barrios participated in, Defendant Barrios reiterated that the new media

rights agreement for the MENA region, announced on July 25, 2019, has not yet been completed.

Barrios stated:

> *Our previous full year guidance, which targeted adjusted OIBDA of at least $200 million, to continued improvement in our engagement metrics, second, large-scale event in the MENA region and the completion of a media rights deal in the MENA region.  Although we are holding a second large-scale event today in Riyadh, Saudi Arabia, our previously contemplated agreement for the region has not yet been completed.*
>
> Additionally, we've also accelerated investment to support the creation of our core In Ring content, while reducing or delaying other expenses to lessen the impact of that spending.  *Given these developments, we've modified our full year guidance to an adjusted OIBDA range of $180 million to $190 million.*

121.    On the call, Defendant Barrios reiterated that "*no assurances*" could be given that

the deal would ever be completed.

122.    In response to a question regarding whether the lowered guidance was related to

the Saudi media deal, Defendant Barrios stated "*we had anticipated the deal would have been*

*completed early in the quarter, it hasn't*" and "*that has an impact on the guide.*"

**David Karnovsky, JP Morgan Chase & Co, Research Division**

[…] On the lower outlook for 2019, I think there's been some confusion on the guide since you are holding the Crown Jewel event today. Can you bucket out the $10 million to $20 million between the Middle East deal, the performance of some areas that are more transactional and content investment? And then just on the pull forward of spend, can you just talk about where you're investing more in content now?  […]

**George A. Barrios**

*Yes. So we can't bucket out within them. Giving a little bit more color, we had anticipated the deal would have been completed early in the quarter, it hasn't. So that has an impact on the guide.* And then as I mentioned, we brought forward some investments into our core In Ring content. As I said before, those investments really – or the production of that content really has 3 components. It has the creation of the storyline, second is attracting, developing and retaining talent, and then the third is the production elements that go into what our fans experience at the event

and also what they watch on video. And so we accelerated some investments across all 3 of those core In Ring content elements.

123.     In response to a question regarding whether the Saudi media deal was dead, Defendant Barrios confirmed that "*discussions are ongoing*."

### Eric Isaac Katz, Wolfe Research, LLC

Okay. And then, I know it was mentioned in the release and you kind of said it upfront on the call regarding the deal that no assurances can be given, and I know you can't guarantee a deal, but I guess the last line about insurances didn't necessarily need to be in there. So it sounds like to us, there's a scenario where a deal might not get done, even though there's an agreement in principle. So I guess maybe just trying to be clear on what are the sticking points that could potentially cause a deal to die, even though you have a 10-year partnership with the Kingdom?

### Defendant Barrios

*I think it's like any other discussion you're having with a partner, you're trying to find a common ground that works for you. 3 months ago, we expected that deal to be finalized. As I characterized it now is discussions are ongoing.  So I'll leave it at that.  I'm not sure there's much more I can add than that. But I would say it's similar to all discussions, you're just trying to find common ground.*

124.     On the call, Defendant Barrios added that "*we never really talked about a timeline on the MENA region so I'll stay away from that.*"

125.     On this news, the Company's stock price fell $10.40 per share, or 15.65%, to close at $56.04 per share on October 31, 2019.

126.     Defendants' statements above were materially false and/or misleading when made in that they failed to disclose that the new media-rights agreement the Company began negotiating in 2019 with a different media company owned would not be completed in 2019, nor was it reasonable for the Company to believe it would be completed in 2020 given the circumstances present.  *See also* 101(a).

127.     Analysts were collectively critical of the Company, especially regarding the MENA

deal, or lack thereof.  For example, analysts at Wolfe Research stated as follows in an October 31, 2019 report:

> Well, that was frustrating. Again.  We're all in a tough spot because we have even less visibility into 2020 given the new overhang called MENA and the pull-forward of investment spend. We don't necessarily think the lower 2019 guide has an impact on 2020 – but we got nothing to go on, hence the stock's -16% reaction. What did we decide to do? Well, we lowered Q4 '19 to $112MM vs. the $108-118MM guide – so we now sit at $185MM for 2019. We removed MENA from our 2020 and beyond – which took our revenue down by ~$15MM annually (~1%). We also took out a recurring 2nd Saudi event - ~$50MM in rev. and $20MM in OIBDA. And we left our underlying expenses relatively unchanged (excl. the removal of a 2nd Saudi event), at ~+3%y/y – recall that we incorporate ~+1% of regular opex and ~+2% of investment spend. This takes our '20 EBITDA down to $439MM from $475MM – we remind you that before this call, Consensus was at $436MM.
>
> How much is MENA? The prior deal with OSN ended earlier in 2019, which we estimate was ~$9MM/yr. We were thinking that the new deal steps up 1.5x to around $15MM/yr, which would all be incremental at this p int. If we're right, then ~$4MM of the Q4 miss is MENA-related.

