# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RYAN MERHOLZ, and MELVYN KLEIN, Derivatively On Behalf Of WORLD WRESTLING ENTERTAINMENT, INC., | Case No.: 3:20-cv-00557-VAB |
| Plaintiffs, | |
| v. | |
| VINCENT K. MCMAHON, STEPHANIE MCMAHON, PAUL LEVESQUE, FRANK A. RIDDICK, III, STUART U. GOLDFARB, LAUREEN ONG, ROBYN W. PETERSON, MAN JIT SINGH, JEFFREY R. SPEED, ALAN M. WEXLER, GEORGE A. BARRIOS, and MICHELLE D. WILSON, | |
| Defendants, | |
| WORLD WRESTLING ENTERTAINMENT, INC., | |
| Nominal Defendant. | |
| DANIEL KOOI, Derivatively On Behalf Of WORLD WRESTLING ENTERTAINMENT, INC., | Case No.: 3:20-CV-00743-VAB |
| Plaintiffs, | |
| v. | |
| VINCENT K. MCMAHON, FRANK A. RIDDICK, III, JEFFREY R. SPEED, PATRICIA A. GOTTESMAN, STUART U. GOLDFARB, LAUREEN ONG, PAUL LEVESQUE, ROBYN W. PETERSON, STEPHANIE MCMAHON, MAN JIT SINGH, ALAN M. WEXLER, GEORGE A. BARRIOS, AND MICHELLE D. WILSON, | |
| Defendants, | |

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>             Nominal Defendant. | |
| RODNEY NORDSTROM, Derivatively On Behalf of WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>             Plaintiffs,<br><br>      v.<br><br>VINCENT K. MCMAHON, GEORGE A. BARRIOS, MICHELLE D. WILSON, STEPHANIE MCMAHON, PAUL LEVESQUE, FRANK A. RIDDICK III, STUART U. GOLDFARB, LAUREEN ONG, ROBYN W. PETERSON, MAN JIT SINGH, JEFFREY R. SPEED, ALAN M. WEXLER, AND PATRICIA A. GOTTESMAN,<br><br>             Defendants,<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>             Nominal Defendant. | Case No.: 3:20-CV-00904-VAB |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SHAREHOLDER DERIVATIVE COMPLAINTS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .......................................................................................4

I.  BACKGROUND OF WWE .................................................................................4

II.  WWE'S FOCUS ON THE MIDDLE EAST ....................................................5

III.  THE OSN AGREEMENT IS QUIETLY TERMINATED .................................7

IV.  THE INDIVIDUAL DEFENDANTS MISREPRESENT THE STATUS OF WWE'S AGREEMENTS IN THE MIDDLE EAST .......................................................7

V.  THE TRUTH EMERGES.....................................................................................8

VI.  THE SECURITIES ACTION IS SUSTAINED ..................................................9

ARGUMENT ............................................................................................................10

I.  THE COMPLAINTS ADEQUATELY PLEAD DEMAND FUTILITY..........................10

    A.  Standards Governing Demand Futility ..................................................10

    B.  Demand Futility Is Adequately Pled........................................................12

        1.  Defendants Concede V. McMahon, S. McMahon, Levasque, And Riddick Are Not Independent ..................................................12

        2.  Plaintiffs Adequately Plead Demand Is Excused For Breach Of Fiduciary Duty ...................................................................14

            (i)  *Speed, Goldfarb And Singh Face A Substantial Likelihood Of Liability For Their Service On The Audit Committee* ..........................14

            (ii)  *Speed, Goldfarb, Ong, Peterson, Singh, Wexler and Riddick Face A Substantial Likelihood Of Liability For Signing The 2018 10-K* ...............................16

        3.  Plaintiffs Adequately Plead Demand Is Excused For Corporate Waste....................................................................19

        4.  The Merholz Complaint Adequately Pleads Futility For Violations Of The Exchange Act.........................................................20

        5.  WWE's Exculpatory Provision Does Not Insulate Defendants.................20

II.     PLAINTIFFS' COMPLAINTS STATE CLAIMS FOR RELIEF ....................................20

        A.     The Complaints State A Claim For Breach Of Fiduciary Duty ..............................20

        B.     The Complaints State A Claim For Corporate Waste ...............................................22

        C.     The Complaints State A Claim For Unjust Enrichment............................................23

        D.     The Merholz And Kooi Complaints State Claims For Insider Selling ...................24

III.    THE MERHOLZ COMPLAINT STATES A 10(b)-5 CLAIM..........................................27

        A.     Merholz Adequately Pleads Materially False
               And Misleading Statements And Omissions ...........................................................27

               1.     The Individual Defendants Misled The Market Concerning The
                      Premature Termination of the OSN Agreement ................................................27

                      (i)     The Risk Disclosures Regarding Failure To Renew Key
                              Agreements Are Actionable Misstatements ..........................................30

                      (ii)    Defendants Misled The Market Concerning A Potential
                              Media-Rights Agreement With Saudi Arabia To Replace The
                              OSN Agreement ....................................................................................31

                      (iii)   Purported Statements Of Opinion Are Actionable .............................32

                      (iv)    Purported Forward-Looking Statements Are Actionable; Safe
                              Harbor Does Not Apply .......................................................................33

               2.     Merholz Pleads Facts Showing A Strong Inference of Scienter.................34

                      (i)     Defendants Own Sworn Declarations Acknowledge Scienter ..........35

                      (ii)    The Core Operations Doctrine Supports
                              An Inference of Scienter .......................................................................36

               3.     Merholz Adequately Alleges Reliance .......................................................37

               4.     Merholz Adequately Pleads Loss Causation...............................................38

        B.     Merholz Pleads A Violation Of Section 20(a) ....................................................39

IV.     PLAINTIFFS HAVE PROPERLY PLED STANDING ......................................................39

CONCLUSION ...................................................................................................................40

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Alidina v. Internet.com Corp.*,
   2002 Del. Ch. LEXIS 156 (Del. Ch. Nov. 6, 2002) .................................................. 20

*Ash v. McCall*,
   2000 Del. Ch. LEXIS 144 (Del. Ch. Sept. 15, 2000) ............................................. 40

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ......................................................................................... 10

*BG Litig. Recovery I, LLC v. Barrick Gold Corp.*,
   180 F. Supp. 3d 316 (S.D.N.Y. 2016) ..................................................................... 38

*Brophy v. Cities Serv. Co.*,
   70 A.2d 5 (Del. Ch. 1949) ................................................................................. 24, 25

*Calma on Behalf of Citrix Sys., Inc. v. Templeton*,
   114 A.3d 563 (Del. Ch. 2015) .................................................................................. 24

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................... 30, 34, 35, 36

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................ 34

*Collins & Aikman Corp. v. Stockman*,
   2009 U.S. Dist. LEXIS 43472 (D. Del. May 20, 2009) .......................................... 20

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................................. 38

*Emerald Partners v. Berlin*,
   726 A.2d 1215 (Del. 1999) ....................................................................................... 20

*Equity Capital Growth Fund, L.P. v. Clegg*,
   1997 WL 208955 (Del. Ch. Apr. 22, 1997) ............................................................ 11

*Estate of Soler v. Rodriguez*,
   63 F.3d 45 (1st Cir. 1995) ........................................................................................ 37

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   104 F. Supp. 3d 441 (S.D.N.Y. 2015) ..................................................................... 33

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
   539 A.2d 1060 (Del. 1988) .......................................................................... 23

*Forestal v. Caldwell*,
   2016 WL 9774914 (C.D. Cal. Nov. 14, 2016) ...................................... 18, 19

*Frederick Hsu Living Tr. v. ODN Holding Corp.*,
   2017 WL 1437308 (Del. Ch. April 24, 2017) ........................................... 24

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...................................................... 34

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................... 25

*Galdi v. Jones*,
   141 F.2d 984 (2d Cir. 1944) ..................................................................... 39

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018) ................................................. 32, 33

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000) ..................................................................... 30

*Grimes v. Donald*,
   673 A.2d 1207 (Del. 1996) ....................................................................... 10

*Grobow v. Perot*,
   539 A.2d 180 (Del. 1988) ......................................................................... 10

*Guth v. Loft, Inc.*,
   5 A.2d 503 (1939) ..................................................................................... 11

*Halpert v. Zhang*,
   966 F. Supp. 2d 406 (D. Del. 2013) ......................................................... 22

*In re Abbott Labs. Derivative S'holders Litig.*,
   325 F.3d 795, 808 (7th Cir. 2003) ............................................................ 11

*In re Am. Int'l Grp., Inc.*,
   965 A.2d 763 (Del. Ch. 2009) .................................................................. 26

*In re Avon Secs. Litig.*,
   2019 WL 6115349 (S.D.N.Y. 2019) ........................................................ 32

*In re Barrick Gold Sec. Litig.*,
  2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)..................................................................... 39

*In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)........................................................................... 38

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996)...................................................................................... 21

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008)............................................................... 11, 23, 37, 38

*In re Dole Food Co., Inc. Stockholder Litig.*,
  2015 WL 5052214 (Del. Ch. Aug. 27, 2015).................................................................. 25

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................................... 30

*In re Finisar Corp. Deriv. Litig.*,
  2012 WL 2873844 (N.D. Cal. July 12, 2012).................................................................. 37

*In re Galena Biopharma, Inc. Derivative Litig.*,
  83 F. Supp. 3d 1047 (D. Or. 2015)............................................................................... 26

*In re HealthSouth Corp. S'holders Litig.*,
  845 A.2d 1096 (Del. Ch. 2003)................................................................................... 23

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013).................................................................... 28

*In re INFOUSA, Inc. S'holders Litig.*,
  953 A.2d 963 (Del. Ch. 2007)...................................................................................... 12

*In re Initial Pub. Offering Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008)........................................................................... 39

*In re Intel Corp. Derivative Litig.*,
  621 F. Supp. 2d 165 (D. Del. 2009).............................................................................. 12

*In re Intuitive Surgical S'holder Derivative Litig.*,
  146 F. Supp. 3d 1106 (N.D. Ca. Nov. 16, 2015).............................................................. 16

*In re Oracle Corp.*,
  867 A.2d 904 (Del. Ch. 2004)...................................................................................... 25

*In re Pfizer Inc. S'holder Derivative Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010) ................................................................ 10, 11, 21

*In re SCANA Corp. Derivative Litig.*,
  2018 WL 3141813 (D.S.C. June 27, 2018) ............................................................. 16

*In re SFBC Int'l, Inc. Sec. & Derivative Litig.*,
  495 F. Supp. 2d 477 (D.N.J. 2007) .......................................................................... 11

*In re TASER Int'l S'holder Derivative Litig.*,
  2006 WL 687033 (D. Ariz. Mar. 17, 2006) ............................................................ 11

*In re The Student Loan Corp. Derivative Litig.*,
  2002 WL 75479 (Del. Ch. Jan. 8, 2002) ................................................................. 13

