```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
2      - - - - - - - - - - - - - - -    X
       RYAN MERHOLZ and MELVYN KLEIN,    :
3      Derivatively On Behalf Of WORLD   :
       WRESTLING ENTERTAINMENT, INC.,    :
4                                        :
                    Plaintiffs,          :
5                                        :
                 V.                      :
6                                        : Case No:
       VINCENT K. MCMAHON, STEPHANIE     : 20CV557(VAB)
7      MCMAHON, PAUL LEVESQUE, FRANK A.  :
       RIDDICK, III, STUART U.           :
8      GOLDFARB, LAUREEN ONG, ROBYN W.   :
       PETERSON, MAN JIT SINGH, JEFFREY  :
9      R. SPEED, ALAN M. WEXLER, GEORGE  :
       A. BARRIOS, and MICHELLE D.       :
10     WILSON,                           :
                                         :
11                  Defendants,          :
                                         :
12     WORLD WRESTLING ENTERTAINMENT     :
       INC.,                             :
13                                       :
                 Nominal Defendant       :
14     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _     :
                                         :
15     DANIEL KOOI, Derivatively On      :
       Behalf Of WORLD WRESTLING         :
16     ENTERTAINMENT, INC.,              :
                                         X
17                  Plaintiffs,          :
                 V.                      :
18                                       :
       VINCENT K. MCMAHON, FRANK A.      : Case No.
19     RIDDICK, III, JEFFREY R. SPEED,   : 20CV743(VAB)
       PATRICIA A. GOTTESMAN, STUART U.  :
20     GOLDFARB, LAUREEN ONG, PAUL       :
       LEVESQUE, ROBYN W. PETERSON,      :
21     STEPHANIE MCMAHON, MAN JIT        :
       SINGH, ALAN M. WEXLER, GEORGE A.  :
22     BARRIOS, AND MICHELLE D. WILSON,  :
                                         :
23                  Defendants           :
                                         :
24     WORLD WRESTLING ENTERTAINMENT,    :
       INC.,                             :
25                  Nominal Defendant    :
       _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    X
```

```
 1   - - - - - - - - - - - - - -  x
 2   RODNEY NORDSTROM,                 :
 3   Derivatively On Behalf of         :
     WORLD WRESTLING                   :  Case No.
 4   ENTERTAINMENT, INC.,              :  20CV904(VAB)
                                       :
 5               Plaintiffs,           :
                                       :
 6          V.                         :
                                       :
 7   VINCENT K. MCMAHON, GEORGE        :
     A. BARRIOS, MICHELLE D.           :
 8   WILSON, STEPHANIE MCMAHON,        :
     PAUL LEVESQUE, FRANK A.           :
 9   RIDDICK III, STUART U.            :
     GOLDFARB, LAUREEN ONG, ROBYN      :
10   W. PETERSON, MAN JIT SINGH,       :
     JEFFREY R. SPEED, ALAN M.         :
11   WEXLER, AND PATRICIA A.           :
     GOTTESMAN,                        :  915 Lafayette Blvd
12                                     :  Bridgeport, CT
                Defendants,            :  October 29, 2020
13                                     :
     WORLD WRESTLING                   :
14   ENTERTAINMENT, INC.,              :
                                       :
15             Nominal Defendant.      :
                                       X
16   - - - - - - - - - - - - - -
```

17              TRANSCRIPT OF MOTIONS HEARING

18    BEFORE:  THE HONORABLE VICTOR A. BOLDEN, U.S.D.J.

19

     APPEARANCES:
20   FOR THE PLAINTIFF        GREGORY EGLESTON, ESQ.
     RYAN MERHOLZ:            Gainey McKenna & Egleston
21                            501 Fifth Avenue
                              New York, NY 10017
22

23   FOR THE PLAINTIFF        JUSTIN KUEHN, ESQ.
     RODNEY NORDSTROM:        Moore Kuehn
24                            30 Wall Street
                              New York, NY 10005
25

```
 1

 2   FOR THE PLAINTIFF          JAMES FICARO, ESQ.
     KOOI:                      Weiser Law Firm
 3                              22 Cassatt Avenue
                                Berwyn, PA 19312
 4
                                JONATHAN M. SHAPIRO, ESQ.
 5                              Aeton Law Partners LLP
                                311 Centerpoint Drive
 6                              Middletown, CT 06457

 7
     FOR THE DEFENDANTS:        DANIEL J. KRAMER, ESQ.
 8                              Paul, Weiss, Rifkind,
                                Wharton & Garrison, LLP-NY
 9                              1285 Avenue of the Americas
                                New York, NY 10019-6064
10
                                JEFFREY MUELLER, ESQ.
11                              Day Pitney LLP-Htfd-CT
                                242 Trumbull St.
12                              Hartford, CT 06103-1212

13                              JERRY S. MCDEVITT, ESQ.
                                K&L Gates, LLP- Ptsbrg PA
14                              K&L Gates Center
                                210 Sixth Ave
15                              Pittsburgh, PA 15222-2613

16   FOR THE INTERVENOR         DANIEL MEYER, ESQ
     PLAINTIFF DENNIS           Bernstein Litowitz Berger &
17   PALKON:                    Grossmann
                                1251 Avenue of the Americas
18                              New York, NY 10020

19                              WILLIAM H. NARWOLD, ESQ
                                Motley Rice LLC
20                              One Corporate Ctr., 17th Fl.
                                20 Church St.
21                              Hartford, CT 06103

22

23              Sharon Montini, RMR, FCRR
                     915 Lafayette Blvd
24                  Bridgeport, CT 06604
                   Official Court Reporter
25
```

```
 1                    (Proceeding commenced 9:05 via Zoom
 2   videoconferencing.)
 3              THE COURT:  All right.  Good morning.
 4   We are here in Merholz v. McMahon, 20cv557 --
 5   actually, I will just do the cases separately.
 6              Could I have the parties in Merholz v.
 7   McMahon enter their appearance for the record.
 8              MR. EGLESTON:  Yes, good morning.  It's
 9   Greg Egleston from Gainey, McKenna & Egleston on
10   behalf of Merholz and Klein.
11              THE COURT:  Who is representing McMahon
12   in this action?
13              MR. MUELLER:  Yes, your Honor.  It's
14   Jeffrey Mueller from Day Pitney on behalf of the
15   defendants.
16              THE COURT:  All right.  Great.
17              MR. KRAMER:  Good morning, your Honor.
18   Dan Kramer from Paul Weiss on behalf of all
19   defendants in all cases.  Thank you.
20              THE COURT:  Thank you, Mr. Kramer.
21              MR. McDEVITT:  Good morning, your Honor.
22   Jerry McDevitt on behalf of -- K&L Gates on behalf
23   of all defendants in all cases also.
24              THE COURT:  All right.  Anyone else?
25   Okay.
```

```
1              All right.  Are there any different
2    counsel for Kooi v. McMahon on the plaintiffs' side?
3    And that's 20cv743.
4              JAMES FICARO:  Yes, your Honor.  Good
5    morning.  This is James Ficaro from the Weiser Law
6    Firm on behalf of plaintiff Daniel Kooi.
7              THE COURT:  All right.
8              MR. SHAPIRO:  Good morning, your Honor.
9    It's Jonathan Shapiro also on behalf of the
10   plaintiffs.
11             THE COURT:  And we have the same
12   defendants in Kooi v. McMahon, correct?  So that
13   would be Mr. Mueller, Mr. Kramer, and McDevitt?  Did
14   I get that right?
15             MR. McDEVITT:  McDevitt, your Honor.
16             THE COURT:  McDevitt, okay.
17             And then finally Nordstrom v. McMahon,
18   20cv904.  Counsel for Nordstrom?
19             MR. KUEHN:  Good morning, your Honor.
20   Justin Kuehn on behalf of plaintiff from the law
21   firm Moore Kuehn.
22             THE COURT:  All right.  And then we have
23   the same defendants representing them.  So that
24   would be Mr. Mueller, Mr. Kramer, Mr. McDevitt.
25             All right.  We have a few things on.  So
```