**November 4, 2019 – Press Release**

128.    On November 4, 2019, just days after the *Crown Jewel* live event in Riyadh, Saudi Arabia, the Company issued a press release reporting that it had finalized a deal with the Saudi GEA to add a second live event each year throughout the duration of the 10-year agreement. The press release also noted that "***WWE and GEA also continue to work towards the completion of a media agreement in the MENA region,***" stating:

> Following the historic Crown Jewel event in Riyadh, WWE (NYSE: WWE) and the Saudi General Entertainment Authority (GEA) have expanded their live event partnership through 2027 to include a second annual large-scale event.  ***WWE and GEA also continue to work towards the completion of a media agreement in the MENA region.***
>
> ***This long-term partnership demonstrates WWE and GEA's commitment to bring sports entertainment to the region and supports Saudi Arabia's Vision 2030.***

129.    As a result of Defendants' misrepresentations and omissions, the Company's stock

price was artificially inflated. Defendants' statements drove the price of the Company's shares up $2.61 per share, or about 4.91%, to close at $55.77 per share on November 5, 2019.

130.    Defendants' statements contained in ¶ 128 were materially false and/or misleading when made in that they failed to disclose that the new media-rights agreement the Company began negotiating in 2019 with a different media company owned would not be completed in 2019, nor was it reasonable for the Company to believe it would be completed in 2020 given the circumstances present. *See also* ¶ 101(a).

**December 9, 2019 – Company Conference Presentation**

131.    On December 9, 2019, Defendant Barrios presented to investors at the UBS Global TMT Conference. During the conference and in response to an analyst question regarding "international renewals," Defendant Barrios continued to mislead the market about the prospects of completing the Saudi media deal, stating that it was still "***working through [the deal]***."

> **Unknown Analyst**
>
> Last question I got is probably one of your favorites. Any updates on international renewals, India, Middle East? Or when do you expect to have an update?
>
> **George A. Barrios**
>
> ***Yes. I mean so we mentioned on the last call that we were working through those. So at this point, nothing really to update.***

132.    Defendant Barrios' statements about contained in 131 were materially false and/or misleading for the reasons set forth in paragraphs 101(a), 130.

**January 7, 2020 – Company Conference Presentation**

133.    On January 7, 2020, Defendant Barrios presented to investors at the Citi 2020 Global TMT West Conference. During the conference, Defendant Barrios admitted that the Company prematurely announced the near completion of a media rights deal with the Saudi

government in July 2019, stating in pertinent part:

> *Yes. So – and probably the better way to describe it is, would be Middle East-North Africa rights, primarily for Raw and SmackDown. So we – which we've had agreements in that region, both free-to-air with MBC and Pay with OSN. In the second quarter, I believe we said when we confirmed or supported the guidance for full year 2019 was that one of the things that subtended that was our expectation of a new deal in the market. That didn't come to fruition. So we talked about it in the third quarter that we continue to work with GSA on those rights. We think we'll get a deal then, but it didn't come to fruition in the time frame that we thought.*

134.    Even at the time of this conference, analysts were still confused as to the various deals the Company had in Saudi Arabia, requesting more details:

**<u>Unknown Analyst</u>**

Okay. But then that's separate and apart from any sort of broadcast of live content in Saudi Arabia, it's a totally separate deal. Is that right?

**<u>Defendant Barrios</u>**

Well, we have 2 agreements for 2 events that we've been doing large events. Those have media elements to those. But separate and apart from that, there's the rights to the core content, which is Raw and SmackDown, and also the content that currently lives on WWE Network.

135.    Defendant Barrios' statements about contained in ¶¶ 133, 134 were materially false and/or misleading in that they failed to disclose that the new media-rights agreement the Company began negotiating in 2019 with a different media company owned would not be completed in 2019, nor was it reasonable for the Company to believe it would be completed in 2020 given the circumstances present. *See also* ¶ 101(a).