*In re Veeco Instruments, Inc. Sec. Litig.*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006) ................................................................. 10, 11

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ....................................................................... 27, 29, 38

*In re Whitehall Jewellers, Inc. S'holder Deriv. Litig.*,
  2006 WL 468012 (N.D. Ill. Feb. 27, 2006) ............................................................ 38

*In re Zillow Grp., Inc. S'holder Derivative Litig.*,
  2020 WL 978503 (W.D. Wash. Feb. 28, 2020) ...................................................... 15

*Jackson Nat. Life Ins. Co. v. Kennedy*,
  741 A.2d 377 (Del. Ch. 1999) ................................................................................ 23

*Lewis v. Anderson*,
  477 A.2d 1040 (Del. 1984) ...................................................................................... 40

*Malone v. Brincat*,
  722 A.2d 5 (Del. 1998) ............................................................................................ 20

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014) .................................................................................... 27

*Mizel v. Connelly*,
  1999 WL 550369 (Del. Ch. Jul. 22, 1999) ............................................................. 13

*Omnicare Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ................................................................................................. 32

*Penn Mont Sec. v. Frucher,*
    502 F. Supp. 2d 443 (E.D. Pa. 2007) ...................................................................... 23

*Pfeiffer v. Toll,*
    989 A.2d 683 (Del. Ch. 2010) ...................................................................... 25, 35

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Stumpf,*
    2012 WL 424557 (N.D. Cal. Feb. 9, 2012) ............................................................ 20

*Rales v. Blasband,*
    634 A.2d 927 (Del. 1993) ...................................................................... 10, 13

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha,*
    2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ....................................................... 16, 17

*Ryan v. Gifford,*
    918 A.2d 341 (Del. Ch. 2007) ...................................................................... 11, 23

*Sandys v. Pincus,*
    2016 WL 7094027 (Del. Dec. 5, 2016) ................................................................ 13

*Silverberg on Behalf of Dendreon Corp. v. Gold,*
    2013 WL 6859282 (Del. Ch. Dec. 31, 2013) ....................................................... 26

*Smith v. Stevens,*
    957 F. Supp. 2d 466 (S.D.N.Y. 2013) ................................................................ 40

*Stanziale v. Nachtomi,*
    416 F.3d 229 (3d Cir. 2005) ...................................................................... 20

*Stone ex rel. AmSouth Bancorporation v. Ritter,*
    911 A.2d 362 (Del. 2006) ...................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ...................................................................... 34

*Weiss v. Swanson,*
    948 A.2d 433 (Del. Ch. 2008) ...................................................................... 22

*Winston v. Mandor,*
    710 A.2d 835 (Del.Ch. 1997) ...................................................................... 23

## **Statutes**

8 *Del. C.* § 141(a) ...................................................................... 35

8 *Del. C.* § 327 ................................................................................................................. 39

**Rules**

Fed. R. Civ. P. 9(b) .......................................................................................................... 18

Fed. R. Civ. P. 12(b)(6)............................................................................................ 2, 4, 35

Fed. R. Civ. P. 23.1 .......................................................................................... 2, 3. 39, 40

Plaintiffs Ryan Merholz, Melvyn Klein, Daniel Kooi, and Rodney Nordstrom respectfully submit this Opposition to Defendants'[1] Motion to Dismiss (the "Motion").

## PRELIMINARY STATEMENT

There are currently three shareholder derivative actions pending in this Court brought for the benefit of WWE (the "Actions").[2]  The Actions allege various claims for relief on behalf of WWE against certain of WWE's current and former officers and directors.  The Actions collectively assert claims for breach of fiduciary duty, corporate waste, insider selling, and violations of the Exchange Act of 1934 (the "Exchange Act").

Though the specific claims vary by Plaintiff, they each arise out of the same operative facts.  Over the past several years, WWE has pinned its future revenue success on monetizing its product internationally.  The Middle East emerged as a linchpin in WWE's international strategy with WWE entering into an agreement with Orbit Showcase Network ("OSN") to broadcast WWE content throughout the region (the "OSN Agreement").  Over the past two years, the Individual Defendants regularly touted the OSN Agreement and a 10-year partnership with the Saudi General Sports Authority to host live events in Saudi Arabia as critical drivers of WWE's highly popularized financial metric: adjusted operating income before depreciation or amortization (hereinafter, "OIBDA") – a non-GAAP metric that WWE states "is the primary measure used by

---

[1]      "Defendants" means Nominal Defendant World Wrestling Entertainment, Inc. ("WWE" or the "Company") and Vincent K. McMahon ("V. McMahon"), George A. Barrios ("Barrios"), Michelle D. Wilson ("Wilson"), Stephanie McMahon ("S. McMahon"), Paul Levesque ("Levesque"), Frank A. Riddick III ("Riddick"), Stuart U. Goldfarb ("Goldfarb"), Laureen Ong ("Ong"), Robyn W. Peterson ("Peterson"), Man Jit Singh ("Singh"), Jeffrey R. Speed ("Speed"), Alan M. Wexler ("Wexler"), and Patricia A. Gottesman ("Gottesman") (the "Individual Defendants").

[2]      *See Merholz et. al. v. McMahon et al*., 20-cv-557; *Kooi v. McMahon et. al*., 20-cv-743; and *Nordstrom v. McMahon et. al*., 20-cv-904.  Without waiving any argument that this Court lacks jurisdiction over them, Plaintiffs Kooi and Nordstrom have agreed, in the interest of judicial efficiency, to jointly oppose the Motion.

management of WWE to evaluate segment performance and make decisions about allocating resources."

Yet neither of the two relationships would yield the promised financial success. As early as February 2019, the Individual Defendants regularly told the public that a "renewal" of a broadcasting agreement in the Middle East was forthcoming. Yet before these statements were made, the Individual Defendants *knew*, and employees from WWE admit, that as early as November 2018, OSN had informed WWE that the network was shutting down its sports coverage, and indeed, the OSN Agreement was formally terminated on December 18, 2018. Not a single Individual Defendant, including those who signed filings with the Securities and Exchange Commission ("SEC") detailing the risks WWE would face should the OSN Agreement fail to be renewed, said a word about the termination of the OSN Agreement.

With the loss of OSN, the Individual Defendants settled on the Saudi General Sports Authority ("SGSA") to become WWE's new media rights provider in the region. To that end, by the summer of 2019, the Individual Defendants stated that an "agreement in principle" had been reached with the SGSA for a new media rights deal in the MENA region and that negotiations would be wrapped up "very soon." They were not. And according to WWE insiders, a year later a deal had yet to be finalized.

Ultimately the truth would come to light. WWE would fall well short of its quest for record breaking OIBDA for fiscal year 2019, and Defendants Wilson and Barrios, long time executives of WWE, would abruptly depart WWE.

The Motion seeks dismissal of the Actions under both Fed. R. Civ. P. 23.1 for failure to make pre-suit demand and Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Both attempts fail. As a threshold matter, what the Motion conveniently tries to sweep under the rug in a footnote is

2

that several of the same false and misleading statements alleged in the Actions have already been found, at the pleading stage, to be false and misleading in the parallel securities class action pending in the U.S. District Court for the Southern District of New York, captioned *City of Warren Police and Fire Retirement System v. World Wrestling Entertainment, Inc, et al.*, Case No. 20-cv-02031 (the "Securities Action").  Motion at 10 n.6.  There, the Honorable Jed S. Rakoff ("Judge Rakoff") denied WWE's (and several individuals also named as defendants in the Securities Action) motion to dismiss claims for securities fraud under the Exchange Act (the "Securities Order").[3]  Defendants suggest that because the Securities Action was subject to the heightened pleading standards of the Private Securities Litigation Reform Action ("PSLRA"), Judge Rakoff's ruling has no relevance to the case at bar.  But it is exactly ***because*** the statements at issue were found to be false and misleading under a heightened pleading standard that compels the same conclusion here under a traditional notice pleading standard.

As detailed herein, Plaintiffs adequately plead that there is reason to doubt that five of the ten-person WWE Board of Directors (the "Board") could independently or disinterestedly investigate a pre-suit demand under Delaware law.  In fact, Defendants ***concede*** that four of the directors are so incapable, leaving Plaintiffs with the burden of pleading that a single director faces a substantial likelihood of liability in order for Plaintiffs' Fed. R. Civ. P. 23.1 pleading burden to be met.  This is easily done.

On February 7, 2019, each director of WWE signed its Annual Report on Form 10-K which was filed with the SEC ("2018 10-K").  The 2018 10-K contained a risk disclosure related to WWE's failure to renew key media rights agreements internationally, including the Middle East.  The directors signed onto this statement when they knew, or should have known, that this

---

[3]      *See* Declaration of Gregory M. Egleston in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Shareholder Derivative Complaints at Exhibit 1.

hypothetical "risk" had been a reality for *three months*.  Moreover, the members of the Board's Audit Committee face a substantial likelihood of liability because they were specifically charged with the supervision of WWE's use of non-GAAP financial metrics such as OIBDA, which itself was inextricably tied to the existence of a media rights deal in the Middle East.  Still, the members of the Audit Committee failed to disclose the true nature of WWE's financial situation throughout 2018 and 2019 despite knowing that WWE's highly touted quest for record-breaking 2019 OIBDA was a pipe dream.  For each count alleged in the Actions, Plaintiffs adequately plead that pre-suit demand is excused.

Defendants attempt to dismiss the Actions under Fed. R. Civ. P. 12(b)(6) fares no better. Plaintiffs' allegations, which includes admissions provided by the Individual Defendants themselves, demonstrates that the Individual Defendants knew the OSN Agreement had been terminated and that no substitute agreement was forthcoming.  Yet still, the Individual Defendants continued to make or authorize statements to the contrary, while unjustly enriching themselves through salaries and director fees, and wasting corporate assets to bolster WWE's stock price in order for WWE insiders to sell their stock, reaping *millions* in ill-gotten gains while in possession of adverse, material, non-public information.  With all proper inferences made in Plaintiffs' favor at the pleading stage, the Motion should be denied in its entirety.

## STATEMENT OF FACTS

### I.      BACKGROUND OF WWE[4]

WWE is an integrated media and entertainment company headquartered in Stamford, Connecticut. Kooi ¶ 1. WWE is primarily known for its scripted professional wrestling shows. WWE reports revenues in three segments: live events, media, and consumer goods.  Kooi ¶ 39.

---

[4]      "Merholz ¶" refers to the Merholz and Klein Complaint.  "Kooi ¶" refers to the Kooi Complaint.  "Nordstrom ¶" refers to the Nordstrom Complaint.

From nearly its inception, WWE business centered around its live events.  Live events provide ongoing content for WWE's media platforms and live event segment revenues consist primarily of ticket sales, including primary and secondary distribution, revenues from events for which WWE receives a fixed fee, as well as the sale of travel packages associated with WWE's global live events.