 1    I have received a motion to withdraw the motion to

 2    remand.  That would have been brought on behalf of

 3    the Kooi and Nordstrom plaintiffs.  So is it Mr.

 4    Ficaro who is speaking for the Kooi plaintiffs?

 5                 MR. FICARO:  Yes, your Honor.

 6                 THE COURT:  All right.  So you wish to

 7    withdraw the motion to remand, correct?

 8                 MR. FICARO:  Correct.

 9                 THE COURT:  Okay.  All right.  And who

10    is on for Nordstrom?  Who is counsel for Nordstrom

11    again?  I'm sorry.

12                 MR. KUEHN:  Justin Kuehn and Fletcher

13    Moore.

14                 THE COURT:  Justin Kuehn.  And so you

15    all wish to withdraw the motion to remand as well?

16                 MR. KUEHN:  That is correct, your Honor.

17                 THE COURT:  Okay.  All right.  So I will

18    grant that.  So that will simplify my task.  I will

19    grant the motion to withdraw.

20                 All right.  I know I also have --

21    although it's not fully briefed, I have this motion

22    to intervene.  Are any of the counsel here who is on

23    behalf of the parties who has filed this motion to

24    intervene here?

25                 MR. NARWOLD:  Yes, your Honor.  Bill

1   Narwold of Motley Rice on behalf of the proposed

2   intervenor, Dennis Palkon, in all three actions.

3   Also on the phone with me -- or on the Zoom with me

4   is Daniel Meyer of the Bernstein Litowitz firm.  He

5   has a pro hac pending that we filed in all three

6   cases.  To the extent you wish to hear from us, he

7   would be the one speaking with your Honor's

8   permission.

9              THE COURT:  All right.  So who is the

10  one who will be speaking?  Mr. Meyer?

11             MR. MEYER:  Yes, your Honor.  And with

12  your permission, I'd like to make a few brief

13  comments on the record.

14             THE COURT:  Well, let me hold off and

15  figure out exactly what the defendants want to do

16  about the motion to intervene.  I've not given them

17  an opportunity to respond yet.  I understand that

18  your essential position is that you wish to

19  intervene.  You have concerns about the current

20  lawsuits that have been brought on behalf of the

21  three separate suits by the plaintiffs.  You want to

22  be able to intervene in this action, and you have

23  concerns about whether -- if this Court were to

24  grant the motion to dismiss, whether that would be

25  with prejudice.

```
 1              That, in effect, is the action you wish

 2   to bring.  Is that a fair summary, Mr. Meyer?

 3              MR. MEYER:  Yes, your Honor.  You hit

 4   that spot on.

 5              THE COURT:  Great.  Just hang on just

 6   one minute.

 7              Who is going to be speaking for

 8   defendants?  Is it Mr. Mueller for the defendants?

 9   Mr. Kramer?  Who is speaking for the defendants?

10              MR. KRAMER:  I will, your Honor.  Dan

11   Kramer.

12              THE COURT:  Mr. Kramer, what is your

13   position with respect to the motion to intervene?

14              MR. KRAMER:  So our position is that it

15   should be fully briefed.  The briefing schedule

16   lasts for a couple of more weeks.  We haven't

17   responded yet, but the Court should go forward with

18   the motion to dismiss argument today and we will

19   explain in our opposition papers to intervention why

20   the intervenor's complaint is even more defective

21   than the current complaints and why your Honor

22   should feel comfortable not only granting the motion

23   to dismiss we're arguing today, but granting it with

24   prejudice once you have seen and heard argument on

25   the intervenor's motion to intervene.
```

1          So that's our proposal, your Honor, that

2    we go forward today and then we fully brief the

3    intervention motion.  Then at the end of that your

4    Honor can decide, if you are so inclined to dismiss,

5    whether the dismissal is appropriate with prejudice.

6          THE COURT:  Okay.  Thank you very much,

7    Mr. Kramer.

8          Mr. Meyer, I do want to ask you one

9    question.  As I understand the most recent filing

10   you have, you've notified the Court that you have

11   made some demands with -- I assume the proper

12   demands in the chancery court of Delaware regarding

13   records that you think would be helpful in terms of

14   producing your complaint.  How long are you

15   anticipating that process would take?  I am assuming

16   what you are basically telling the Court is you want

17   to intervene in this action, but you are right now

18   not in a posture where you can actually file a

19   complaint, that that complaint will be delayed by

20   you getting records you need in order to put in the

21   proper complaint.

22          But maybe I'm getting that wrong, so let

23   me hear from you, Mr. Meyer, on that point.

24          MR. MEYER:  Sure, your Honor.  So we

25   made a demand under Section 220 of the Delaware

1    General Corporate Law.  We've actually received the

2    books and records.  We have negotiated the scope of

3    the production of the books and records with

4    defendants.  So we did not file a complaint pursuant

5    to Section 220 in Delaware.  We have received the

6    books and records from defendants and incorporated

7    those books and records into the proposed complaint

8    that we've attached to our motion here.