**<u>January 30, 2020 – Defendants Barrios and Wilson Forced Out of Company</u>**

136.    On January 30, 2020, WWE announced that *two of its most senior and longest serving executives, Defendants Barrios and Wilson, had abruptly left the Company*. Analysts and market commentators reacted with shock at the sudden loss of two key figures who had long

been part of the public face of the Company.  For instance, *Forbes* described the departures as a "bloodbath" that had caused "[p]anic and uncertainty" throughout the Company's corporate offices.

137.    In addition, the Company preannounced its 4Q19 results and revealed for the first time that it "***expects its full year 2019 Adjusted OIBDA to be approximately $180 million***" which was at the lower end of guidance of $180 million to $190 million provided by the Company on October 31, 2019.

138.    On this news, the Company's stock price fell $13.42 per share, or 21.54%, to close at $48.88 per share on January 31, 2020.

139.    The full truth about the Company's inability to secure a media rights deal with the Saudi Arabian government and its effects on the Company's revenues was not revealed until February 6, 2020 when the Company issued a press release, reporting disappointing financial results for 4Q19 and reduced guidance for full year 2020.  The press release revealed that consumer engagement metrics had continued to deteriorate in the fourth quarter, and that the Company had achieved just $180 million in adjusted OIBDA for the year (which was preannounced a week prior) due to the failure to complete the MENA distribution agreement with the Saudis.  The press release stated:

> *"For the year, we achieved record revenue and Adjusted OIBDA. However, with the delay in completing a Middle East distribution agreement as well as lower business performance than anticipated, our results were at the low-end of guidance," added Frank Riddick, interim Chief Financial Officer. "As we work to strengthen engagement in 2020, we are pursuing several strategic initiatives that could increase the monetization of our content, including the distribution of content in the Middle East and India as well as strategic alternatives for our direct-to-consumer service, WWE Network. Excluding the potential impact of these initiatives, we expect significant revenue growth based on the full year impact of our new content distribution agreements in the U.S. and anticipate Adjusted OIBDA of $250 to $300 million. Management believes it has the potential to exceed this range but is unable to provide additional guidance at this*

*time.*"

140.    Later in the day, the Company held a conference call with analysts, media representatives and investors to discuss its results.  During the earnings call, in which Defendants V. McMahon and Riddick confirmed that the Company's 2020 financial guidance did not include any revenues related to a prospective MENA deal. When asked if "guidance for 2020 assumes . . . 0 revenues associated with your rights -- TV rights or media rights in India and the Middle East," Defendant Riddick responded "Well, *on MENA, you're correct*."

141.    When asked later in the call to confirm whether the MENA media-rights deal assumptions were included in the 2020 guidance, Defendant Riddick confirmed that the MENA deal was not included—and, thus, if the deal was completed in 2020, it would be an addition to the projections: "Yes, we're still pursuing those new agreements.  And from our perspective, as quickly as we can get them done, that's what we're aiming for.  And I think, as I explained earlier, the India rights are – we already have existing India rights and they are in the guidance because we're already doing, being paid under that arrangement. It would be the increment on India.  *But yes, there's – for MENA, it would be an addition to their guidance.*"

142.    Later in the call, an analyst asked: "[W]hat's taking so long for the MENA and India because we thought those were going to be done like early in '19.  And is there – do we have –will we be done by the end – will we be done with those deals by the end of the first quarter when you're going to give us this comprehensive overview of WWE, do you think?"

143.    In response, with respect to the MENA deal, Defendant Riddick stated: "*The MENA rights, just the intricacies dealing with the Saudi Arabian government and their own ways of going about and doing business, I think we don't want to predict a specific date.  But as I said before, the uncertainty is around the timing and the amount, not that these deals will*

*eventually be done*."

144.    Also on the call, referring now to the Company's 2019 performance, Defendant V. McMahon stated: "*our performance was at the low end of recent guidance as we work through our Middle East distribution agreement and our ongoing efforts to strengthen our brand and customer engagement.*"

145.    Finally, Defendant Riddick disclosed that the Company's WWE Network subscribers were down for 2019: "*WWE Network's average paid subscribers decreased 10% to approximately 1.42 million . . . primarily by the impact of lower subscriber additions earlier in the year.*" This news reflected that the OSN deal had terminated earlier that year, meaning the Company lost WWE Network subscribers who previously had accessed it for free as OSN subscribers when the OSN deal was still in place.

146.    On this news, the Company's stock price fell another $4.50 per share, or 9.18%, to close at $44.50 per share on February 6, 2020.