By the early 2000s, WWE was focused on international expansion.  This strategy was formally outlined in WWE's 2005 Form 10-K, dated July 13, 2005.  WWE started to increase the number of tours and live events it held internationally, growing its presence in Europe and Asia, and expanding into other regions, including the Middle East, Latin America, Australia and New Zealand.  Selling the rights to broadcast WWE content in international markets proved to be a significant revenue generator of its own.

## II.   WWE'S FOCUS ON THE MIDDLE EAST

In 2014, WWE's international expansion hit a major milestone when it struck a deal with OSN, a Kuwaiti-controlled direct broadcast satellite provider serving the Middle East and North Africa ("MENA") region.  OSN traditionally offered popular entertainment content such as movies, sporting events, and various TV shows from major U.S. and international networks and studios, in addition to local versions specifically for the MENA region.

On July 21, 2014, WWE and OSN formally announced a five-year exclusive media agreement, stating that "WWE's flagship television program Monday Night Raw [would] air live on OSN, WWE's exclusive pay-per-view partner in the Middle East and North Africa through 2019."  Merholz ¶ 39; Kooi ¶ 40; Nordstrom ¶ 82.

On February 15, 2015, WWE and OSN jointly issued a release stating they were adding WWE Network to the five-year agreement as part of an expanded partnership.  In the years that

followed, expansion into the MENA region became a critical part of WWE's business plans and growth initiatives, as the Middle East grew to become the **_WWE's second-largest market_** by monetization.   WWE's international revenues increased from $87.6 million in 2005 to $135.3 million in 2010.  After a decline over the next few years, WWE's international revenues increased to $169.8 million in 2015, $189 million in 2016, and $201 million in 2017—the increase during these more recent years driven, in part, by the 2014 launch of the WWE Network—a subscription streaming network available in more than 170 countries.  Merholz ¶ 41.

In March 2018, the Saudi Press Agency announced that WWE and the SGSA had signed a 10-year multi-platform partnership with WWE to hold wrestling events in the country.  The first event held under the Saudi partnership was the *Greatest Royal Rumble*, which took place on April 27, 2018.  WWE hailed the event as the largest "outside the U.S. in the past 16 years" and a major contributor to WWE's "record" second quarter 2018 results.  Merholz ¶ 48; Kooi ¶ 44; Nordstrom ¶ 86.  The second event was the *Crown Jewel* held on November 2, 2018.  WWE viewed business dealings with the Saudi government as a lucrative entrance point into the MENA region and a key pillar of its business plans.  Merholz ¶ 59.

The Individual Defendants routinely praised the international market and the MENA region specifically as the future of WWE's revenue generation.  Merholz ¶¶ 36-38; Kooi ¶ 3; Nordstrom ¶ 90.  The Individual Defendants specifically cited the partnership deals with OSN and the SGSA as a driver of adjusted "OIBDA – the non-GAAP metric" that WWE states "is the primary measure used by management of the Company to evaluate segment performance and make decisions about allocating resources."  Kooi ¶ 3.  By early 2019, the Individual Defendants were touting record-breaking OIBDA of $200 million for fiscal year 2019 based primarily on revenue generated from

the Middle East.  Merholz ¶¶ 75, 95, 97, 108, 109, 113, 115, 120, 150; Kooi ¶¶ 48-50, 59, 63, 64, 66; Nordstrom ¶¶ 91, 93.

### III.      THE OSN AGREEMENT IS QUIETLY TERMINATED

The OSN deal was prematurely terminated in December 2018.  According to Carlo Nohra ("Nohra"), Vice President and General Manager of WWE – Middle East, who was the self-described principal point of contact with OSN regarding the applicable media-rights agreements, in early 2018, OSN became delinquent in the payments of rights fees to WWE.  Nohra explained that in September 2018, WWE sent OSN a "Notice of Material Breach" based on the delinquent payments.  OSN responded with a letter dated November 5, 2018, in which OSN's general counsel informed WWE that OSN was contemplating the future long-term funding of its business and hoped to respond to WWE about the missed payments after an upcoming board meeting.  Merholz ¶ 78; Nordstrom ¶ 91.

According to Nohra, in November 2018, OSN sent WWE an unsolicited settlement proposal, in which OSN's general counsel informed WWE that it intended to exit its sport content business and conclude its sports coverage in early 2019.  Negotiations followed, and, according to Nohra, WWE and OSN entered into a settlement agreement dated December 18, 2018 pursuant to which OSN and WWE agreed to the early termination of their media-rights agreements effective March 31, 2019, and OSN agreed to pay WWE all rights fees owed for 2018 and through March 31, 2019.  Merholz ¶ 77; Kooi ¶ 52; Nordstrom ¶ 91.

### IV.      THE INDIVIDUAL DEFENDANTS MISREPRESENT
### THE STATUS OF WWE'S AGREEMENTS IN THE MIDDLE EAST

As early as February 2019, the Individual Defendants regularly told the market that a "renewal" of a broadcasting agreement in the Middle East was forthcoming.  The only such agreement was that with OSN, which was set to expire in the summer of 2019.  Yet before these

statements were made, the Individual Defendants **_knew_**, or were reckless in not knowing, that as early as November 2018, OSN had informed WWE that the network was shutting down its sports coverage.  Merholz ¶¶ 80, 101(a), 147(a), 213; Kooi ¶¶ 5, 52; Nordstrom ¶¶ 90-91.

The true state of WWE's financial future in the Middle East went undisclosed.  Despite specifically warning in public filings with the SEC that "failure to maintain or renew key agreements could adversely affect our ability to distribute our media content, WWE Network, our films and/or other of our goods and services, which could adversely affect our operating results" the Individual Defendants signed a SEC filing they knew omitted material information.  Merholz ¶ 100.

During this time, the Individual Defendants scrambled to find another media rights broadcaster.  They settled on the SGSA.  In an attempt to blunt the impact of the loss of the OSN Agreement, the Individual Defendants would, starting in July 2019, publicly shift focus away from the (secretly) defunct OSN venture and begin promoting the prospects of their negotiations of a media rights agreement with the SGSA.  Such a deal was critical for WWE to reach its highly publicized goal of full-year $200 million fiscal year 2019 OIBDA guidance.

To that end, by the summer of 2019, the Individual Defendants stated that an "agreement in principle" had been reached with the SGSA for a new media rights deal in the MENA region and that negotiations would be wrapped up "very soon."  They were not.  And according to WWE insiders, a year later a deal had yet to be finalized.  Kooi ¶ 8 Nordstrom ¶ 5.

## V.    **THE TRUTH EMERGES**

The truth would ultimately emerge in October 2019.  On Halloween, the Individual Defendants caused WWE to announce that it was lowering its fiscal year 2019 adjusted OIBDA guidance from $200 million to a range of $180 million to $190 million. This was in large part due

to its failure to complete a distribution agreement with the SGSA.  On a conference call to discuss the results, Defendant Barrios now stated that "no assurances" could be given that the deal would ever be completed.  Merholz ¶ 121; Kooi ¶ 62; Nordstrom ¶ 110.

On January 30, 2020, the purpose of the misrepresentations was made clear:  After an entire year of promising, predicting, and promoting expected adjusted OIBDA of $200 million – heads rolled.  WWE announced that two of its most senior and longest serving executives, Defendants Barrios and Wilson, abruptly left WWE.  Days later, on February 6, 2020, the Individual Defendants caused WWE to announce that WWE achieved just $180 million in adjusted OIBDA for the year.

Yet not every shareholder was harmed by the drop in WWE stock price.  While in possession of material inside information regarding the true picture of WWE's Middle East media rights efforts, three WWE insiders would liquidate their personal WWE stock for proceeds in excess of *$270 million*.  Merholz ¶¶ 153-57; Kooi ¶ 13; *see also* Securities Order at 28 ("McMahon's March 27, 2019 sale was also suspiciously timed, as it occurred only few days before the OSN Agreement ended and a month before the issuance of lower-than-expected income projections for the second-quarter of 2019, which resulted in a drop in WWE's stock price.").

## VI.   THE SECURITIES ACTION IS SUSTAINED

As a result of the foregoing, WWE and Defendants V. McMahon, Barrios, and Wilson have been named as defendants in the Securities Action.  On August 6, 2020, Judge Rakoff issued an order in the Securities Action, denying the defendants' motion to dismiss.  In the Securities Order, Judge Rakoff held that a claim for securities fraud had been stated against WWE, V. McMahon, Barrios and Wilson based upon alleged misrepresentation about WWE's media-rights contracts in the MENA region.

**ARGUMENT**

**I.    THE COMPLAINTS ADEQUATELY PLEAD DEMAND FUTILITY**

  **A.    Standards Governing Demand Futility**

Pre-suit demand is not required if the facts pled show demand would have been futile. *Aronson v. Lewis*, 473 A.2d 805, 807 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. Supr. 2000).[5]  Plaintiffs are excused from making a demand if there is reason to doubt that: (i) a majority of a board's directors are independent or disinterested; or (ii) the challenged acts are a valid exercise of business judgment.  *Id*. at 812; *see also In re Pfizer Inc. S'holder Derivative Litig*., 722 F. Supp. 2d 453, 458 (S.D.N.Y. 2010).  To implicate the *Aronson* test, a plaintiff must challenge a board decision where directors exercised business judgment. *Aronson*, 473 A.2d at 812; *see also In re Veeco Instruments, Inc. Sec. Litig*., 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006).

In the absence of a challenged board action, demand is excused where the allegations raise reason to doubt that a majority of the directors are disinterested or independent.  *Rales v. Blasband*, 634 A.2d 927, 930 (Del. 1993).  This reasonable doubt standard "is sufficiently flexible and workable to provide the stockholder with the keys to the courthouse in an appropriate case where [as here] the claim is not based on mere suspicions or stated solely in conclusory terms." *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996), *overruled on other grounds by Brehm*, 746 A.2d 244 (internal citation omitted).  Thus, Plaintiffs only need allege with particularity facts giving rise to a reasonable inference that a majority of directors cannot consider a demand disinterestedly.  *Id*.; *see also Grobow v. Perot*, 539 A.2d 180, 186-87 (Del. 1988).  Plaintiffs adequately allege reasonable doubt regarding disinterestedness of directors by demonstrating they are subject to a

---

[5]       Plaintiffs agree that the demand futility analysis is governed by Delaware law.  Motion at 8.

"substantial likelihood of liability" based on the challenged conduct. *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007); *see also In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 808 (7th Cir. 2003).[6]

Substantial likelihood of liability exists where there is conscious disregard of a duty to act, particularly when serious problems or misconduct threatening the corporation's core business is at issue. Such actions or conscious inactions cannot constitute a legally protected business decision, and accordingly are not a valid exercise of business judgment. *See Veeco*, 434 F. Supp. 2d at 278 (excusing demand where directors allegedly "conscientiously permitted a known violation of law by the corporation to occur"); *Pfizer*, 722 F. Supp. 2d at 460 (same). Black-letter Delaware law requires directors to act once they have information indicating that they should. As part of their ongoing, non-exculpable duty of loyalty, directors must act once they are on notice, thereby preventing problems from growing into far-more-significant troubles. *See, e.g., Guth v. Loft, Inc.*, 5 A.2d 503, 510 (1939).