9                THE COURT:  All right.  Thank you.  So

10   it's that complaint that I assume Mr. Kramer is

11   referring to that he believes he can respond to and

12   deal with in response to your motion to intervene.

13               MR. MEYER:  I believe that is what he is

14   saying, yes.

15               THE COURT:  Okay.  All right.  So let me

16   do this.  Let's begin with the arguments regarding

17   the motion to dismiss and we'll see where things

18   take us.

19               Mr. Kramer, I assume you are arguing for

20   the defendants?

21               MR. KRAMER:  Yes, your Honor.  Yes, I

22   am.

23               THE COURT:  Go ahead, sir.

24               MR. KRAMER:  Thank you, your Honor.  May

25   it please the Court, I am Dan Kramer from the law

```
1   firm of Paul Weiss representing the defendants in

2   these three actions.

3           With the motion to remand off the table,

4   what's before your Court, the Court today, is a

5   motion to dismiss on three separate grounds.  The

6   first is on the ground that demand was not futile,

7   the second is on the ground that plaintiffs have not

8   adequately pled that they are continuous

9   shareholders, and the third is 12(b)(6) grounds,

10  failure to state a claim.

11          So let me start with the demand is not

12  futile argument.  As your Honor knows, the claims in

13  the actions before the Court are derivative claims.

14  They are claims that belong to the company and, if

15  asserted, are asserted for the benefit of the

16  company.  They are not claims that shareholders

17  ordinarily have standing to bring, and the standard

18  is quite high in order for a court to decide to take

19  the claims -- or the decision whether to assert the

20  claims away from the company and to give it to a

21  shareholder.

22          And what these plaintiffs must plead

23  with particularity is that the Court should take

24  that somewhat extreme action because they claim that

25  a majority of the directors are disabled and unable
```

1    to perform their duties with respect to determining

2    whether the claims should be brought or not.

3              So here there were ten directors at the

4    time these lawsuits were brought.  That's what you

5    look at, what the board looked like at the time the

6    lawsuit was brought.  So what plaintiffs need to do

7    here is to allege with particularity that five of

8    those ten directors are disabled.

9              Now, six of the ten directors are

10   outside, non-management directors.  Six of the ten

11   directors, there is a presumption that they're able

12   to handle these claims.  And so what plaintiffs have

13   argued here, really the sole argument to focus on on

14   the demand futility, is they say that those outside

15   directors are disabled because there is a

16   substantial likelihood that they are liable for the

17   claims asserted in the lawsuit.

18             So what they have to show, your Honor,

19   is that they've pled a claim against these outside

20   directors, understanding that under the company's

21   charter they have a provision, which is a very

22   common provision under Delaware, an exculpation

23   provision, which means that the outside directors

24   are exculpated from liability unless plaintiffs can

25   allege they acted with subjective bad faith or

1   actual intent.

2          So essentially what plaintiffs need to

3   do here in order to take the decision whether to

4   assert these claims away from the board and to have

5   a shareholder assert it instead, is they are going

6   to have to allege that one or more of these

7   directors acted with subjective bad faith or actual

8   intent.  And, your Honor, what I'm going to do is go

9   through each claim they allege and show your Honor

10  that they do not come close to meeting that very

11  high standard.

12         So let me start, if I may, with the

13  first claim they allege.  They allege a breach of a

14  fiduciary duty claim for making false statements

15  under Delaware law.  And I keep referring to

16  Delaware law because that's the state of

17  incorporation and everyone agrees that's the law

18  that will apply to this issue.

19         Under Delaware law that's known as a

20  *Malone* claim, and even without the exculpation

21  clause, what they have to plead is that the

22  directors knowingly disseminated false information

23  and deliberately misinformed the shareholders.  And

24  with the exculpation clause they have to show that

25  they did it with bad faith or actual intent to

1  defraud.

2          And the two statements here, your Honor,

3  have to do with WWE's media distribution rights

4  agreement for the Middle East.  They make two claims

5  here.  First they claim that the company delayed too

6  long in disclosing that a contract it had with a

7  company called OSN had been terminated.  And the

8  second thing they claim is that the company was

9  overly optimistic when it later said that there was

10  an agreement in principle with the Saudis on these

11  media rights agreements.

12          So on the first claim, the false

13  statement claim, the plaintiffs focus on three

14  directors.  Your Honor, can you hear me?  The video

15  part went out here.  I want to make sure you have

16  the audio.

17          THE COURT:  I can hear you and see you.

18  I don't know.

19          MR. KRAMER:  Okay.  It's back.

20          THE COURT:  Okay.  You can't see me?

21          MR. KRAMER:  I can see you now.  I

22  apologize.

23          So they focus on the three directors,

24  outside directors on the audit committee, and they

25  concede that merely the status of being on the audit

```
 1   committee is certainly not enough, not sufficient to
 2   meet these very high standards.  Instead, they can
 3   claim, aha, but we have alleged additional details
 4   that get us over the pleading --
 5              THE COURT:  Mr. Kramer, just for one
 6   second.  I just want to make sure we're on the same
 7   page and I've got all of the players correct.  The
 8   three outside directors who are members of the audit
 9   committee, that's Stuart Goldfarb, Man Jit Singh and
10   Jeffrey Speed, correct?
11              MR. KRAMER:  That is correct, your
12   Honor.
13              THE COURT:  Okay.
14              MR. KRAMER:  That is correct, yes.  And
15   plaintiffs will concede that mere status on an audit
16   committee isn't enough to show a substantial
17   likelihood of liability for anything, but they say
18   they've alleged details.
19              What are the details they've alleged in
20   the complaint?  They've essentially taken excerpts
21   from the charter for the audit committee about
22   responsibility for reviewing earning statements and
23   other responsibilities, and they allege in a
24   conclusory fashion that these directors did not
25   fulfill those responsibilities and they must have
```

1   known that the statements, the two statements I

2   mentioned, were false.

3           Now, that's just not good enough.

4   That's not good enough to show knowingly

5   disseminating false information, deliberately

6   misinforming shareholders, and it is certainly not

7   good enough to show subjective bad faith or actual

8   intent.

9           But that, when you parse through it all,

10  your Honor, that's what the status of these

11  pleadings are, and they're wholly deficient.