## DEFENDANTS' KNOWLEDGE

147.    The following allegations support a strong inference of Defendants' knowledge:

(a)    Statements of current Company employees and others with knowledge corroborate that the Company was informed in November 2018 that the media-rights agreement with OSN would not be renewed;

(b)    Expansion in the MENA region and the relationship with the Saudi government was an extremely important part of the Company's growth plans and Defendants spoke of it frequently;

(c)    Certain Defendants' stock sales were highly unusual and suspicious in timing and amounted to more than $280 million; and

(d)      The abrupt departures of Defendants Barrios and Wilson.

148.      Defendants had told investors in 2018 that the Company expected to significantly grow its revenues earned on media-rights agreements in its seven largest markets, including the Middle East, over the next two years.   On June 27, 2018, Defendants told investors that the Company "expects [that] revenue from existing and new 'key content agreements,' . . . will grow to approximately $311M in 2019 and $462M in 2021,"[22] and a related presentation disclosed that the Company projected WWE's "***total*** revenue from 'key content agreements' [to] increase to $314M in 2019 and $542M in 2021."

149.      Defendants therefore touted the importance of renewing and finalizing its media-rights agreements in its largest markets, including the Middle East, and investors were heavily focused on it.

150.      Defendants also spoke about the importance of the relationship with the Saudi government and their ongoing negotiations to finalize a media rights agreement.   In fact, on July 25, 2019, Defendants specifically tied the Company's ability to meet its full-year 2019 guidance to the Company's negotiations with the Saudi government.   A press release issued that day stated: "The Company reiterated its full year guidance, which targets revenue of approximately $1 billion and Adjusted OIBDA of at least $200 million.   This guidance assumes continued improvement in WWE's engagement metrics, a second large scale event in the MENA region, and the completion of a media rights deal in the MENA region.   The Company believes it has agreements in principle with the Saudi General Sports Authority on the broad terms for the latter two items."   Because the

---

[22]      "WWE's 'key content agreements' reflect the licensing of WWE's flagship programs, Raw and SmackDown in the U.S., U.K., India, Canada, LATAM, Middle East and South Africa." June 27, 2018 Conference Call Presentation at https://corporate.wwe.com/~/media/Files/W/WWE/company-new/2018/wwe-us-deals-and-outlook-presentation-06-27-18.pdf (last visited June 18, 2020).

Company's full-year guidance depended on the outcome of these negotiations, Defendants had to have been aware of the status of those discussions.

151.    Given the critical importance of the MENA region to the Company's overall business and projected growth, including specifically the importance of finalizing a new media-rights agreement in the region, the problems detailed herein could not have occurred without Defendants' knowledge.

152.    In addition, Defendant V. McMahon sold 3,204,427 shares of WWE stock from February 2019 through February 2020 for proceeds of more than $261 million.  Moreover, during this same time period, 12,627 shares of Defendant V. McMahon's stock worth $886,794 were withheld by the Company to pay for his personal taxes in connection with Company-issued stock. ***Through these transactions, Defendant V. McMahon disposed of approximately 10.1% of his total shares that were available for sale during this time period.***

153.    Defendant V. McMahon sold more than 3.2 million Company shares for over $261 million in gross insider trading proceeds on March 27, 2019, with only a few days left in the Company's disappointing 2019 first quarter and while Defendant V. McMahon had known, or was deliberately reckless in not knowing, that OSN had informed the Company in November 2018 that it would not renew its media rights agreement and the parties had entered into a settlement dated December 18, 2018, formally terminating the contract effective March 31, 2019.   Thus documenting that renewal of that particular media agreement for distribution of the Company's content in its key MENA market was impossible, forcing the Company to seek a new media partner for distribution of its content in the Middle East, which put in serious jeopardy the ability to finalize a media-rights agreement for the MENA region by the end of 2019.

154.    The abrupt nature of Defendants Barrios and Wilson's departure from the

Company—mere days before the announcement of the disappointing financial results in the fourth quarter—provides additional evidence of Board knowledge.

155.    Defendant V. McMahon was one of the Company's largest shareholders, served as the Company's CEO, and was the Chairman of the Board.   He clearly possessed unmatched control over the Company.  Defendant V. McMahon has served at all relevant times as the CEO of the Company and Chairman of the Board.

156.    Defendant Barrios was a Co-President of the Company, its principle financial officer and a member of its Board.  Prior to his abrupt termination on January 30, 2020, he clearly had considerable control over the Company.  Defendant Barrios also sold 114,678 shares of WWE stock during the relevant period for proceeds of more than $8.6 million.  In addition, during the relevant period, 64,497 shares of Barrios' WWE stock worth $4.5 million were withheld by the Company to pay for his personal taxes in connection with Company-issued stock.  Through these transactions, ***Barrios disposed of approximately 74.1% of the total shares***, including vested stock units, he had available for sale during the relevant period.