Demand is regularly excused where, based on plaintiffs' allegations, it is reasonable to infer that directors consciously failed to act. *See, e.g., In re TASER Int'l S'holder Derivative Litig.*, 2006 WL 687033, at *9-17 (D. Ariz. Mar. 17, 2006) (excusing demand where "alleged facts, taken together, lead to 'reasonable inferences' that the Board was aware of Taser's safety issue problems"); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1081 (C.D. Cal. 2008) (excusing demand and reasonably inferring directors were on notice of and failed to address wrongdoing that "implicate[d] a fundamental part of the Company's business."); *In re SFBC Int'l, Inc. Sec. & Derivative Litig.*, 495 F. Supp. 2d 477, 485-86 (D.N.J. 2007) (same).

---

[6]     Further, even if no single allegation would sufficiently raise a reasonable doubt regarding a director's independence, the totality of the allegations in combination may be sufficient to do so. *See Int'l Equity Capital Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *5 (Del. Ch. Apr. 22, 1997).

### B.     Demand Futility Is Adequately Pled

When the first of the Actions was commenced, the WWE Board consisted of the following ten (10) members: V. McMahon, S. McMahon, Speed, Goldfarb, Ong, Levasque, Peterson, Singh, Wexler, and Riddick.  Merholz ¶ 184; Kooi ¶ 83.  Therefore, Plaintiffs must adequately plead reason to doubt that five (5) of those directors are disinterested or independent.  *See*, *e.g.*,  *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989-90 (Del. Ch. 2007) (plaintiff must raise reason to doubt "that a majority—or in a case where there are an even number of directors, exactly half— of the board was incapable of considering demand."); *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 170 (D. Del. 2009) (same).

### 1.     Defendants Concede V. McMahon, S. McMahon, Levasque And Riddick Are Not Independent

Defendants concede, as they must, that V. McMahon, S. McMahon, Levasque and Riddick cannot independently evaluate a pre-suit demand with respect to any of the allegations levied against them.  The principal professional occupation of V. McMahon is his employment with WWE as Chairman of the Board and Chief Executive Officer ("CEO").  The principal professional occupation of S. McMahon is her employment with WWE as Chief Brand Officer.[7]  The principal professional occupation of Levesque is his employment with WWE as Executive Vice President, Talent, Live Events & Creative.[8]  Riddick is employed with WWE as interim Chief Financial Officer ("CFO").  In these positions, V. McMahon, S. McMahon, Levesque and Riddick are "inside" directors who earn substantial compensation because of their employment with WWE.

---

[7]      Defendant S. McMahon is the daughter of Defendant V. McMahon.  Merholz ¶ 9; Nordstrom ¶ 27.

[8]      Defendant Levesque is the husband of Defendant S. McMahon.  He is also the son-in-law of Defendant V. McMahon.  Merholz ¶ 10; Nordstrom ¶ 147.

As the Delaware Chancery Court has reasoned, "the remuneration a person receives from her full-time job is typically of great consequence to her.  It is usually the method by which bills get paid, health insurance is affordably procured, children's educations are funded, and retirement savings are accumulated."  *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 n.3 (Del. Ch. Jan. 8, 2002).  Thus, there is sufficient reason to doubt V. McMahon, S. McMahon, Levesque and Riddick's independence.  *See, e.g., Rales,* 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices."); *Mizel v. Connelly*, 1999 WL 550369, at *3 (Del. Ch. Jul. 22, 1999) ("Since [employee-directors] each derive their principal income from their employment at [the corporation], it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment.") (footnote omitted).

The reasoning for this is obvious; there is reason to doubt that directors who earn their living as corporate officers could independently consider a demand because of their substantial interest in retaining their employment by catering to directors who control that employment.  *See, e.g., Student Loan Corp.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002) ("I find it improbable that a reasonable person in the position [employee-directors] occupy would not ponder the effect affirmative action on a demand would have on her future").[9]

---

[9]     Further, WWE's 2020 Proxy Statement filed with the SEC on March 6, 2020 states that V. McMahon, S. McMahon, Levesque and Riddick are not independent because their own peers have determined that they are incapable of exercising independent business judgment with respect to a demand.  *See Sandys v. Pincus*, 2016 WL 7094027, at *5 (Del. Dec. 5, 2016) (where director is not independent under stock exchange rules "and the company's own board has determined that the director[] whose ability to consider a demand impartially is in question cannot be considered independent, a reasonable doubt exists under *Rales*.").

13

With this concession, Plaintiffs must demonstrate that only *one* (1) other director was either not independent or faced a substantial likelihood of liability in order to prevail with respect to each cause of action.

### 2.   Plaintiffs Adequately Plead Demand Is Excused For Breach Of Fiduciary Duty

#### (i)   *Speed, Goldfarb And Singh Face A Substantial Likelihood Of Liability For Their Service On The Audit Committee*

Defendants Speed, Goldfarb, and Singh face a substantial likelihood of liability for breach of fiduciary duty and unjust enrichment due to their service on the Board's Audit Committee.[10] Defendants' seek to paint these allegations with a broad brush, arguing that service alone on a board subcommittee is insufficient to allege futility.  Motion at 23.  But Defendants fail to appreciate the details of the allegations.

The Audit Committee's charter mandates specific areas over which the Audit Committee is tasked in assisting the Board with oversight.  Specifically,  the Audit Committee's charter highlights the specific relevant areas of responsibility which include, *inter alia*, "[r]eview and discuss earnings press releases with management, including the type and presentation of information, paying particular attention to any use of "proforma", "adjusted" or other information which is not required by generally accepted accounting principles ('GAAP')."  Merholz ¶ 22; Kooi ¶ 37; Nordstrom ¶ 69.

Throughout the Relevant Period detailed in the Actions, one "adjusted" non-GAAP financial metric dominated WWE's financial disclosures: adjusted OIBDA.  In fact, WWE stated that OIBDA "is the primary measure used by management of the Company to evaluate segment performance and make decisions about allocating resources."  Kooi ¶ 3.

---

[10]     As detailed herein, a claim for unjust enrichment is satisfied when there is a corresponding breach of fiduciary duty.  Therefore, the futility analysis for both claims is identical.

Starting in early 2019, the Individual Defendants caused WWE to predict record-setting OIBDA of $200 million for WWE during the 2019 fiscal year.  Reaching that goal was inextricably tied to WWE's international performance.  As Defendant Barrios told investors on February 7, 2019:

> So if we're moving revenue at a faster clip than we anticipate, we may put some additional investments in the fourth quarter but all geared towards hitting that $200 million in OIBDA for the year.  And as we talked about in the prepared remarks, it really is on those areas of continuing to drive content, especially the localization of our current content and potentially local content in some of our key international markets.
>
> *    *    *
>
> In terms of the rights renewal process outside the U.S., obviously, there's a lot of key markets that we're still working on, U.K., India, China, Latin America, the Middle East. We'll announce those as the deals get done or shortly thereafter.

Merholz ¶ 97; Kooi ¶ 50; Nordstrom ¶ 90.

Only one renewal was pending in the Middle East at that time – the agreement with OSN. WWE already knew that deal was dead.  And given Defendants Speed, Goldfarb and Singh's charge of "paying particular attention" to adjusted non-GAAP metrics, Defendants Speed, Goldfarb, and Singh either knew or were derelict in their duties to WWE in not knowing that the publicly stated goal of $200 million OIBDA was aspirational at best given the termination of the OSN Agreement.  Defendants cannot have it both ways, either Defendants Speed, Goldfarb, and Singh performed their duties and therefore properly reviewed the likelihood of reaching the targeted OIBDA – and by extension learned of the cancellation of the OSN Agreement – or Defendants Speed, Goldfarb, and Singh consciously disregarded their own duty to act.  In any event, such conduct creates a substantial likelihood of liability and demand is excused with respect to Defendants Speed, Goldfarb, and Singh.  *See In re Zillow Grp., Inc. S'holder Derivative Litig.*, 2020 WL 978503, at *3 (W.D. Wash. Feb. 28, 2020) ("Plaintiffs further allege that, as audit

committee members, Blachford and Maffei were charged with reviewing legal and regulatory matters that may affect the company.  Because Blachford and Maffei were members of the audit committee, it is reasonable to infer that they were informed of the contents of the civil investigative demand."); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for  their  responsibilities, they breach their duty of loyalty by  failing  to discharge that fiduciary obligation in good faith.").

Other courts have also found membership on Board subcommittees relating directly to the alleged wrongdoing supported a finding of demand futility.  *See, e.g., In re SCANA Corp. Derivative Litig.*, 2018 WL 3141813, at *6 (D.S.C. June 27, 2018) (demand futile as to Audit Committee members who "failed to fulfill their risk management duties and failed to ensure SCANA's filings with the [SEC] were accurate."); *In re Intuitive Surgical S'holder Derivative Litig.*, 146 F. Supp. 3d 1106 (N.D. Ca. Nov. 16, 2015) (demand futile as to Audit Committee members where committee charter "suggests that these directors would have received even more information regarding the regulatory issues than the full board"); *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, 2009 WL 3853592, at *3 (M.D. Fla. Mar. 30, 2009) (demand futile as to Audit Committee members "specifically charged with oversight of . . . the integrity of the financial statements . . . [and] compliance . . . with legal and regulatory requirements").

### (ii) *Speed, Goldfarb, Ong, Peterson, Singh, Wexler And Riddick Face A Substantial Likelihood Of Liability For Signing The 2018 10-K*

At the time the 2018 10-K was filed with the SEC on February 7, 2019 bearing their signatures, Defendants Speed, Goldfarb, Ong, Peterson, Singh, and Wexler either knew, or were

reckless in not knowing, that the early termination of the OSN Agreement had already been agreed to by WWE and that information was not disclosed.[11]

The 2018 10-K emphasized the importance of the Saudi relationship, stating that, "[i]n 2018, WWE embarked on an important long-term partnership with the General Sports Authority of the Kingdom of Saudi Arabia for, among other things, a series of live events in that region." Merholz ¶ 99; Kooi ¶ 55; Nordstrom ¶ 93. It also stated that WWE had "an important partnership with the General Sports Authority of the Kingdom of Saudi Arabia" that was then "expected to continue to constitute a significant percentage of [WWE's] revenues." *Id.*

Critically, the 2018 10-K also contained a list of risk factors centered on WWE's key agreements for distributing content:

> **Our failure to maintain or renew key agreements could adversely affect our ability to distribute our media content, WWE Network, our films and/or other of our goods and services, which could adversely affect our operating results**
>
> Our media content is distributed by cable, satellite and broadcast television networks and digital platforms around the globe. As detailed below, we depend on third parties for many aspects of the operation and distribution of WWE Network. Our films are generally also distributed by other, more established film companies. Because a large portion of our revenues are generated, directly and indirectly, from this distribution, any failure to maintain (such as due to a breach or alleged breach by either party) or renew arrangements with distributors and platforms, the failure of distributors or platforms to continue to provide services to us or the failure to enter into new distribution opportunities on terms favorable to us could adversely affect our financial outlook, liquidity, business and operating results.
>
> \*      \*      \*
>
> *We have significant relationships outside the United States with distributors nearing the end of their terms, including in the United Kingdom, India, Latin America and the Middle East*.