12          They also argue, your Honor, that the

13  decision denying the motion to dismiss in the

14  securities class action lawsuit filed on these

15  statements in the Southern District of New York,

16  Judge Rakoff's decision, somehow should influence

17  your Honor's consideration of this claim, but the

18  fact is, aside from the fact that that lawsuit

19  alleged different conduct, it did not allege any

20  claims against the outside directors.  It did not

21  name the outside directors.  There was no allegation

22  and no decision relating to the outside directors.

23          So if the obligation here, in order to

24  take this claim away from the company, is to show

25  that the outside directors acted in bad faith or

1    actual intent, the Southern District of New York

2    decision is absolutely irrelevant.  It did not

3    address any allegations regarding the conduct of any

4    of the outside directors.

5            So that's the first claim.  That's the

6    *Malone*, the alleged false statement claim, and they

7    haven't come close to showing bad faith, actual

8    intent to issue a false statement.

9            Your Honor, the second claim we thought

10   they were making was a lack of oversight claim, a

11   *Caremark* claim under Delaware law, and so our

12   briefing explains that this is the hardest claim

13   under Delaware law to assert and how they didn't

14   come close.  And, in fact, in the opposition brief

15   plaintiffs back off and say now they're not

16   asserting a *Caremark* or oversight claim.  So that's

17   not something your Honor would need to address here.

18   That's on page 21 of their opposition brief.

19   They've clarified what they are doing here and

20   they've clarified they're not bringing that claim.

21           The other claim your Honor need not be

22   concerned with is what's known under Delaware as a

23   *Brophy* claim, an insider trading claim, because that

24   claim is not alleged against the outside directors.

25   There is no -- it's not alleged against them, so

```
 1   they couldn't possibly have any liability, much less
 2   substantial liability.
 3              So both the Caremark and Brophy claims
 4   are irrelevant -- or do not help plaintiffs with
 5   respect to demand futility.
 6              There are three more alleged breaches of
 7   fiduciary duty which I think we can dispose of
 8   easily.  They make an allegation of unjust
 9   enrichment, and that fails for two reasons.  First,
10   you have to have an underlying breach of fiduciary
11   duty to have an unjust enrichment claim, and as I
12   have explained, the Malone false statement claim
13   they don't come close to alleging.  They themselves
14   admit there is no Caremark or Brophy claim.  So
15   there is no underlying breach of fiduciary duty
16   claim.
17              And even if there were, unjust
18   enrichment does not apply to ordinary director
19   compensation.  And that's the only allegation here
20   as to any benefit that the outside directors got.
21              So for both of those reasons, they
22   haven't pled an unjust enrichment claim.
23              Corporate waste, they say that the
24   company engaged in corporate waste by doing what
25   many companies across America do, which is a stock
```

1    repurchase program.  The law on that is clear, you

2    have to allege that the program of repurchasing

3    stock was egregious or irrational.  The complaint

4    does not contain claims that would satisfy that.

5    And then they would have to on top of that allege

6    that these directors in putting in such a plan -- or

7    brings such a plan acted with subjective bad faith

8    or actual knowledge of illegality, and there are no

9    claims with respect to that.

10             And that takes us through the alleged

11   breaches of fiduciary duty.  I'm sorry, they also

12   have an excessive compensation claim, which is

13   similar to corporate waste, but, again, it doesn't

14   apply to ordinary director compensation, and that's

15   all they have here.  There is just a long line of

16   Delaware cases saying even if you could allege a

17   breach of fiduciary duty, which they have not done

18   here, you do not have an excessive compensation

19   claim when all you are alleging that the outside

20   directors received was ordinary director

21   compensation.

22             Now, the final claim in the -- the final

23   claim asserted, and this one is asserted only in one

24   of the complaints, the Merholz complaint, is a claim

25   for violation of the Exchange Act, the Securities

1  Exchange Act of 1934, and there are a whole host of

2  problems with that claim against the outside

3  directors, but let me just say there is no scienter

4  alleged here.  There is no -- in the allegations in

5  the Merholz complaint about the defendants'

6  knowledge, which is 147 to 165 of their complaint,

7  they don't even mention the outside directors.

8  There is no allegation that the outside directors

9  knew that any statement was false or misleading,

10  much less that they made any such statement with

11  scienter or intent to defraud.

12        The most that they say in their brief is

13  that these directors had access to information from

14  which they could have learned that the statements

15  were allegedly false, and under the Second Circuit

16  case in *Novak* and several cases following it, merely

17  alleging access to information isn't enough.  And

18  here they don't even say what that information is.

19  So it's wholly insufficient.

20        And, finally, as I mentioned earlier,

21  they trot out Judge Rakoff's denial of the motion to

22  dismiss in the securities class action case.  And,

23  again, that case had no claims against the outside

24  directors or allegations against them, no findings

25  against them, and so that decision does not support

the notion that there is a substantial risk of
liability.

So, your Honor, this is not a case where
your Honor should take the extraordinary step of
stepping in and taking away from the company its
right and obligation to determine whether to bring
these claims and give it to a shareholder.  They
haven't shown that a majority of this board is
unable to consider a demand should one be made, and
on this basis alone all three of these complaints
can be dismissed and your Honor need not reach the
other two arguments that we've made.  You may, but
you need not do that.  You could on this -- on this
basis alone your Honor could dismiss the entire
case.

Your Honor, should I go to the second and
third arguments?

THE COURT:  Sure.  Just on the demand
futility, and going back, just briefly, to the
pending motion to intervene, which obviously is
still not fully briefed, if the Court was to reach
the ruling you suggest with respect to demand
futility, that still leaves open the question of
what the arguments are in the pending motion to
intervene, correct -- proposed complaint attached to

1    the motion to intervene?

2              MR. KRAMER:  Correct, your Honor.  And

3    in our opposition to that motion, which is due I

4    think November 13th, someone will correct me if I'm

5    wrong, somewhere around then, we will show a couple

6    of things.

7              Number one, that complaint was made when

8    the board had 12 directors, because the board has

9    acted -- excuse me -- appointed additional

10   independent directors.  So the hurdle for that

11   proposed intervening complaint is higher because

12   there are two additional independent directors.

13   That's the first thing.

14             The second thing is, that complaint is

15   made with the benefit of having received the

16   company's books and records.  And we will show, your

17   Honor, that the company's books and records make it

18   absolutely clear that there is no basis to argue

19   futility here, and we believe it will give your

20   Honor additional comfort that even if these

21   plaintiffs were to get company books and records and

22   try to plead a complaint that way, that would also

23   fail.