157.    Defendant Wilson was a Co-President of the Company and a member of its Board.  Prior to her abrupt termination on January 30, 2020, she clearly had considerable control over the Company.  Defendant Wilson sold 158,134 shares of WWE stock during the relevant period for proceeds of approximately $11 million.  In addition, during the relevant period, 65,318 shares of Wilson's WWE stock worth $4.6 million were withheld by the Company to pay for her personal taxes in connection with Company-issued stock.  Through these transactions, ***Wilson disposed of 100% of the total shares***, including vested stock units, she had available for sale during the relevant period.

158.    These Defendants, as senior executive officers of the Company, were able to and

did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company.

159.    These Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.

160.    Accordingly, these Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

161.    These Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about the Company's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board meetings and committees thereof, and reports and other information provided to them in connection therewith.

162.    As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, these Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. These Defendants' wrongdoing violated these specific requirements and obligations.

163.    These Defendants are liable as primary participants in a wrongful scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or

otherwise acquired the Company's publicly traded securities, which included the dissemination of materially false and misleading statements (both affirmative statements, misleading statements and material omissions) regarding the Company's business in the MENA region, including renewal of a key media-rights agreement.

164.    The scheme: (a) deceived the investing public regarding the Company's operations and the true value of the Company's common stock, and (b) caused the Company to repurchase the Company's common stock at artificially inflated prices, which fell as the true condition of the Company's business in Saudi Arabia and the MENA region was revealed.

165.    Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit by disseminating materially false and misleading statements and/or concealing material information.  Defendants were culpable for this deceit insofar as they acted, or omitted to act, in furtherance of the scheme with scienter.

## THE COMPANY'S STOCK REPURCHASE

166.    On April 25, 2018, the Board approved a stock repurchase plan that took effect upon expiration of the prior plan on May 11, 2018 and authorized the Company to repurchase up to $90 million of stock over the six months following its effective date.

167.    On October 24, 2018, the Board approved a new stock repurchase plan, which became effective November 11, 2018, that replaced the Company's prior stock repurchase plan and authorized the Company to repurchase up to $90 million of stock over the six months following its effective date.

168.    On March 8, 2019, the Board approved a $60 million share repurchase plan which was scheduled to expire in September 2019.

169.    On May 1, 2019, the Board adjusted the repurchase parameters of the plan such that

it was expected to repurchase a further $9 million, between May 9, 2019 and the plan's initially scheduled expiration in September 2019 in addition to the $24 million purchased under the plan prior to such period.

170.    On July 29, 2019 and October 31, 2019, the Board approved further adjustments to the plan to extend its term.

171.    On February 13, 2020, the Board approved a new share repurchase plan, which became effective February 24, 2020, that replaced the Company's prior stock repurchase plan and authorized the Company to repurchase up to $40 million of stock over the six months following its effective date.

172.    On February 28, 2020, the Board adjusted the repurchase parameters of the plan, and the plan is now expected to repurchase an aggregate of approximately $19 million through the plan's expiration in August 2020.

173.    The Company was financially harmed by being cause by Defendants to make these stock repurchases at artificially inflated prices.

## **DUTIES OF THE DIRECTOR DEFENDANTS**

174.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

175.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

176.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or

practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)        ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)        ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

177.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

178.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

179.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, Waste of Corporate Assets gross, unjust enrichment, violations of

Section 10(b) of the Exchange Act and SEC Rule 10b-5 against the Director Defendants, and Section 20(a) of the Exchange Act against Defendant V. McMahon by the Director Defendants.

180.    Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

181.    Plaintiffs are current owners of the Company stock and have continuously been an owners of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

182.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

183.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

184.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  The Board was comprised of the following ten (10) defendants: Defendants V. McMahon, S. McMahon, Levesque, Riddick, Goldfarb, Ong, Peterson, Singh, Speed, and Wexler.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board as five (5) Board members are interested and thus a demand on the Board would be a futile and useless act.

185.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

186.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

187.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant V. McMahon**

188.     The principal professional occupation of Defendant V. McMahon is his employment with the Company as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   Additionally, Defendant V. McMahon is a named defendant in the securities class action *entitled City of Warren Police and Fire Retirement System v. World Wrestling Entertainment, Inc., et al.*, Civil Action No.: Civil Action No. 1:20-cv-02031-JSR (S.D.N.Y) (the "Securities Class Action").