Merholz ¶ 100.

---

[11]      The 2018 10-K was also signed by V. McMahon, S. McMahon, Levesque, and Riddick whose lack of independence has been conceded.

What the 2018 10-K does not disclose is that as early as November 2018 OSN had informed WWE that the network was shutting down its sports coverage and that OSN and WWE agreed ***to an early termination of their broadcasting agreement via settlement agreement on December 18, 2018***. That is, these statements were misleading because the Individual Defendants already knew that one of its "key" agreements, the OSN Agreement, had been terminated and that this hypothetical "risk" had already materialized. Merholz ¶ 101(a); Kooi ¶ 58; Nordstrom ¶ 96.

These statements in the 2018 10-K have already been found to be false and misleading by Judge Rakoff in the Securities Action. In the Securities Order, Judge Rakoff wrote:

> Plaintiff alleges this was misleading because defendants already knew that one of its "key" agreements, the OSN Agreement, had been terminated in February 2019 and thus that this risk had already materialized.
>
>    *  *  *
>
> Given the alleged importance of a MENA agreement to WWE's financial projections […], plaintiff has thus adequately alleged with particularity not only that WWE failed to disclose its inability to renew a key agreement, but also that this failure had adversely affected WWE's "financial outlook" by February 2019.

*See* Securities Order at 11-12.

As detailed in the Actions, the existence of a media rights deal in the Middle East was a key driver of WWE's touted international growth strategy and was a material fact that should have been disclosed. Indeed, Judge Rakoff held that these statements are false and misleading under the heightened pleading standards of the PSLRA and Fed. R. Civ. P. 9(b). Thus, the Individual Defendants who authorized and signed the statements face a substantial likelihood of liability ***at the pleading stage*** of a derivative action where mere notice pleading controls.

A similar situation was present in *Forestal v. Caldwell*, 2016 WL 9774914 (C.D. Cal. Nov. 14, 2016). There, the district court found that two (2) directors who had signed the corporation's annual reports – which were found in the parallel securities action to contain false and misleading

18

statements – faced a substantial likelihood of liability for their conduct and demand was excused. *Id*., at *8-9.  The same is true here – if the statements are found false and misleading under the heightened pleading standards of the PSLRA, the individuals who authorized those statements through their signature face a substantial likelihood of liability for pleading purposes here.

### 3. Plaintiffs Adequately Plead Demand Is Excused For Corporate Waste

A majority of the Board faces a substantial likelihood of liability for approving the stock repurchase plan, and therefore wasting corporate assets.  The plan, according to WWE's February 7, 2019 press release, was "supported by WWE's strong financial performance."  Nordstrom ¶ 94. But a majority of the WWE directors knew, or had reason to know, that WWE's "strong financial performance" was illusory by February 7, 2019.  At that time, the same date the false and misleading 2018 10-K was filed with the SEC, each WWE director was aware that the OSN Agreement was terminated and no replacement was ready to take its place. Given the critical importance of the Middle East market to WWE's overall revenue, the decision to spend corporate resources only served to artificially inflate the price of WWE's stock.  And as detailed in the Merholz and Kooi Complaints, it was those corporate insiders who illicitly sold their personally held WWE stock, who benefitted from those artificially inflated prices.

### 4. The Merholz Complaint Adequately Pleads Futility For Violations Of The Exchange Act

The Merholz Complaint adequately pleads futility for the Section 10(b).  Defendants posit that this cannot be so with respect to Speed, Goldfarb, Ong, Peterson, Singh and Wexler because there are insufficient allegations regarding the false and misleading nature of the 2018 10-K and no evidence of their actual or constructive knowledge.  Motion at 21-22.

First, Judge Rakoff already concluded that the statements in the 2018 10-K were false and misleading.  Securities Order at 11-12.  And at the risk of belaboring the point, the Merholz

Complaint adequately pleads a strong inference of scienter on behalf of Speed, Gottesman, Goldfarb, Ong, Peterson, Singh, and Wexler.  *See, infra*, Section III, 2.  Given the allegations of knowledge against them, Speed, Goldfarb, Ong, Peterson, Singh, and Wexler cannot be expected to independently or disinterestedly investigate a pre-suit demand.

## 5. WWE's Exculpatory Provision Does Not Insulate Defendants

That WWE has an exculpatory provision under Section 102(b)(7) of the Delaware General Corporation Law is hardly remarkable.  Motion at 5, 11, 13, 26.  Yet, an exculpatory clause "may properly be invoked and applied 'only where the factual basis for a claim *solely* implicates a violation of the duty of care.'"  *Collins & Aikman Corp. v. Stockman*, 2009 U.S. Dist. LEXIS 43472, at *64 (D. Del. May 20, 2009) (emphasis added) (quoting *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999)).  Claims based upon a violation of the duty of loyalty are non-exculpable.  *See Alidina v. Internet.com Corp*., 2002 Del. Ch. LEXIS 156, at *28 (Del. Ch. Nov. 6, 2002).  Thus, dismissal of the Actions based upon an exculpatory provision is inappropriate. *See Stanziale v. Nachtomi*, 416 F.3d 229, 242 (3d Cir. 2005) (exculpatory clause is an affirmative defense that "generally will not form the basis for dismissal under Rule 12(b)(6)").

## II. PLAINTIFFS' COMPLAINTS STATE CLAIMS FOR RELIEF

### A. The Complaints State A Claim For Breach Of Fiduciary Duty

Directors and officers violate their non-exculpable duty of loyalty by issuing false and misleading statements.  *See Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998) ("When the directors disseminate information to stockholders when no stockholder action is sought, the fiduciary duties of care, loyalty and good faith apply.  Dissemination of false information could violate one or more of those duties."); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Stump*, 2012 WL 424557, at *8 (N.D. Cal. Feb. 9, 2012) ("plaintiffs have pled particularized facts alleging that

defendants breached their duty of loyalty by omitting material facts in the proxy statement to shareholders").

The allegations in the Actions clearly state a claim for breach of fiduciary duty. The Actions allege that the Individual Defendants knew that the OSN Agreement had been terminated in December 2018 yet continued to represent to the public that its renewal was possible. Later, the Individual Defendants would boast of a "near final" agreement which is still, over a year later, not executed.

Defendants attempt to mischaracterize Plaintiffs' allegations as a so-called "oversight liability" claim, as seminally discussed in *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996). Motion at 15. But Plaintiffs do not assert a "*Caremark* claim." Rather, Plaintiffs allege claims for breach of the non-exculpable fiduciary duties of loyalty and good faith based on the Individual Defendants' ***knowledge*** that the statements made were false and misleading and the Individual Defendants' subsequent failure to remedy those misstatements. *See, e.g., Pfizer*, 722 F. Supp. 2d at 459-60 (distinguishing *Caremark* based on the inference of "knowledge" of directors).

Plaintiffs can adequately plead such knowledge because Defendants provided Plaintiffs testamentary evidence from WWE employees who confirmed that WWE knew by November 2018 the OSN Agreement would be terminated and that the termination was agreed to by December 2018. Given the critical importance to WWE of the existence of a media rights agreement in the Middle East, WWE's officers (V. McMahon, S. McMahon, Levasque, Barrios, Wilson and Riddick) had to know the status of a potential renewal of the OSN Agreement yet continued to make or authorize false and misleading statements about the potential for renewal. *See* Securities Order 26-27 ("it is virtually inconceivable that the CEO and Co-Presidents of WWE would not

21

have been aware of the formal termination by WWE of this important contract -- or so a reasonable jury could infer from the facts pleaded in the complaint.").  Similarly, as directors of WWE, Speed, Gottesman, Goldfarb, Ong, Peterson, Singh, and Wexler, knew or consciously disregarded a known duty to inquire, as to the status of the renewal of the OSN Agreement prior to signing the 2018 10-K which clearly stated that the failure to renew such an agreement was a "risk" to WWE's success.  Further, as members of WWE's Audit Committee, Speed, Goldfarb, and Singh, particularly had a conscious duty to inform themselves of the status of a media rights deal in the Middle East given the importance of such a deal to WWE's reporting of its OIBDA financial metric.

With all proper inferences drawn in Plaintiffs' favor, the Actions adequately plead a claim for breach of fiduciary duty.

### B.    The Complaints State A Claim For Corporate Waste

Defendants argue that "any claim for corporate waste brought against Defendants in their capacities as Directors fails because Plaintiffs have not alleged knowing, intentional misconduct." Motion at 30.  This argument is baseless.  *See* Section III, A, 2 below.  To state a waste claim under Delaware law, "the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *Halpert v. Zhang*, 966 F. Supp. 2d 406, 416 (D. Del. 2013) (internal citations omitted).  Courts have applied waste theory to compensation of directors and officers.  *See Weiss v. Swanson*, 948 A.2d 433, 450 (Del. Ch. 2008) (motion to dismiss waste claim denied where compensation grants approved "without any valid corporate purpose").[12]

---

[12]    Defendants also argue that "Plaintiffs do not allege with particularity that any Defendant's actions resulted in legal liability or caused the Company to overpay for WWE's own stock during the period when Plaintiffs claim the

Defendants further argue that Plaintiffs' allegations that the director Defendants "received 'excessive' compensation is wholly conclusory."  Motion at 31.  The Complaints allege that Defendants committed corporate waste by paying excessive compensation and bonuses and by awarding self-interested stock options to certain officers and directors.  Merholz ¶ 224; Nordstrom ¶ 120.  Corporate waste is a 'classic' derivative harm" because "it diminishes the value of the corporation as a whole and entitles the corporation to recover damages." *Penn Mont Sec. v. Frucher*, 502 F. Supp. 2d 443, 465 (E.D. Pa. 2007) (citing *Winston v. Mandor*, 710 A.2d 835, 845 (Del.Ch. 1997)).   As demonstrated herein, Plaintiffs sufficiently allege that the Individual Defendants knew all along that WWE's year 2019 OIBDA guidance was false and misleading as the OSN Agreement had already been terminated; and so, although the rest of the world might have been duped into thinking the bonuses were appropriate, the Individual Defendants knew they were excessive.