24             And so that's why I suggested at the

25   beginning that your Honor go forward with the motion

1    to dismiss on futility in these cases, also go

2    forward with the intervention motion, and we believe

3    at the end of this motion, we're hopeful your Honor

4    will agree, that on the current complaints demand is

5    not futile.  And we're hoping when you go through

6    the intervention motion and see our arguments as to

7    how that complaint, even with documents, can't fix

8    these problems, you will be comfortable dismissing

9    all of these claims with prejudice.

10           THE COURT:  All right.  So you've got

11   the two other arguments about which I will call --

12   for lack of a better phrase, I will call it sort of

13   standing argument about the stock ownership and then

14   dismissing the claims on the merits.  Do you want to

15   quickly address those?

16           MR. KRAMER:  Sure.

17           THE COURT:  Is there any particular

18   points you wanted to highlight about those

19   arguments?

20           MR. KRAMER:  Sure.  I will do it very

21   quickly because I do believe this case can be tossed

22   on futility grounds.  I don't want to burden the

23   Court too much.

24           On the continuous shareholder rule, I'm

25   a little perplexed that the plaintiffs have had us

1   actually brief this.  We said to them we think you

2   haven't pled the facts of your ownership

3   sufficiently, why don't you just clean that up so we

4   don't have to burden the Court, and, instead, they

5   told us that they had nothing more to say.

6         And under *Facebook*, your Honor,

7   formulaic recitations about stock ownership isn't

8   enough.  They actually have to plead that they were

9   owners of stock from the very first event alleged in

10  the complaint, which here is early February 2019,

11  through the date of filing their lawsuit, and meant

12  to continue to own stock throughout the case.  And

13  merely saying, as Merholz and Kooi do, that they are

14  current shareholders and that they owned stock

15  during the relevant period, that's not enough under

16  *Smith v. Stevens*.  It's just not enough.

17        THE COURT:  Mr. Kramer, on that point, I

18  mean Merholz uses language "intends" -- "is a

19  current stockholder and intends to retain

20  ownership."  And then Nordstrom has language "has

21  continually been a shareholder of WWE since

22  September 26, 2018."

23        So your sense is that's not enough to

24  say that you've had the stock from before 2019 to

25  the present?

1          MR. KRAMER:  So Merholz and Kooi say

2    they're current shareholders and owned during the

3    relevant period.  That's not enough for them.

4    Nordstrom, one could argue, in fact alleges that he

5    or she owned before February, but they should make

6    it more specific.  But what they've failed to do is

7    they've failed to allege that they intend to hold

8    throughout the course of the lawsuit.

9          Again, your Honor, I can't imagine why

10   they didn't take this issue up if able.  Every now

11   and then you get a plaintiff who is not a proper

12   plaintiff.  You should figure that out at the very

13   beginning, and if it's not an issue, it's really

14   easy to clear up.  But they chose not to.  So we

15   felt we had to make the argument.  And then they

16   rely on a 1944 case, a case that was before --

17   45 years before *Iqbal*, to say they don't have to

18   plead this.

19          THE COURT:  I got the point.

20          MR. KRAMER:  All right.  So that's on

21   continuous shareholder.

22          And, your Honor, my argument on 12(b)(6)

23   overlaps a lot with the demand futility.  Unless

24   your Honor has specific questions about that, which

25   I'm very happy to answer, the overlap is

1    substantial, and then we pick up a couple of

2    additional -- you know, the overlap is complete for

3    the outside directors certainly, and then for some

4    of the management directors we have additional

5    arguments, which I can point out or we can rest on

6    our briefs.  I know this is going long.  Whatever is

7    going to be most helpful to your Honor.

8            THE COURT:  Why don't you rest on the

9    papers.  That's fine.  And to be clear, once I'm

10   here I don't usually have a clock, so I don't mind

11   it, but it sounds like -- well, I think I have the

12   arguments.

13           MR. KRAMER:  Thank you, your Honor.

14           THE COURT:  Thank you very much, Mr.

15   Kramer.

16           Let me hear from the plaintiffs.  All

17   right.  Is one person going to speak for the three

18   sets of plaintiffs or --

19           MR. FICARO:  Yes, your Honor.  This is

20   James Ficaro from the Weiser Law Firm.  I'm counsel

21   for plaintiff Daniel Kooi.  The plaintiffs here have

22   spoken, and I'm going to present the argument with

23   respect to futility, standing, and the lion's share

24   of the causes of action.  Since the Exchange Act

25   claim is only alleged in the Merholz action, Mr.

1  Egleston, Mr. Merholz' client, is prepared to answer

2  any questions the Court might have about that cause

3  of action specifically.

4          THE COURT:  Okay.  Go ahead.

5          MR. FICARO:  Your Honor, I think the

6  motion suffers from one primary deficiency, and it's

7  worth noting up front, and that is that it is

8  focussed on the complaint the defendants wish the

9  plaintiffs had filed rather than the allegations

10  actually before the Court.  And I think that's best

11  demonstrated by Mr. Kramer's focus on a *Caremark*

12  claim in the briefing, which I am gathering is

13  mostly just another way for defendants, as they

14  often love to do, to cite that most often quoted

15  phrase from Delaware law that *Caremark* claims are

16  difficult -- in fact the most difficult of all

17  corporate claims to plead.

18          The reality is very different.  The

19  plaintiffs here do not allege a lack of oversight,

20  they allege knowledge.  And we have documents in our

21  possession from WWE that show that in November of

22  2018 the company was aware and knew that the OSN

23  agreement was going to be terminated.  They also

24  show that that agreement was terminated in December,

25  and at that point there was no longer any potential

1  for a Middle East agreement to be, quote-unquote,

2  renewed.

3            Nevertheless, in February of 2019, the

4  company issues its annual report on Form 10-K and

5  discusses at length the potential of a renewal of an

6  agreement in the Middle East.  It's a disclosure

7  that was false.  It was misleading.  Judge Rakoff in

8  the Southern District of New York agrees.  And we

9  will talk about the role of that opinion in a little

10  bit.

11            Let's go back to the beginning because

12  there are some things that me and Mr. Kramer do

13  agree on, and that is the requirements for demand

14  futility under this ten member board.  We need to

15  allege that five of the ten members of the board at

16  the time the Merholz complaint was filed are either

17  not independent or could not disinterestedly

18  investigate a demand had one hypothetically been

19  sent.

20            I also agree with Mr. Kramer the

21  defendants concede four of those directors at the

22  time were inside directors; therefore, they could

23  not independently examine a hypothetical pre-suit

24  demand.