189.     Defendant V. McMahon earned the following as a result of his employment with the Company:

|  | Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| V. McMahon | 2019 | $1,400,000 | $0 | $1,677,716 | $406,000 | $19,987 | $3,503,703 |
|  | 2018 | $1,400,000 | $0 | $1,507,401 | $2,730,000 | $20,837 | $5,658,238 |
|  | 2017 | $1,388,462 | $0 | $0 | $1,680,000 | $19,075 | $3,087,537 |

190.    Defendant V. McMahon owns 28,697,568 shares of Class B Company stock (92.3% of the class). Class B common stock is fully convertible into Class A common stock, on a one-for-one basis, at any time at the election of the holder. The two classes are entitled to equal per share dividends and distributions and vote together as a class with each share of Class B entitled *to ten votes* and each share of Class A entitled to one vote, except when separate class voting is required by applicable law. If any shares of Class B common stock are beneficially owned by any person other than Vincent McMahon or his wife, Linda McMahon, any descendant of either of them, any entity which is wholly owned and is controlled by any combination of such persons or any trust, all the beneficiaries of which are any combination of such persons, each of those shares will automatically convert into shares of Class A common stock.

191.    Defendant V. McMahon's 92.3 percent stock ownership of Class B voting stock along with his family relationship with Defendant S. McMahon (the daughter of Defendant V. McMahon) and Defendant Levesque (the husband of Defendant S. McMahon and son-in-law of Defendant V. McMahon) (both Board members) means that these Board members could not be independent as the family relationship between these Board members and the controlling stockholder demonstrate that Defendants S. McMahon and Levesque are beholden to the controlling shareholder Defendant V. McMahon.

192.    Defendant V. McMahon also owns a majority of Alpha Entertainment, LLC ("Alpha"), which owns and operates the professional football league XFL. Under arrangements made at the time of its organization, WWE received, among other things, an equity interest in

Alpha without payment by, or other financial obligation on the part of, WWE; WWE sold certain intellectual property rights relating to XFL to Alpha for a payment in the amount of $1 million; and WWE entered into a support services agreement under which WWE provides Alpha certain administrative support services on a cost-plus margin basis.  During the year ended December 31, 2019, Alpha was billed approximately $3.25 million for services under the administrative support services agreement, of which $236,000 was due at year end and subsequently paid.

193.    Further, since Defendant V. McMahon derives his principal income from his employment at the Company, it is doubtful that he can consider the demand on its merits without also pondering whether an affirmative vote would endanger his continued employment.

**Defendant S. McMahon**

194.    The principal professional occupation of Defendant S. McMahon is her employment with the Company as its Chief Brand Officer, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits.

195.    Defendant S. McMahon earned the following as a result of his employment with the Company:

| | Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| S. McMahon | 2019 | $706,019 | $0 | $502,146 | $102,950 | $716,133 | $2,027,248 |

196.    Defendant S. McMahon is also the daughter of Defendant V. McMahon.  Because of this familial relationship, it is reasonable to conclude that these individuals would not sue each other.

197.    Defendant S. McMahon also owns 1,977,382 shares of Company B stock or 6.4% of Class B stock.  Defendant S. McMahon's mother, Linda E. McMahon owns 566,770 shares of

Company B stock or 1.8% of Class B stock.

198.    There is a reasonable inference that Defendant S. McMahon is beholden to her father's (Defendant V. McMahon) voting control of Company stock; therefore, her discretion is sterilized.

199.    Further, since Defendant S. McMahon derives her principal income from her employment at the Company, it is doubtful that she can consider the demand on its merits without also pondering whether an affirmative vote would endanger her continued employment.

200.    Defendant S. McMahon also has booking agreements with the Company (*see* DEF 14A, dated March 6, 2020 at p. 20) raising the inference that she is unlikely to sue herself.

201.    Defendant S. McMahon also receives compensation in her capacity as employee of the Company and as an independent contractor performer for the Company, including participating in talent royalties for certain Company products bearing her name and/or likeness.  Defendant S. McMahon has a booking contract with the Company.

**Defendant Levesque**

202.    The principal professional occupation of Defendant Levesque is his employment with the Company as its EVP of Global Talent Strategy & Development, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Defendant Levesque is the husband of Defendant S. McMahon.

203.    There is a reasonable inference that Defendant Levesque is beholden to his father-in-law's (Defendant V. McMahon) voting control of Company B stock; therefore, his discretion is sterilized.