## C.    The Complaints State A Claim For Unjust Enrichment

Delaware has long recognized a cause of action for unjust enrichment.  *See, e.g.*, *Fleer Corp. v. Topps Chewing Gum, Inc.* 539 A.2d 1060, 1062 (Del. 1988).  Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Ryan*, 918 A.2d at 361.  There are five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a

---

stock price was inflated."  Motion at 32.  However, the court in *Countrywide* upheld a corporate-waste claim that was, like Plaintiffs' claim, based on a stock-repurchase program, which "may have served to delay the eventual impairment caused by unsound business practices."  554 F. Supp. 2d at 1078; *Jackson Nat. Life Ins. Co. v. Kennedy,* 741 A.2d 377, 394 (Del. Ch. 1999) ("If Plaintiffs succeed on the merits of their breach of fiduciary duty . . . claim[], it is likely they will also be able to prove that neither [of the defendants] can retain any benefit resulting from the disputed transaction 'justifiably' or in accordance with 'the fundamental principles of justice or equity and good conscience.' Plaintiffs, therefore, properly state an actionable claim for unjust enrichment . . . .").

remedy provided by law." *Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 591 (Del. Ch. 2015).

"A defendant may be liable even when the defendant retaining the benefit is not a wrongdoer and even though he may have received [it] honestly in the first instance." *Ryan*, 918 A.2d at 361. Because unjust enrichment is a "flexible doctrine that a court can deploy to avoid injustice," *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *42 (Del. Ch. April 24, 2017), restitution may be ordered even against a defendant who is not a wrongdoer— what matters is that the defendant should not keep the benefits in equity and good conscience. *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1105-06 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004).

Here, Plaintiffs' unjust enrichment claim is related to Defendants' breaches of fiduciary duty but is not reliant on ***proving*** breach of fiduciary duty. While unjust enrichment and breach of fiduciary duty can be treated as duplicative depending on the facts and pleadings, they are not ***necessarily*** duplicative. *Calma*, 114 A.3d at 591-92 ("At the pleadings stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim—*i.e.,* where both claims are premised on the same purported breach of fiduciary duty—is frequently treated 'in the same manner.'"). In any event, Plaintiffs sufficiently allege fiduciary breaches, so the unjust enrichment claim survives Defendants' cursory challenge. Finally, Plaintiffs adequately allege that Defendants retained financial benefits from their employment with WWE or from their Board service while in breach of their duties. *See* Merholz ¶¶ 187, 188, 194, 202, 209, 232; Kooi ¶¶ 100, 101; Nordstrom ¶¶ 161-62. Thus, unjust enrichment is adequately alleged.

### D.   The Merholz And Kooi Complaints State Claims For Insider Selling

Plaintiffs Merholz and Kooi's claims for insider trading is based on *Brophy v. Cities Serv.*

24

*Co.*, 70 A.2d 5 (Del. Ch. 1949), which recognized the right of a corporation to recover from fiduciaries for harm caused by insider trading.  *See also Pfeiffer v. Toll*,  989 A.2d 683, 689, 692 (Del. Ch. 2010) (*Brophy* insider trading claim is a breach of fiduciary duty claim), *abrogated on other grounds*, *Kahn v. Kohlberg Kravis Roberts & Co. L.P.*, 23 A.3d 831, 840 (Del. 2011); *In re Dole Food Co., Inc. Stockholder Litig.*, 2015 WL 5052214, at *44 & n.37 (Del. Ch. Aug. 27, 2015) (citing *Brophy*).

To state a *Brophy* claim, a plaintiff must allege that:  "(1) the corporate fiduciary possessed material, nonpublic company information; and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information."  *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005).  Both requirements are satisfied here.

Plaintiffs Merholz, Klein and Kooi allege V. McMahon sold more than 3.2 million WWE shares for over ***$261 million*** in gross insider trading proceeds on March 27, 2019.  Merholz ¶ 152; Kooi ¶ 77.  Defendant Barrios also sold 114,678 shares of WWE stock during the relevant period for proceeds of more than $8.6 million.  Merholz ¶ 156.  In addition, during the Relevant Period, 64,497 shares of Barrios' WWE stock worth $4.5 million were withheld by WWE to pay for his personal taxes in connection with WWE-issued stock.  Merholz ¶ 156.  Through these transactions, Barrios disposed of approximately 74.1% of the total shares, including vested stock units, he had available for sale during the Relevant Period.  Merholz ¶ 156.[13]  Wilson sold over 158,000 shares of WWE stock on August 8, 2019 for proceeds of nearly $11 million.  Merholz ¶ 157; Kooi ¶ 80. At the time of Wilson's sale, she knew that a replacement media rights deal was not going to be

---

[13]    That these sales were made pursuant to a 10b5-1 trading plan is irrelevant at this stage because "the existence of a Rule 10b5-1 trading plan is an affirmative defense that must be pled and proved." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200-01 (S.D.N.Y. 2010).

announced "very soon" and used that information to liquidate her personally held shares at artificially inflated prices.  By virtue of their positions at WWE as CEO and co-Presidents of WWE, V. McMahon, Wilson and Barrios knowledge of the importance of the Middle East media right deal to the profitability of WWE, as well as their public statements and omissions regarding the media rights deal,  V. McMahon, Wilson and Barrios had to have known that the OSN Agreement was ending *and* that no replacement would be announced very soon.  Accordingly, Plaintiffs have properly plead the appropriate inference at the pleading stage.  *Brophy's* first element is therefore satisfied.

To satisfy *Brophy*'s second element, Plaintiffs Merholz, Klein and Kooi need only allege facts raising a reasonable inference that V. McMahon, Barrios and Wilson were aware of material, nonpublic information and used that information "improperly by making trades because [they were] motivated, in whole or in part, by the substance of that information." *Silverberg on Behalf of Dendreon Corp. v. Gold*, 2013 WL 6859282, at \*10 (Del. Ch. Dec. 31, 2013); *see also In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009) (allegations that defendant sold stock while in "knowing possession" of material non-public information are sufficient at the pleading stage to establish improper motivation and liability under *Brophy*); *In re Galena Biopharma, Inc. Derivative Litig.* 83 F. Supp. 3d 1047, 1070 (D. Or. 2015) (knowledge in support of a *Brophy* claim "can be alleged generally").  The timing of the trades, which all predate the disclosure of material information, supports this position.  V. McMahon's *$261 million* trade was made with only a few days left before the OSN Agreement lapsed.  Merholz ¶ 153; Kooi ¶ 77.  Barrios' substantial trade was made while information about the OSN Agreement was actively withheld from the public (Merholz ¶ 156;  Kooi ¶ 79) and Wilson's $11 million stock sale occurred while the market was actively deceived into believing a new Middle East media rights deal was imminent.  Merholz ¶

157; Kooi ¶ 80; *see also* Securities Order at 28.   Therefore, Plaintiffs have made the proper showing and their claims for insider trading should be sustained.

## III.  THE MERHOLZ COMPLAINT STATES A 10(b)-5 CLAIM

Plaintiffs Merholz and Klein's Section 10(b) claim is straightforward and grounded in well-recognized law.  Plaintiffs Merholz and Klein allege the Individual Defendants caused WWE to issue statements that were materially false or misleading when made.  Merholz ¶¶ 94, 159,163, 165, 178, 183, 186, 213, 214, 215.  Merholz and Klein further alleges those misrepresentations artificially inflated the price of WWE shares, causing WWE itself to purchase millions of WWE shares at artificially inflated prices through its stock repurchase program.  Merholz ¶¶ 166-73.

### A.  Merholz Adequately Pleads Materially False And Misleading Statements And Omissions

Liability can attach under Rule 10(b)-5 when a defendant makes an actual statement that is either "untrue" outright or "misleading" by virtue of what it omits to state, *i.e.*, "half-truths." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) ("half-truths" — true statements that create a materially misleading impression—support claims for securities fraud).  In addition, pure omissions can also be actionable when a corporation has a duty to disclose the omitted facts.  *Id.* And "once a company speaks on an issue or topic, there is a duty to tell the whole truth," "[e]ven when there is no existing independent duty to disclose [such] information."  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[T]here is a duty to tell the whole truth.").

#### 1.  The Individual Defendants Misled The Market Concerning The Premature Termination Of The OSN Agreement

"[I]t is undisputed that defendants did not disclose until July 2019 that the OSN Agreement, due to expire at the end of 2019, had been formally terminated as of March 31, 2019 as a result of a termination agreement signed in December 2018."

Securities Order at 8.

This finding by Judge Rakoff is collateral estoppel against Defendants V. McMahon, Barrios and Wilson. Defendants' statements concerning (1) the status of "renewal" negotiations regarding the MENA region media-rights agreement (*i.e.*, the OSN Agreement) (Merholz ¶¶ 97-100, 103-04, 106) and (2) the issuance and affirmance (through July 25, 2019) of WWE's 2019 full-year financial guidance, which depended on renewing key media rights agreements (including the OSN Agreement) (Merholz ¶ 95) were materially false and misleading, because, unbeknownst to the market and WWE shareholders, the OSN Agreement was terminated two months before the start of the Relevant Period. *See* Section III above.

Courts are clear that a company has "a duty to disclose a major dispute or uncertainty that exists in an important business relationship where the company publicly touts that specific relationship and the uncertainty may significantly affect the corporation's financial success." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013). Here, the status of WWE's media-rights renewal discussions (including with its partner in the Middle East, OSN) were material to investors, considering that Defendants were asked about them frequently (Merholz ¶ 104), WWE told investors it expected to increase the revenues on these deals significantly between 2018 and 2020 (Merholz ¶¶ 72-73, 118), and WWE otherwise touted the importance of renewing these agreements before and during the Relevant Period. Merholz ¶¶ 76-78, 103. The Individual Defendants therefore had a duty to tell the market when discussing its international media-rights renewals that one of these key agreements—the OSN Agreement—for its second-largest market in terms of monetization (Merholz ¶ 103), had been terminated early and could not possibly be renewed with OSN. *See Hi-Crush*, 2013 WL 6233561, at *15-16.

As a result, Individual Defendants' affirmative statements about working on the renewal of its international media-rights agreements, which included the MENA agreement (Merholz ¶¶

28

97, 104, 106), and the Individual Defendants' unwillingness to comment on the negotiations' status after being asked by analysts (Merholz ¶ 110), were materially false and misleading, because the Individual Defendants knew, but failed to disclose, that the OSN Agreement was terminated prematurely.  *See* Securities Order at 8.

It was also misleading for Defendants to tell investors that a renewed agreement would be "completed substantively by the middle of the year" (Merholz ¶ 103) and that those negotiations were "ongoing."  Merholz ¶¶ 103, 123.  *See* Securities Order at 10-11.  At the very least, Defendants were obligated to disclose that WWE's efforts to renew (or find a new partner for) a media-rights agreement for the MENA region would be significantly complicated by the fact that its current partner in the region had prematurely terminated its contract.  For similar reasons, certain of Defendants' statements about renewing the MENA region deal were "untrue outright." *Vivendi*, 838 F.3d at 239.  It was plainly false for Defendant Barrios to state on February 7, 2019 that WWE was "working on" the "rights ***renewal*** process" in "key markets," including "the Middle East" (Merholz ¶ 97) (emphasis added), considering that the media-rights agreement had already been ***terminated***, and so there was no agreement to "***renew[]***."  *See* Securities Order at 20.