25            Our disagreement focusses on the other

1    six members.  We believe there are allegations in

2    the complaint that sufficiently show that those

3    individuals could not disinterestedly examine a

4    pre-suit demand and face a substantial likelihood of

5    liability for their own underlying conduct.

6               So let's start, as one often should, at

7    the beginning, as Mr. Kramer did, and discuss the

8    audit committee, which itself contains three

9    members, Mr. Speed, Goldfarb, and Singh.  With

10   respect to those three individuals, the complaints

11   do more than Mr. Kramer and defendants suggest.

12   They don't simply list a litany of responsibility

13   and say, well, as an audit committee member you are

14   de facto facing a substantial likelihood of

15   liability.  Rather, what the complaints individually

16   and together demonstrate is that individuals who

17   served on WWE's audit committee had

18   responsibilities, had the knowledge that statements

19   that were to be made in the 10-K were false and

20   misleading and did not seek to properly disclose the

21   information.

22              So let's talk with some specifics,

23   rather than generally, about what these complaints

24   say.  The company's audit committee charter places

25   responsibility with the audit committee to two key

1  factors when discussing financial results.  First,

2  it requires members of the audit committee to speak

3  with management.  Two, it asks the audit committee

4  to "pay particular attention" to any use of pro

5  forma adjusted or other information "not required by

6  generally accepted accounting principles."  This

7  leads to a discussion of the company's key financial

8  metric of adjusted OIBDA.

9          So just based on this document alone,

10 the charter allows us to make one key inference that

11 perhaps, as I am sure Mr. Kramer would posit, the

12 individuals on the audit committee did their job.

13 So they were diligent.  They talked to management.

14 They then paid particular attention to a key

15 financial metric that, as alleged in the complaints,

16 the company routinely touted, throughout all of 2019

17 was saying would produce record-breaking OIBDA and

18 ultimately would not as a result of the misconduct

19 of the defendants.

20          So this was a well-documented focus on

21 OIBDA and what it means with respect to the Middle

22 East.  Absent a media rights agreement, the company

23 had no hope of achieving this record-breaking

24 financial metric that it touted regularly.  Analysts

25 regularly asked about the focus on the statistic,

1  whether they would meet their goals.  Mr. Barrios,

2  Mr. McMahon, Ms. Wilson, everyone focused on this

3  metric, and the company was happy to tout it.

4        Those are key basic points for

5  understanding why these members of the audit

6  committee faced the substantial likelihood of

7  liability, because we know from the declaration of

8  Carlo Nohra that in November of 2018 WWE was

9  informed that the reason OSN had been so delinquent

10  in its payments that year was because it was facing

11  financial hardships, that it was going to have to,

12  as a result of these financial hardships, exit the

13  sports industry altogether.

14        That started a one-month discussion

15  between WWE and OSN to terminate the OSN agreement,

16  meaning at the date that was terminated there was no

17  media rights agreement in the Middle East and,

18  though the agreement paid its fees until the spring

19  of 2019, there was no chance of renewal.

20        All the complaints argue, your Honor, is

21  that the audit committee members knew this and had

22  to know it.  Here's how they had to know it, because

23  management knew.  And per the audit committee

24  charter, the audit committee members had to speak to

25  management.  They know it because a media rights

1    deal in the Middle East was a key driver of OIBDA.

2    So the loss of that agreement would prevent them

3    from adequately reviewing a financial metric that

4    they are charged with, quote-unquote, paying

5    particularly close attention to.

6              Now, the defendants often try and cite

7    or rely on authority in disposing of plaintiffs'

8    argument with bizarre circumstances, and this is no

9    different.  Let me draw the Court's attention to a

10   couple of cases where this inference at the pleading

11   stage is more than permitted.

12             The first case I would bring the Court's

13   attention to is the *Zillow* matter.  And Zillow helps

14   this Court properly understand why these inferences

15   are appropriate here with respect to futility for a

16   couple of reasons.  There, two members of an audit

17   committee were found to face a substantial

18   likelihood of liability for signing a false and

19   misleading annual report because Zillow's audit

20   committee charter charged them with reviewing legal

21   and regulatory matters.

22             So the court made the inference that

23   because the company had received a civil

24   investigation demand, the audit committee knew or

25   should have known about the existence of that civil

1    investigation demand, and when those individuals

2    signed the false and misleading 10-K, a false and

3    misleading 10-K that was found to be false and

4    misleading in the companion securities class action

5    under the heightened pleading standards of the

6    PSLRA, just as is the case here, those individuals

7    faced a substantial likelihood of liability.  In

8    fact, the court in *Zillow* noted, while applying

9    Delaware law -- it should be clear, the fact that

10    this was from the Western District of Washington

11    bears no importance, we're talking about the same

12    body of law -- that "because the members of the

13    audit committee, it's reasonable to infer that they

14    were informed of the contents of civil investigation

15    demand."

16        Your Honor, at the pleading stage the

17    plaintiffs here are asking for that same inference.

18    They had the responsibility to know it.  We know the

19    company knew it.  We know management had it.  The

20    plaintiffs here had the declaration of Mr. Nohra

21    that clarifies exactly when the company knew that

22    the OSN agreement was going to disappear.

23        The other cases plaintiffs cite are

24    particularly on point as well, both in *Scana* and

25    *Intuitive*.  In *SCANA* members of a committee of the

1   nuclear oversight committee were found to face a

2   substantial likelihood of liability for their

3   failure to oversee a nuclear construction project in

4   South Carolina.   There, an outside document, just

5   like the letter from OSN, informed management that

6   the construction of that nuclear project was

7   woefully inadequate, woefully behind schedule, and

8   there was an inference that these individuals,

9   because of their responsibility on a committee with

10  oversight function, knew it; not failed to oversee,

11  but rather knew it, a particular distinction here.

12            And the same is true in *Intuitive* as

13  well where there members of an audit committee with

14  responsibility over legal and regulatory filings

15  were found to face a substantial likelihood of

16  liability because of the company's defective

17  hardware.

18            Your Honor, those are the mere

19  inferences we're asking this Court to make.   One,

20  that the audit committee members did their jobs;

21  spoke to management.   Management would include

22  perhaps a vice president of the company, perhaps

23  Carlo Nohra himself, and knew that the OSN agreement

24  could not be renewed, and then still signed on.   And

25  with that finding and with that inference, your

1   Honor, the demand futility question is over.  It's

2   done.  It means this Court is able to pass this

3   complaint on futility already.