204.    Further, since Defendant Levesque derives his principal income from his employment at the Company, it is doubtful that he can consider the demand on its merits without

also pondering whether an affirmative vote would endanger his continued employment.

205.   Defendant Levesque earned the following as a result of his employment with the Company:

| | Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Levesque | 2019 | $706,019 | $0 | $502,146 | $102,950 | $2,016,977 | $3,328,092 |
| | 2018 | $678,875 | $0 | $615,895 | $667,022 | $3,069,667 | $5,031,459 |
| | 2017 | $643,288 | $0 | $696,788 | $390,000 | $1,493,640 | $3,223,716 |

206.   Defendant Levesque also has booking agreements with the Company (*see* DEF 14A, dated March 6, 2020 at p. 20), raising the inference that he is unlikely to sue himself.

207.   Defendant Levesque also receives compensation in his capacity as employee of the Company and as an independent contractor performer for the Company, including participating in talent royalties for certain Company products bearing his name and/or likeness.   Defendant Levesque has a booking contract with the Company.

208.   Since he joined the Company as a performer in 1995, the Company has had a booking agreement with Defendant Levesque as an independent contractor.   Under his current booking agreement, Defendant Levesque is entitled to a minimum guaranteed annual payment of $1 million which the Company recoups from all payments under the agreement including pay for performing in live and televised events and royalties for merchandise sold utilizing Defendant Levesque's name and/or likeness.

**Defendant Riddick**

209.   The principal professional occupation of Defendant Riddick is his employment with the Company as its Interim Chief Financial Officer, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.

210.   Further, since Defendant Riddick derives his principal income from his

employment at the Company, it is doubtful that he can consider the demand on its merits without also pondering whether an affirmative vote would endanger his continued employment.

**Defendants Goldfarb, Singh and Speed**

211.    Demand is excused because Defendants Goldfarb, Singh and Speed face a substantial likelihood of liability for their misconduct.

212.    During the Relevant Period, Defendants Goldfarb, Singh and Speed served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

213.    Plaintiffs have pleaded sufficient particularized facts to show that beyond Defendants Goldfarb, Singh and Speed membership in the Audit Committee, they had to have known that (a) OSN had informed the Company in November 2018 that it would not renew its media rights agreement and the parties had entered into a settlement dated December 18, 2018 formally terminating the contract effective March 31, 2019, meaning the renewal of that particular media agreement for distribution of the Company's content in its key MENA market was impossible, and forcing the Company to seek a new media partner for distribution of its content in the Middle East, which put in serious jeopardy the ability to finalize a media-rights agreement for the MENA region by the end of 2019 and (b) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.  Plaintiffs' allegations are sufficient to support an inference that the Audit Committee knew of the failure to comply with regulations and failed to act.

214.    Defendants Goldfarb, Singh and Speed breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Goldfarb, Singh and Speed face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants V. McMahon, S. McMahon, Levesque, Wilson,
Goldfarb, Ong, Peterson, Riddick, Singh, Wexler and Barrios**

215.    Defendants V. McMahon, S. McMahon, Levesque, Wilson, Goldfarb, Ong, Peterson, Riddick, Singh, Wexler and Barrios each signed the false and misleading FY18 10-K, which failed to disclose that (a) OSN had informed the Company in November 2018 that it would not renew its media rights agreement and the parties had entered into a settlement dated December 18, 2018 formally terminating the contract effective March 31, 2019, meaning the renewal of that particular media agreement for distribution of the Company's content in its key MENA market was impossible, and forcing the Company to seek a new media partner for distribution of its content in the Middle East, which put in serious jeopardy the ability to finalize a media-rights agreement for the MENA region by the end of 2019 and (b) as  a  result  of  the  foregoing, Defendants' public statements were materially false and misleading at all relevant times.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

216.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

217.    The Director Defendants owe the Company fiduciary obligations.  By reason of

their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

218.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

219.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

220.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

221.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.   Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

222.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

223.     The wrongful conduct alleged regarding the issuance of false and misleading

statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

224.   As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

225.   As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

226.   Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT III

### (Against Defendants V. McMahon, Barrios, and Wilson For Unjust Enrichment)

227.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

228.   By their wrongful acts and the omissions of material fact that they caused to be made, Defendants V. McMahon, Barrios and Wilson were unjustly enriched at the expense of, and to the detriment of, the Company.