Defendants argue that "there are no allegations before this Court making a particularized showing of the OSN Agreement's materiality to WWE's financial outlook[.]"  Motion at 27.  But it was material to investors' understanding of the ongoing contract negotiations for several reasons, including that: (1) it weakened WWE's bargaining position because it had to find a new partner on a faster timeline than investors appreciated; (2) it meant that at least one potential counterparty (OSN)—and WWE's current counterparty for the past five years—was no longer an option as a new partner; (3) it meant that WWE would be left without any media-rights deal revenues at all as of April 1, 2019, unless it found a new partner before then; and (4) because WWE would not have

a media-rights agreement in the MENA region, it would miss out on the opportunity to further expand its media reach into this important growth market.  Securities Order at 13.

Further supporting materiality is that these lost revenues had an immediate impact on WWE's stock price, considering that WWE provided lower-than-expected guidance on April 25, 2019 for the second-quarter 2019, reflecting the materialization of the still-unknown risk that WWE would not receive in that quarter the revenues associated with the OSN Agreement.  *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (stock drop on release of previously concealed information supports materiality).[14]  And finally, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000); *see also* Securities Order at 13 ("the status of the OSN Agreement specifically is not so 'obviously unimportant' as to justify dismissal on grounds of lack of materiality.").

### (i)    The Risk Disclosures Regarding Failure To Renew Key Agreements Are Actionable Misstatements

Plaintiffs allege that the Individual Defendants issued materially false and misleading risk disclosures (Merholz ¶ 100) because they warned of a risk that already had materialized, namely that the OSN Agreement—*one of WWE's key agreements*—had already been terminated prematurely.[15]

---

[14]    *See* Securities Order at 31.

[15]    *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").

The Individual Defendants included a risk disclosure in WWE's 2018 10-K, issued on February 7, 2019,[16] warning of the risk that the "failure to maintain or renew key agreements could adversely affect our ability to distribute our media content," and also stated: "***Because a large portion of our revenues are generated***, directly and indirectly, from this distribution, any failure to maintain (such as due to a breach or alleged breach by either party) or renew arrangements with distributors and platforms . . . could adversely affect our financial outlook, liquidity, business and operating results." Merholz ¶ 100. This was materially misleading because, as of December 18, 2018, the Individual Defendants already knew that the OSN Agreement had been terminated. Merholz ¶¶ 78-81, 84, 101(a).

> ### (ii)     Defendants Misled The Market Concerning A Potential Media-Rights Agreement With Saudi Arabia To Replace The OSN Agreement

Defendants not only failed to disclose that the OSN Agreement was prematurely terminated until July 25, 2019, but they also attempted to blunt the impact of this news by simultaneously claiming that WWE was then in negotiations with the Saudi government for a media-rights agreement for the MENA region, and that the deal would be completed "***very soon***" because the parties had reached an "***agreement[] in principle***." Merholz ¶¶ 88, 89,109, 110. In reality, Defendants had no reasonable basis to believe that the new MENA deal with the Saudi government would be completed at all—because the parties were far apart on basic assumptions about the deal, including the size of the market—and, as a result, Defendants' relevant statements about completing a media-rights agreement with the Saudi government (and statements regarding WWE's full-year guidance, which depended on this deal being completed) were materially false

---

[16]     Defendants V. McMahon, S. McMahon, Levesque, Wilson, Goldfarb, Ong, Peterson, Riddick, Singh, Wexler and Barrios signed the 2018 10-K. *See* Merholz ¶ 98.

and misleading.  Merholz ¶¶ 108-110, 113-15, 119, 121, 123-24, 128, 131, 133; Securities Order

at 22.

<em><strong>(iii)       Purported Statements Of Opinion Are Actionable</strong></em>

The statements Defendants appear to challenge as opinions are actionable.  As an initial

matter, many of the statements in the complaints are not opinions at all.  For instance, Defendant

Barrios's February 7, 2019 statement that WWE was "working on" the "rights renewal process"

in "key markets," including "the Middle East" (Merholz ¶ 97), is not an expression of opinion—it

is a statement of fact, albeit a false one.  The same is true of Defendant Barrios's February 26,

2019 statement that negotiations on the MENA distribution rights deal were "ongoing."  Merholz

¶ 103; *see* Merholz ¶ 103 ("with a target to 'get that locked down by the middle of the year'");

Merholz ¶ 110 ("we are going to be close to announcing those deals very soon."); *Omnicare Inc.*

*v. Laborers Dist. Counsel Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (a "fact is 'a

thing done or existing' or '[a]n actual happening'").

Even those statements that arguably contain opinions are actionable as Defendants either:

(1) did not genuinely hold the expressed opinions or (2) omitted material facts about the basis for

the opinion, which rendered the statements misleading in context.  *Omnicare*, 575 U.S. at 192-93,

185-95.  In fact, "that [Defendants] may have believed [their statements] to be accurate is

irrelevant, even when read as an opinion statement.  The core inquiry when determining whether

an omission renders an opinion misleading is whether the omitted facts 'conflict with what a

reasonable investor would take from the statement itself.'"  *In re Avon Secs. Litig.*, 2019 WL

6115349, at *17 (S.D.N.Y. 2019) (citing *Omnicare*, 575. U.S. at 188-90); *Galestan v. OneMain*

*Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (finding opinion statements actionable

where defendants omitted information making the statement misleading).

32

Defendant Barrios's statement on July 25, 2019 that "[w]e believe we have agreements in principle" with the Saudi government on "the completion of a media rights deal in the MENA region" (Merholz ¶ 113), is misleading (as detailed above, *see supra* at 28-32) notwithstanding that he used the words "[w]e believe." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015) ("[T]he use of the word 'believed' does not transform defendants' representation . . . into a statement of opinion"); Securities Order at 22 ("plaintiff has plausibly alleged that WWE's statement, even though cabined with the phrase 'I believe,' did not 'fairly align[] with the information in the issuer's possession at the time' and was thus misleading."); Securities Order at 29 ("defendants' statements about the imminence of a media rights agreement with Saudi Arabia, including WWE's claim that 'believe[d] it ha[d] an agreement[] in principle' in July of 2019, were false.")

### (iv)    *Purported Forward-Looking Statements Are Actionable; Safe Harbor Does Not Apply*

Defendants incorrectly argue that a certain unidentified category of statements are forward-looking statements that are in actionable because they are protected by the statutory safe harbor. Motion at 41.  As an initial matter, many of the alleged statements are not actually forward looking at all (Merholz ¶¶ 97, 103, 106, 109, 110, 113, 119, 124, 128, 131, 133) because they are based on representations of historical and/or current facts (and therefore not protected by the statutory safe harbor). *See Galestan*, 348 F. Supp. 3d at 304 (finding that "many of [Defendants'] statements are not protected by the safe harbor provision because they were statements of present fact").  Here, Defendants made affirmative statements that "[t]he Company believes it has agreements in principle with the Saudi General Sports Authority" (Merholz ¶ 109).  These statements are "neither themselves forward-looking nor provided a basis for forward-looking projections that could be

disclaimed" with the cautionary language Defendants provided here. *Lockheed Martin*, 875 F. Supp. 2d at 366.

With respect to those statements that are arguably forward-looking, these statements—including those regarding WWE's 2019 full-year guidance—are misleading for what they omit to disclose (the OSN Agreement terminated in December 2018). It is well settled that "the safe harbor does not apply to material omission," even where the omission makes misleading forward-looking projections. *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013); *see also* Securities Order at 23. Moreover, the safe harbor also does not apply because Defendants' boilerplate cautionary language (Motion at 41, 42) was not sufficiently meaningful. *See Galestan*, 348 F. Supp. 3d at 304; *see* also Securities Order at 23-24.

Defendants seek cover in certain of WWE's disclosures regarding the risk of entering into, maintaining, and/or renewing key agreements. Motion at 47 (citing 2018 10-K). But these risk disclosures were "not 'meaningful' or 'sufficiently specific' because [Defendants] did not disclose that the risk factors were not merely hypothetical (*i.e.*, they "could" happen), but were in fact happening." *Aeropostale*, 2013 WL 1197755, at *12; *see also* Securities Order at 12-13.

## 2.   Merholz Pleads Facts Showing A Strong Inference of Scienter

The inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged" but "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-324 (2007). "Scienter may be inferred from (i) facts showing that a defendant had 'both motive and opportunity to commit the fraud,' or (ii) facts that constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.,* 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017).

### (i)       *Defendants Own Sworn Declarations Acknowledge Scienter*

As detailed herein, *see supra* Section III, WWE representatives confirm that OSN informed WWE ***in November 2018*** that it would not renew its agreement (scheduled to end in late 2019)—and that, ***on December 18, 2018***, the parties entered into a settlement agreement formally terminating the agreement, effective March 31, 2019.   Merholz ¶ 81.

Under Section 141(a) of the General Corporation Law, directors have the statutory power and responsibility to direct and oversee the business and affairs of the corporation. 8 Del. C. § 141(a).  It would afford an ostrich-like immunity to the Audit Committee Directors (Defendants Goldfarb, Singh and Speed) and WWE's executive officers and directors (Defendants V. McMahon, S. McMahon, Levesque, and Riddick) not to grant Plaintiffs a Rule 12(b)(6) inference that these defendants knew about core information of this type.  *See* Section I.B.1 and I.B.2 above; *Pfeiffer v. Toll*, 989 A.2d 683 (Del. Ch. 2010); *see* Securities Order at 26-27 (". . . it is virtually inconceivable that the CEO and Co-Presidents of WWE would not have been aware of the formal termination by WWE of this important contract -- or so a reasonable jury could infer from the facts pleaded in the complaint.").

There is no requirement that Plaintiffs must specifically identify documents, or communications, or specific meetings containing information contradicting public statements in order to adequately allege scienter.  *Lockheed Martin*, 875 F. Supp. 2d at 370-71.  Requiring Plaintiffs to prove scienter only through allegations such as reports and meetings would also effectively render meaningless allegations relating to the core operations doctrine (discussed below) and allegations of motive and opportunity.[17]

---

[17]      Defendant V. McMahon is collaterally estopped from arguing that he lacked scienter.  *See* Securities Order at 27 (". . . defendant McMahon's stock sales during the class period . . . supports a finding of scienter as to the OSN-related misrepresentations.").

### (ii)   *The Core Operations Doctrine Supports An Inference Of Scienter*

The renewal of the OSN Agreement—and the need to ultimately replace it with a new media rights agreement for the MENA region—was so important to WWE that the Individual Defendants must have had knowledge of the information concerning these negotiations.  *See Lockheed Martin*, 875 F. Supp. 2d at 371.