4          But let's go ahead and follow Mr.

5   Kramer's outline nevertheless and discuss some of

6   the other allegations on a case-by-case basis, a

7   claim-by-claim basis with respect to futility.  It

8   bears noting, I should mention as well, that every

9   director, every defendant listed in the Merholtz

10  complaint signed that false and misleading 10-K.

11         So let's talk very briefly about the

12  *Brophy* claim, because I think that it is important

13  on the futility standard to discuss why I think that

14  still easily goes in plaintiffs' favor.  The first

15  is because the defendants didn't really talk about

16  it.  The motion contains a footnote with the

17  unremarkable proposition that the *Brophy* claim is

18  not alleged against a majority of the outside

19  directors, and that's true, but we are not obligated

20  to only plead a substantial likelihood of liability

21  as a method for demand to be excused.

22         The defendants never address our

23  argument in the motion.  They simply leave a

24  footnote out there and move on.  So, therefore, it

25  is our position that that argument is waived.  And

1   even if it's not, it is very clear that individuals

2   could be found to be not independent in those

3   investigations should they have received a demand

4   with respect to the *Brophy* claim.

5           Your Honor, with respect to unjust

6   enrichment, I think the plaintiffs' position here is

7   pretty straightforward.  You don't even need to be a

8   wrongdoer to have been unjustly enriched, but you

9   cannot be facilitating a breach of fiduciary duty,

10  or, as plaintiffs do allege, in breach of that duty,

11  and then receive compensation from the company.

12  More importantly, if you are breaching your

13  fiduciary duty, then the company has given you

14  something that you do not deserve as a result of

15  that breach.

16          Finally, your Honor, the corporate waste

17  claim, I think all of these futility arguments, they

18  kind of all run together because they all focus on

19  the same issue -- right?  -- and that is the issue

20  of knowledge.  So when it comes to corporate waste,

21  when members of the WWE board of directors approved

22  a stock repurchase plan, they did it while knowing

23  that the company was not going to reach its

24  financial metrics.  They knew it when -- they made

25  this decision when they knew that the OSN agreement

was gone and that WWE was left with no media rights

deal in the Middle East, a critically important

function for the company's international market and

one that the company regularly touted as a possible

expansion of growth.

So they made a decision.  And they knew

the company was in financial distress, or at least

not able to reach its financial metrics that it had

promised the market, and they then made a decision

to repurchase the company stock.  Now, who does that

benefit?  Well, as we'll talk about later, it's the

inside sellers, those who had the stock price of the

company pumped up artificially and then were able to

sell their stock at artificially inflated prices.

Your Honor, I do also want to talk

about what I openly admit is a very confusing

argument from the defendants regarding the ownership

alleged by plaintiffs.

First, I don't know how some of these

plaintiffs could be more clear.  Plaintiff Kooi

specifically said in paragraph 15 of his amended

complaint that he's held the stock since 2014.  Mr.

Nordstrom specifically gives the date he bought the

stock.  Mr. Merholz does allege this a bit more

generally, it's true, but does say that it was held

1    at all relevant times, and relevant times is defined

2    in that complaint.

3            What Mr. Kramer's complaint about asking

4    us to clean up the complaints actually was was a

5    request for discovery.  The letters we received from

6    defense counsel asked us to produce documents

7    demonstrating plaintiffs continuous ownership prior

8    to discovery even commencing in this action.

9            Our position was simple, that we are

10   willing to begin discovery if defendants are.  They

11   said no.  But at the pleading stage, with a verified

12   pleading from plaintiffs that tells the Court the

13   dates that the company -- that the individuals

14   bought the stock, that is more than sufficient.  Mr.

15   Kramer has no case law to suggest that the specific

16   date is insufficient.  Instead, the defendants try

17   to create a brand new statement that now says the

18   plaintiffs must allege their own future conduct and

19   say they must promise to continuously own the stock

20   for the duration of the litigation.

21           Now, I will agree with Mr. Kramer

22   emphatically that a plaintiff in a shareholder

23   derivative action must continue to own those shares,

24   and if they were to sell they could no longer be a

25   plaintiff, but there is no obligation anywhere to

1   suggest that that is required to show or to plead or

2   to verify at the pleading stage.  And the fact that

3   Mr. Kramer in the motion or in the reply fails to

4   offer a single piece of authority in support of that

5   position is clear.

6            Finally, your Honor, I do think it's

7   worth noting -- and I will be quick because I know I

8   am dragging on here -- about some of the claims and

9   the causes of action.  Because futility focuses so

10  heavily on the directors and their roles, and in

11  particular in this instance the outside directors,

12  we have to recall that the causes of action bring

13  back into the fold the inside directors, that is,

14  those who breach their fiduciary duty even though

15  they were already company insiders.

16           As such, this is where, amongst many

17  other places, Judge Rakoff's decision in the

18  securities class action is so critical.  If it is

19  found, as it was there, that statements made by Mr.

20  McMahon, by defendant Barrios, and defendant Wilson

21  were false and misleading, subject to the heightened

22  pleading standards and the fraud standards of the

23  PSLRA, then they certainly meet the 12(b)(6)

24  standards at play here of notice pleading without

25  question.

1          So we have already pled a cause of

2   action against those three defendants.  And the same

3   information and inferences about knowledge extend in

4   the 12(b)(6) realm with respect to the causes of

5   action because we're not under a heightened pleading

6   standard or to allege with specificity under

7   12(b)(6).  So we get those same inferences for

8   futility as we do for 12(b)(6), and the breach of

9   fiduciary duty claim should be sustained.

10          And as we work through all of those

11  claims, all of that information rolls into itself

12  because of that knowledge, because the board knew or

13  should have known that the OSN agreement was gone,

14  because again we have the document that says the

15  company knew.  All of those claims should be

16  sustained.

17          So absent any additional questions from

18  your Honor, I'm happy to yield my time should you

19  have any questions for Mr. Egleston on the Exchange

20  Act claim.

21          THE COURT:  Thank you very much, Mr.

22  Ficaro.

23          Go ahead, Mr. Egleston.

24          MR. EGLESTON:  Good morning, your Honor.

25  I would just like to add to my colleague's argument

1    that I think we do satisfy the 10(b)(5) standards.

2    We show a material misrepresentation.  When the

3    defendant WWE filed their Form 10-K on February 7,

4    2019, they had a risk disclosure statement in there

5    that was false.  When they made that risk disclosure

6    statement, they knew at that moment they did not

7    have the OSN agreement.  The TV agreements had been

8    terminated.  They knew in December.  So that

9    statement is false.  In a securities case, the same

10   exact claim that we have, it was upheld.  The judge

11   said that statement is outright false.