229.   Defendant V. McMahon sold 3,204,427 shares of WWE stock from February 2019 through February 2020 for proceeds of more than $261 million.  Moreover, during this same time period, 12,627 shares of Defendant V. McMahon's stock worth $886,794 were withheld by the Company to pay for his personal taxes in connection with Company-issued stock.  Through these transactions, Defendant V. McMahon disposed of approximately 10.1% of his total shares that were available for sale during this time period.

230.    Defendant Barrios also sold 114,678 shares of WWE stock during the relevant period for proceeds of more than $8.6 million.  In addition, during the relevant period, 64,497 shares of Barrios' WWE stock worth $4.5 million were withheld by the Company to pay for his personal taxes in connection with Company-issued stock.  Through these transactions, Barrios disposed of approximately 74.1% of the total shares, including vested stock units, he had available for sale during the relevant period.

231.    Defendant Wilson sold 158,134 shares of WWE stock during the relevant period for proceeds of approximately $11 million.  In addition, during the relevant period, 65,318 shares of Wilson's WWE stock worth $4.6 million were withheld by the Company to pay for her personal taxes in connection with Company-issued stock.  Through these transactions, Wilson disposed of 100% of the total shares, including vested stock units, she had available for sale during the relevant period.

232.    Plaintiffs, as shareholders and representatives of the Company, seek restitution from Defendants V. McMahon, Barrios and Wilson and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by Defendants V. McMahon, Barrios, and Wilson due to their wrongful conduct and breach of their fiduciary duties.

## COUNT IV

**(Against Defendants for Violations of
Section 10(b) of the Exchange Act and SEC Rule 10(b)-5)**

233.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

234.    During the Relevant Period, Defendants disseminated or approved public statements that failed to disclose that (i) OSN had informed the Company in November 2018 that

it would not renew its media rights agreement and the parties had entered into a settlement dated December 18, 2018 formally terminating the contract effective March 31, 2019, meaning the renewal of that particular media agreement for distribution of the Company's content in its key MENA market was impossible, and forcing the Company to seek a new media partner for distribution of its content in the Middle East, which put in serious jeopardy the ability to finalize a media-rights agreement for the MENA region by the end of 2019 and (ii) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.  Despite this artificial inflation in the price of the Company's shares, Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

235.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding WWE, their control over, and/or receipt and/or modification of WWE's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning WWE, participated in the fraudulent scheme alleged herein.

236.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent

scheme described herein could not have been perpetrated during the time in issue without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Defendants.

237.    Defendants were each members of the Board during the aforesaid time period. Based on their roles at the Company, Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

238.    At a minimum, Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at the Company, Defendants knew and/or recklessly disregarded the extent and scope of their statements during the relevant period.

239.    Likewise, Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

240.    As such Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud; and

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**COUNT V**

**(Derivative Claim for Violations of Section 20(a) of the Exchange Act
Against Defendant V. McMahon)**

241.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

242.    This Count is asserted on behalf of the Company against Defendant V. McMahon for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

243.    During his tenure as an executive officer and/or Chairman of the Board, Defendant V. McMahon was a controlling person of all officers of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of his control, Defendant V. McMahon had the power and authority to direct the management and activities of the other Company officers, to hire and fire the other Company officers at whim, and to cause the other Company officers to engage in the wrongful conduct complained of herein.  Defendant V. McMahon was able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the time period in issue, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

244.    In his capacity as the senior executive, and Chairman of the Board, Defendant V. McMahon had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendant V. McMahon agreed with his course of conduct.

245.    As a result of the foregoing, Defendant V. McMahon, individually, was a controlling person of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

246.    As a direct and proximate result of Defendant V. McMahon's conduct, the

Company suffered damages in connection with its purchase of WWE common stock at materially inflated prices.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

      A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

      B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      C.    Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

      D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      E.    Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 28, 2020

**GAINEY McKENNA & EGLESTON**

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston (CT19709)
Thomas J. McKenna
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

***Attorneys for Plaintiffs***

<u>VERIFICATION</u>

I, RYAN MERHOLZ, have reviewed the allegations made in this Verified Second Amended Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of World Wrestling Entertainment, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this  _28th_  day of July 2020.

_Ryan B. Merholz_____
RYAN MERHOLZ

## <u>VERIFICATION</u>

I, MELVYN KLEIN, have reviewed the allegations made in this Verified Second Amended Stockholder Derivative Complaint, know the contents thereof, and authorize its filing.   To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of World Wrestling Entertainment, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this ___27___ day of ___JULY___ 2020.

_____

MELVYN KLEIN