*First*, Defendants told the market in 2018 that WWE would significantly grow the revenues derived from its media-rights agreements, including the OSN Agreement, over the next two years (2018-2020), which caught the attention of analysts.  Merholz ¶ 102.  *Second*, in the months leading up to the start of the Relevant Period, Defendants spoke frequently about finalizing its media-rights agreements for its key markets, including the all-important MENA region.  Merholz ¶ 76.  *Third*, by the start of the Relevant Period, WWE announced that the MENA region grew to become WWE's ***second-largest market by monetization***.  Merholz ¶ 87.  *Fourth*, at the start of the Relevant Period, WWE provided a full-year 2019 guidance that was dependent on finalizing these agreements (Merholz ¶ 97-98), and just weeks into the Relevant Period, on February 26, 2019, Defendant Barrios described finalizing these agreements as "important for us strategically" and "financially," because it would provide "visibility over the next several years for a ***pretty significant portion of our revenue***, *so really important*."  Merholz ¶ 103.  *Fifth*, by July 25, 2019, Defendants specifically tied WWE's ability to achieve its full-year 2019 guidance to the "completion of a media rights deal in the MENA region."  Merholz ¶ 108.  *Sixth*, WWE's pre-existing 10-year partnership with the Saudi government proved extremely lucrative for WWE in 2018 (Merholz ¶ 60)—meaning Defendants paid close attention to WWE's relationship with the Saudi government.   Defendants also repeatedly singled-out the importance of the Saudi relationship (Merholz ¶ 99), and thus had to have been knowledgeable about it.

3.     **Merholz Adequately Alleges Reliance**

Defendants argue that "if WWE's directors and executives knew the allegedly omitted information (as Plaintiffs claim), then such knowledge is imputed to WWE (the purchaser of the stock), which thus precludes any claim that the purchaser was misled."  Motion at 45.  This argument is baseless.  *See Estate of Soler v. Rodriguez*, 63 F.3d 45, 54 (1st Cir. 1995) ("It is by now well established that a corporation has a claim under § 10(b) if the corporation was defrauded in respect to the sale of its own securities by some or even all of its directors"); *see also In re Finisar Corp. Deriv. Litig.*, 2012 WL 2873844 (N.D. Cal. July 12, 2012); *Countrywide*, 554 F. Supp. 2d 1044.

In *Finisar*, the director and officer defendants sought to dismiss, *inter alia*, the plaintiffs' derivative Section 10(b) claim, arguing that because "defendants *are* Finisar; therefore, Finisar knew the financial statements were misleading (because defendants caused them to be), and could not have been deceived by those statements in issuing or repurchasing stock." 2012 WL 2873844, at *17 (emphasis in original).  The court explicitly rejected that argument, holding that "if Finisar issues or purchases stock at a loss, it does not do so recklessly[—] ***it is a puppet*** whose strings are pulled by the very directors and officers responsible for the fraud."  *Id.* (emphasis added).

The *Countrywide* court's reasoning is similar.  There, the defendants argued that because "the same [directors and officers] who made the fraudulent misstatements also made [the company's] repurchase decision," the company could not have been defrauded.  554 F. Supp. 2d at 1073.  Expressly rejecting that argument, the *Countrywide* court held that a Section 10(b) claim may be foreclosed only when "the shareholders, not only the officers and directors, are involved in the alleged fraud."  *Id.* (collecting cases demonstrating that the knowledge of defrauding directors is not imputed to the corporation absent "disclosure by the allegedly defrauding directors

and ratification by the remaining directors or shareholders" (quoting *In re Whitehall Jewellers, Inc. S'holder Deriv. Litig.*, 2006 WL 468012, at *12 (N.D. Ill. Feb. 27, 2006))).

### 4.   Merholz Adequately Pleads Loss Causation

"[P]leading of loss causation under Section 10(b) is governed by Rule 8 notice pleading standards," rather than the heightened pleading standard of Rule 9.  *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 488 (S.D.N.Y. 2011).  Thus, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," and a complaint is sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs allege in detail how the truth about Defendants' false and misleading statements was revealed to the market through a series of partial revelations.  Merholz ¶¶ 119-25.  Defendants do not challenge this in any detail, but instead vaguely claim that the alleged dates on which the truth was partially revealed amount to nothing more than updates on negotiations, expectations, and financial projections.  Motion at 46.

But this is not true.  Plaintiffs allege, for example, that the lower-than-expected 2Q19 guidance WWE provided on April 25, 2019 reflected a partial materialization of the unknown risk that WWE would not receive in that quarter (2Q19) the revenues associated with the cancelled OSN Agreement, which had been terminated effective March 31, 2019 (*i.e.*, the last day of 1Q19). Merholz ¶ 77; *see, e.g.*, *BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 326-27 (S.D.N.Y. 2016) (loss causation sufficiently pled through disclosure which resulted in a materialization of previously concealed risks).[18]

---

[18]     Defendants suggest that the alleged downward stock movements are not necessarily based on the alleged fraud and do not reveal that Defendants' prior statements were false.  Motion at 47.  But a plaintiff need not plead that a "specific corrective disclosure . . . exposed the precise extent of [the] alleged fraud," so long as the plaintiff's "theory of loss causation nevertheless rest[s] on the revelation of the truth," *Vivendi*, 838 F.3d at 262, and "there is no

### B.      Merholz Pleads A Violation Of Section 20(a)

Defendants argue that "Plaintiffs' section 20(a) claims against V. McMahon also fail"

because "to state a claim under section 20(a), 'a plaintiff must show a primary violation by the

controlled person and control of the primary violator by the targeted defendant," and "show that

the controlling person was in some meaningful sense [a] culpable participant[ ] in the fraud

perpetrated by [the] controlled person.'"  Motion at 48-49.  Plaintiffs have adequately plead these

facts as to Defendant V. McMahon.  Moreover, Judge Rakoff has already held that the plaintiff in

the Securities Action "has alleged both a primary violation and scienter as to all the individual

defendants", which includes Defendant V. McMahon.  *See* Securities Order at 32.

### IV.      PLAINTIFFS HAVE PROPERLY PLED STANDING

Defendants incorrectly argue Plaintiffs fail to satisfy the contemporaneous and continuous

stock ownership requirements.  Motion at 24-25.  To have standing to assert a derivative claim

under Rule 23.1(b)(1) a shareholder-plaintiff is only required to "allege" that he/she "was a

shareholder or member at the time of the transaction complained of."  *See Galdi v. Jones*, 141 F.2d

984 (2d Cir. 1944) (holding that 23.1(b)(1) sets a notice pleading standard for stock ownership).[19]

Here, each of the Complaints, all of which are verified, are more than sufficient to allege standing.

Defendants ***concede***, as they must, that Plaintiffs Kooi and Nordstrom specifically detail when

they first acquired WWE stock.  Kooi ¶ 15; Nordstrom ¶ 10.

---

requirement that the disclosure take a particular form or be of a particular quality."  *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).  Further, Defendants' argument that there was no materialization of a concealed risk because they disclosed the risk (Motion at 47) is misguided.  Defendants' misstatements meant that investors "could not accurately weigh that risk," and "[t]he risk that caused the loss . . . was within the 'zone of risk concealed by the misrepresentations."  *In re Barrick Gold Sec. Litig.*, No. 13 CIV. 3851 SAS, 2015 WL 1514597, at *13 (S.D.N.Y. Apr. 1, 2015) (rejecting this precise argument); *see also* Securities Order at 31.

[19]      Defendants also refer to the ownership requirements of 8 *Del. C.* § 327, but do not claim that the requirements of 8 *Del. C.* § 327 are different than Rule 23.1(b)(1).

Unable to attack Plaintiffs Kooi and Nordstrom, Defendants' attack Merholz and Klein's standing, yet overlook the express language alleging ownership.  Plaintiffs Merholz and Klein both allege continuous ownership "during all times relevant to the Director Defendants' wrongful course of conduct alleged herein" and "at all relevant times." Merholz ¶ 181.  Nothing more is required at the pleading stage.  And Defendants' authority agrees.  *See Smith v. Stevens*, 957 F. Supp. 2d 466, 470 n.2 (S.D.N.Y. 2013) (allegations that "[a]t all times hereinafter mentioned, Plaintiff was and . . . is the owner and holder of record of shares of stock" were sufficient).

In an impermissible attempt to elevate the pleading standard, Defendants add a requirement to Rule 23.1(b)(1) that a shareholder-plaintiff must allege that they "intend to continue to hold shares in [the company] during the pendency of the litigation."  Motion at 25.  This argument fails for two reasons because (1) it is contrary to the plain language of 23.1(b)(1) and (2) Paragraph 125 of the Nordstrom Complaint alleges Nordstrom's intent to hold WWE shares for the duration of this matter.  *See also* Merholz at ¶¶ 4, 5.[20]

## CONCLUSION

For the reasons stated herein, the Motion should be denied in its entirety.

---

[20]     Defendants' reliance on *Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984) and *Ash v. McCall*, Civil Action No. 17132, 2000 Del. Ch. LEXIS 144 (Del. Ch. Sept. 15, 2000) is misplaced.  Both of these cases stand for the unremarkable proposition that to maintain derivative standing a shareholder-plaintiff must continue to be a shareholder of the company.  These cases do not impose a requirement to plead intent to continue to hold shares because no such requirement exists.

Dated: September 18, 2020                    Respectfully submitted,

                                        **GAINEY McKENNA & EGLESTON**

                                        By: */s/ Gregory M. Egleston*
             Gregory M. Egleston (CT19709)
         Thomas J. McKenna
         501 Fifth Avenue, 19th Floor
         New York, NY 10017
         Telephone: (212) 983-1300
         Email: gegleston@gme-law.com
         Email: tjmckenna@gme-law.com

         ***Attorneys for Ryan Merholz and Melvyn Klein***

         **THE WEISER LAW FIRM, P.C.**
         Robert B. Weiser
         James M. Ficaro
         22 Cassatt Avenue
         Berwyn, PA 19312
         Telephone: (610) 225-2677
         Email: rw@weiserlawfirm.com
         Email: jmf@weiserlawfirm.com

         **AETON LAW PARTNERS LLP**
         Jonathan M. Shapiro (CT433168)
         101 Centerpoint Road, Suite 105
         Middletown, CT 06475
         Telephone: (860) 724-2160
         Facsimile: (860) 724-2161
         Email: jms@aetonlaw.com

         ***Attorneys for Daniel Kooi***

         **MOORE KUEHN, PLLC**
         Fletcher Moore
         Justin Kuehn
         30 Wall Street, 8th Floor
         New York, NY 10005
         Telephone: (212) 709-8245
         Email: fmoore@moorekuehn.com
         Email: jkuehn@moorekuehn.com

         ***Attorneys for Rodney Nordstrom***

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 18, 2020, I caused a true and correct copy of the foregoing to be served on counsel of record by electronically filing it with the Clerk of the Court using the ECF system, which will send notification of such filing to the registered participants.


*/s/ Gregory M. Egleston*
Gregory M. Egleston