12              Now as far as scienter is concerned, my

13   colleague, Mr. Ficaro, goes over the audit

14   committee.  I would like to add one other thing on

15   top of that regarding the audit committee.  The

16   audit committee in the charter -- and it states here

17   that one of the functions of the audit committee is

18   to review with the organization's internal and

19   outside counsel any legal matter that could have

20   significant impact on the organization's financial

21   statements.

22              That's what they're charged with doing.

23   They must have known that that OSN agreement was

24   terminated.  They had to have known it.  If they

25   weren't, they didn't know that, they were reckless.

1    So we believe that we allege a majority of the board

2    had knowledge of this.  That's three of them.

3              And now we can go to the three other

4    people.  Vince McMahon in the securities class

5    action was charged with having knowledge of the OSN

6    agreement because he is the CFO -- CEO.  Excuse me,

7    your Honor.

8              And then the two other people.

9    Stephanie McMahon.  Stephanie McMahon is in charge

10   of global brand strength and global growth across

11   all lines of business.  And that includes this OSN

12   agreement and that includes the Middle East.  She

13   had to have known.  If she didn't know, she was

14   reckless.

15             The same thing with her husband.  Her

16   husband is in charge of talent, live events, and

17   creative.  He's the vice president.  And live events

18   had to do with the OSN agreement, the TV agreement,

19   that was terminated.  And if he didn't know that

20   agreement was terminated, he was reckless.

21             So we show a majority of the board

22   actually had knowledge of this termination.

23             So we show those two elements.  We show

24   loss causation, which is at Rule 8, it's not a

25   heightened pleading requirement, and we show

1    reliance.  It's presumed.

2              So we think we satisfy -- we don't

3    think, we know we satisfy the 10(b) element.

4              And as far as 28 of the Exchange Act, we

5    just allege that Vince McMahon was the controller

6    and he had been held to be the controller in the

7    ruling in the securities class action, parallel

8    action here.

9              And that's it, your Honor.  If you have

10   any questions, I'd be happy to answer them.

11             THE COURT:  Just one question, Mr.

12   Egleston.  So the notion is, similar to what Mr.

13   Ficaro was saying with respect to other claims, that

14   with respect to Goldfarb, Singh and Speed, who are

15   on the audit committee, and I guess it also deals

16   with the 10(5) documents that were -- the 10-K

17   statements that were signed, the notion is you

18   believe there was a misleading statement in there,

19   because of their status on the committee they should

20   have been aware of that, understood that, and their

21   willingness to go along with that is the basis for

22   their liability, correct?

23             MR. EGLESTON:  Yes, your Honor.

24             THE COURT:  Okay.  All right.  Thank you

25   very much.

1              And just so both sides know, I've used

2    it a couple of times, but when I say "okay" it just

3    means I understand the argument.  It doesn't mean I

4    agree or disagree with anyone on anything.

5              All right.  Thank you very much.

6              Mr. Kramer, do you have anything in

7    rebuttal?

8              MR. KRAMER:  Yes.  Thank you, your

9    Honor.  Just briefly.  That is, what you heard from

10   plaintiffs' side is a lot of speculation about how

11   they should have known or they must have known or

12   they were reckless for not knowing some of these

13   issues.  Should have known, must have known,

14   reckless, that's not bad faith and it's not actual

15   knowledge.  It just falls short of what they need to

16   allege to show demand futility.

17             And we cite a lot of cases for this

18   proposition that essentially what they pled is that

19   they think they can show that someone in management

20   knew the termination of what, frankly, was a rather

21   small contract, and because the audit committee is

22   supposed to speak with management and oversee

23   financial metrics, they must have, they must have

24   known about the termination.  It falls way short of

25   bad faith or actual knowledge.  It's an

1  impermissible inference.  The *Wood* case, 2020 case

2  from Delaware, is on top of it.

3          And the three cases plaintiffs' cited

4  are all cases which have allegations that go beyond

5  the allegations here.  In *Zillow* there was a very

6  active CFPB investigation going on.  In *SCANA* the

7  nuclear oversight committee had engaged a consultant

8  and sent a reporter to the committee.  And in

9  *Intuitive* there was an FDA recall of one of their

10 products.  So I'm not sure those cases -- how those

11 cases come out in Delaware.  I don't know if there

12 is charter exculpation in those cases, but whatever

13 it is, those are specific allegations of reports

14 that went to the committee containing the

15 information.

16          In our case, there is nothing like that.

17 It's simply -- the charter says you are supposed to

18 give this level of oversight, so we are going to

19 assume that you knew certain facts.  That falls

20 well, well below demand futility.

21          In terms of the *Brophy* claim, it's not

22 alleged against the outside directors.  Therefore,

23 they could not have any liability, much less a

24 substantial liability on those claims.  So I have no

25 idea what the plaintiffs are saying about the *Brophy*

1  claims with demand futility.  There is just -- if

2  there is no claim against them, there is no

3  possibility of liability.

4          And in terms of the Rakoff decision, he

5  did not find that certain statements were false and

6  misleading.  What he found was that in that

7  complaint, which had different allegations,

8  plaintiffs had alleged a false statement as to three

9  defendants, none of whom are outside directors.  So

10  -- and, by the way, the fact that the plaintiffs in

11  the class action didn't even try to allege a claim

12  against the outside directors tells you in their

13  assessment that they couldn't even try based on all

14  of the information they had.

15          So I'm happy to answer any questions you

16  have, but that's our essential response to the

17  opposition.

18          THE COURT:  All right.  Thank you very

19  much, Mr. Kramer.

20          All right.  I appreciate all of the

21  arguments.  And I know there is this motion to

22  intervene hanging out there.  We'll see.  I may

23  decide to just keep everything under advisement and

24  wait until the full briefing on the motion to

25  intervene and have those arguments and try to deal

1    with all of the cases at one time, but I will see

2    what makes the most sense.

3            Unless anyone has anything further --

4    does anyone have anything further?  All right.  I

5    will take that as a no.  Thank you very much.  I

6    appreciate it.  And as I say to parties all the time

7    in the midst of this pandemic, please continue to do

8    what you can to be safe.

9            (Proceeding concluded 11:05)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          I certify that the foregoing is a correct

3   transcript from the record of proceedings in the

4   above-entitled matter.

5

6                              11/4/20

7                               Date

8

9                    /S/   Sharon Montini

10                   Official Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25